# EXHIBIT A

ANDRUS v. DOONEY & BOURKE                    October 24, 2013

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - X
LYNN ANDRUS,                   :
        Plaintiff,             :
  -vs-                         : CIVIL ACTION NO.
DOONEY & BOURKE, INC., and PETER : 3:13cv146(RNC)
DOONEY,                        :
        Defendants.            :
- - - - - - - - - - - - - - - X


            Deposition of LYNN ANDRUS, taken

      pursuant to the Federal Rules of Civil

      Procedure, at Day Pitney, LLP, One

      Canterbury Green, Stamford, Connecticut,

      before Andrea L. Kingsley, LSR #00297, RPR,

      a Notary Public in and for the State of

      Connecticut, on Thursday, October 24, 2013,

      at 10:07 a.m.

Electronically signed by ANDREA KINGSLEY (301-083-252-2637)          4dca70e7-443o-4c48-a893-87d084bffobb

Case 3:13-cv-00146-RNC   Document 85-1   Filed 08/30/14   Page 3 of 26

**Page 14**

1    the bottom, it says, I think, that you went to
2    University of Rhode Island.  Is that correct?
3    A  Yes.
4    Q  Did you receive a degree from the University
5    of Rhode Island?
6    A  I did.
7    Q  What was your degree?
8    A  Bachelor of Science.
9    Q  That was in 1986?
10   A  Correct.
11   Q  And then it shows that you had, I think, two
12   jobs before you joined Dooney & Bourke, one at
13   Bloomingdale's and one at Benetton; is that correct?
14   A  Correct.
15   Q  Were you terminated from either of those jobs?
16   A  No.
17   Q  You resigned from each of them?
18   A  Yes.
19   Q  Did you have any problems with either of those
20   jobs?
21   A  No, not at all.
22   Q  Ever file any claims of harassment or
23   discrimination at either Bloomingdale's or Benetton?
24   A  No.
25   Q  Ever experience either sexual harassment or

**Page 15**

1    sexual discrimination during the time that you worked at
2    Bloomingdale's or Benetton?
3    A  No.
4    Q  And your next job after Bloomingdale's it
5    lists as a store service representative at Dooney &
6    Bourke; correct?
7    A  Yes.
8    Q  How did it happen that you became employed at
9    the company?
10   A  A friend of mine was a headhunter in Norwalk
11   and she saw a job come through for Dooney & Bourke.  And
12   when I was at University of Rhode Island I had
13   remembered that Filene's, Dooney & Bourke carried
14   some -- Filene's carried some Dooney & Bourke products,
15   so I kind of recognized the company when she said they
16   were looking for, actually, a receptionist at the time.
17   That was in '87.
18       So I went in and interviewed with Mary
19   MacIntosh and kind of made it clear I would love to get
20   in if a position opened in sales or merchandising, if I
21   could be considered for the job.  And she said yes, that
22   would be fine.
23   Q  So you interviewed with a woman named
24   MacIntosh?
25   A  Yes.

**Page 16**

1    Q  The job was for receptionist?
2    A  Correct.
3    Q  Receptionist where?
4    A  At Dooney & Bourke.
5    Q  In Norwalk?
6    A  Yes.
7    Q  Were you hired for that position?
8    A  Yes.
9    Q  Did you interview with anyone other than Mary
10   MacIntosh?
11   A  No.
12   Q  So when you started as a receptionist, do you
13   recall what you were paid?
14   A  Not really, no.
15   Q  Were you paid on an hourly basis do you
16   remember?
17   A  I think I did punch a clock when I was a
18   receptionist in store services.  Yeah.  I don't remember
19   what I was paid.
20   Q  How long did you work as a receptionist?
21   A  Maybe six months.
22   Q  After that six months, did you receive some
23   type of promotion?
24   A  Well, someone -- the store services department
25   was looking for someone to go back there to help the

**Page 17**

1    sales reps.  So I talked to the woman who ran that at
2    the time and then she asked me to go back to store
3    services.  So then they started to look for another
4    receptionist.
5    Q  When you say store services, what do you mean?
6    A  Well, at that time store services was the
7    girls that worked back there -- we -- half the room
8    was direct -- how do you call it?  Direct sales.  So it
9    was part of the catalog.  Those girls worked customer
10   service for the catalog, if customers called in, they
11   would take orders, et cetera.  The other half, what we
12   did, support to the sales reps that were out in the
13   field.  If they called in belt orders or handbag orders,
14   we would take the orders over the phone.  If they needed
15   samples, belt swatches, belt boards, handbag samples
16   sent out to them, any information -- catalogs.  Any type
17   of information that the sales reps needed to sell the
18   handbags, we would provide for them.
19   Q  Approximately how many different sales
20   representatives were working with the company at that
21   time?
22   A  Let me think -- there were probably 10 or 11.
23   Maybe.  Maybe.
24   Q  When you went the from receptionist to store
25   services representative, did you work on the catalog

Electronically signed by ANDREA KINGSLEY (301-083-252-2637)         4dca70e7-443e-4c48-a893-87d084bffcbb

## Page 38

1  I kind of became the point person for all those
2  accounts, meaning I was dealing with the day-to-day
3  orders, tracking orders, shipping reports, anything that
4  involved running those accounts.
5      Q   When you say those accounts, what are you
6  referring to?
7      A   A lot of the major department stores that were
8  based in Manhattan. It was — let's see — I'm trying
9  to remember if we still did business with Saks then. I
10 can't remember when Saks dropped the line. It might
11 have been before that. I was working with them, Otto
12 was still there. So it was Bloomingdale's, Lord &
13 Taylor, Macy's, there were two Nordstrom divisions,
14 there was a buying office in New Jersey and one down in
15 DC.
16     Q   Both part of Nordstrom?
17     A   Yes, because at that time Nordstrom had buying
18 offices all over the country. They were in almost every
19 territory. So each rep -- a lot of the reps at Dooney &
20 Bourke had Nordstrom accounts at that time. Like there
21 were three on the west coast.
22     Q   I don't know if I asked you this before. Just
23 to be clear, in the way the independent sales
24 representatives worked at Dooney & Bourke, their
25 territories were divided up geographically?

## Page 39

1      A   Yes.
2      Q   So they would work with the department stores
3  in the geographic territory?
4      A   Correct.
5      Q   You had been working with these New York
6  accounts in your role as an account executive?
7      A   Yes. A lot of them wound up being on my list
8  and I can't remember if it was broken down by accounts
9  or by Otto. Like I was assigned to him. So, yes.
10     Q   Going back to my question: How did you got
11 from the account executive role to the sales
12 representative role?
13     A   So Otto wound up leaving and Benjie at the
14 time who was the vice president of sales.
15     Q   Benjie Hill?
16     A   Benjamin Hill. He kind of said, "Do you want
17 to take over New York accounts?" And I said, "Sure."
18 And then we worked -- he said that he could give me this
19 amount of salary and a guaranteed bonus of X amount a
20 year.
21     Q   Do you recall what the salary was?
22     A   It was -- oh, gosh, it was 69 or 70. And then
23 a guaranteed -- I can't remember if it was 70 or 74. It
24 never changed.
25     Q   So it was either 70 or 74,000?

## Page 40

1      A   Yes. And then there was a guaranteed bonus
2  each year of 15,000.
3      Q   When was the guaranteed bonus paid?
4      A   Well, I don't know if it was paid at Christmas
5  or sometime the following year.
6      Q   Towards the end of the year?
7      A   Or maybe it spilled into the next year.
8      Q   Right around the holidays?
9      A   Yeah, or maybe January, February.
10     Q   So this was essentially an offer to you from
11 Benjie Hill to take a different type of position; is
12 that correct?
13     A   Yeah. I mean he said — Otto left and they
14 needed a replacement and did I want to do — I think at
15 that point he knew I was doing it anyway, so it was
16 pretty seamless because I had had the relationships with
17 the accounts, the buyers, et cetera.
18     Q   So this is something you told Benjie you
19 wanted to do?
20     A   Yes.
21     Q   At this time you had a discussion with him
22 about compensation?
23     A   Yes.
24     Q   That's the time when he said, "This is what I
25 can do for you, I can give you 70 or 74,000 and

## Page 41

1  guaranteed bonus?"
2      A   Yes.
3      Q   At that time did you know before Otto left how
4  Otto was compensated?
5      A   Otto was on a commission sales rep.
6      Q   Did you know what his commission was at that
7  time?
8      A   Back then I believe the sales reps were making
9  5 percent commission. I think it was 5 on handbags, 7
10 on belts. At that time belts had kind of taken a back
11 seat. So it was basically handbags and smaller goods.
12     Q   So most of his commissions were at the 5
13 percent rate?
14     A   Yes.
15     Q   Did you have any discussions at the time you
16 took over this role as sales representative as to
17 whether or not you wanted to be compensated by salary or
18 by commissions or by some type of combination?
19     A   Did I have that discussion with Benjie?
20     Q   Yes.
21     A   No.
22     Q   Did you have that discussion with anybody
23 else?
24     A   No.
25     Q   Did you ever tell anyone at that time that,

Sanders, Gale & Russell
(203) 624-4157

Electronically signed by ANDREA KINGSLEY (301-083-252-2637)          4dca70a7-443e-4c48-a893-87d084bffcbb

**Page 42**

1 "Well, Otto was getting a 5 percent commission and
2 that's the way I want to be paid?"
3     A  I mean, it might have -- I might have talked
4 to the girls I was working with at the time, Daniella
5 and Anne Marie, everyone knew how much the reps were
6 making at the time and business was really good and,
7 yes, it would have been nice to make that much money,
8 but I guess Benjie offered me what he could offer me.
9     Q  Dawn and Anne Marie didn't have any control
10 about setting your compensation?
11     A  No. I thought you meant had we ever discussed
12 the reps making 5 percent and did it come up.
13     Q  Did you ever speak with Benjie and say, "I
14 don't want to be a salaried sales representative, I
15 would prefer to get the commission deal that Otto had?"
16     A  No.
17     Q  Was the salary that Benjie offered you,
18 whether it was 70,000 or $74,000, was that an increase
19 from what you had been making in your prior position as
20 an account executive?
21     A  Yes, it was.
22     Q  Was it a significant increase?
23     A  Yeah, about $30,000.
24     Q  So you had been making $40,000 before?
25     A  Right, 42 I think.

**Page 43**

1     Q  So it was almost doubling your salary?
2     A  Right.
3     Q  Were you satisfied with the compensation
4 package at that time?
5     A  Yes.
6     Q  And you continued to receive health insurance?
7     A  Yes.
8     Q  And if there was a 401(k) available at the
9 time you participated in it?
10     A  Yes. It was more like a savings. Like the
11 company didn't --
12     Q  You put in your own money?
13     A  Right. Like retirement.
14     Q  But you could put it in pre-tax?
15     A  Correct.
16     Q  Any other benefits that you recall at the
17 time?
18     A  No.
19     Q  Is that the position that you remained in
20 throughout the rest of your employment at Dooney &
21 Bourke?
22     A  Yes, basically.
23     Q  The sales representative position?
24     A  Yes.
25     Q  Did there come a time period when you started

**Page 44**

1 to receive commission pay?
2     A  So in -- I'm trying to remember what year -- I
3 did approach -- I think it was Tom Bendheim who was
4 there at the time -- about getting an increase in pay in
5 my salary or my bonus, just based on the sales, volume
6 that these accounts were doing and knowing what other
7 reps were making and I wound up having a conversation
8 with Peter and he said, "Okay, what we'll do is you'll
9 stay on your salary and you'll get 1 percent commission
10 on your accounts."
11     Q  Do you recall when you had this conversation
12 with Peter?
13     A  Probably in '99 or 2000. Around there.
14     Q  Where did this conversation take place?
15     A  It was in the moose room that we have. Sorry,
16 that's -- when you walk into the office, there is a room
17 right to the left that used to have some couches and
18 things in it with a big moose head on it and hence the
19 name.
20     Q  This was located in the East Norwalk offices?
21     A  Yes.
22     Q  Was anyone else present when you had this
23 conversation with Peter?
24     A  No.
25     Q  I think you said when you started your answer

**Page 45**

1 that you initially had a conversation about your pay
2 with Tom Bendheim?
3     A  Correct.
4     Q  Who was Tom Bendheim?
5     A  I guess he was in charge of wholesale sales.
6 Peter basically brought him in to head up wholesale, but
7 he was also responsible for the Dooney retail stores and
8 outlets. So he was kind of responsible for sales and he
9 brought him in over Benjie because Benjie did report to
10 him as well.
11     Q  When you say wholesale, you're referring to
12 Dooney & Bourke sales to these department stores like
13 Macy's and Bloomingdale's and Lord & Taylor?
14     A  Yes.
15     Q  And retail is when Dooney & Bourke is selling
16 it from its own stores?
17     A  Correct. Own retail, full retail or outlets
18 stores.
19     Q  In the conversation that you had with Peter
20 about getting an increase in your pay, can you describe
21 what is it that you said to Peter and how he responded?
22 Do you have any specific recollection of the specific
23 statements made during that conversation?
24     MR. McGUIRE: Objection.
25     A  I feel like when I went to Tom, maybe Tom did

12 (Pages 42 to 45)

Electronically signed by ANDREA KINGSLEY (301-083-252-2637)                          4dca70a7-443e-4c48-a893-37d084bffcbb

ANDRUS v. DOONEY & BOURKE                           October 24, 2013

**Page 46**

1   discuss it with Peter and Tom said you need to talk to
2   Peter directly. So that's —
3       Q    You went to go see Peter?
4       A    Yes.
5       Q    What did you say to Peter?
6       A    I said Tom suggested I talk to you personally
7   about getting an increase in my pay. And so then we
8   started the conversation. I said, you know, "Is there a
9   way I could get an increase attached to my bonus or
10  increase in my salary?" And he just said, "Why don't we
11  just give you a 1 percent flat commission on all the
12  accounts you're handling."
13      Q    How did you respond to that suggestion?
14      A    I said, "Okay, that sounds good."
15      Q    And it was agreed and you left the office?
16      A    Yes.
17      Q    Was anything put in writing reflecting that
18  change in your pay?
19      A    No.
20      Q    Did you start receiving commission payments in
21  your paychecks?
22      A    No. The commissions were paid once a month.
23  So you would get a commission check at the end of the
24  month and I would get a weekly salary.
25      Q    So you continued to get your weekly salary

**Page 47**

1   even after you started getting paid commissions?
2       A    Correct.
3       Q    And your weekly salary, was that paid to you
4   in a paycheck or direct deposit?
5       A    It was — well, before direct deposit, yes, it
6   was a paycheck and then — and then when they switched
7   over to direct deposit, I chose that option.
8       Q    Was the commission payment, was that a
9   separate check you got once a month?
10      A    It was a separate check.
11      Q    It wasn't included in your paycheck?
12      A    No, it was a different check.
13      Q    Same thing, you initially started to get a
14  physical check and at some point it became direct
15  deposit?
16      A    Yeah, but — I don't know why the commission
17  check — it took a little bit longer to do direct
18  deposit with.
19      Q    Did you ever have any other conversations
20  other than the one you described with Peter Dooney about
21  your commissions?
22      A    No.
23      Q    During the conversation you had with Peter,
24  did you indicate that you didn't feel that a 1 percent
25  commission rate was sufficient since you knew that Otto

**Page 48**

1   and some of the independent sales reps had gotten a
2   higher commission rate?
3       A    Not at that time, no.
4       Q    Did you ever have a conversation with Peter
5   Dooney in which you told him that you felt that your
6   commission rate was too low?
7           MR. McGUIRE: Objection to the form.
8       A    No, not with Peter, no.
9       Q    Did you ever have a conversation with anybody
10  else in a management position at Dooney & Bourke in
11  which you indicated that you felt your commission rate
12  was too low?
13      A    No.
14      Q    When you started in this role as a rails
15  representative in 1995, at that time you were living in
16  Connecticut; correct?
17      A    Correct.
18      Q    And you were working out of the Dooney &
19  Bourke offices in Norwalk, Connecticut; correct?
20      A    Yes.
21      Q    Did there come a time when that changed?
22      A    That I wasn't working out of the offices?
23      Q    Yes.
24      A    Yes.
25      Q    When did it change?

**Page 49**

1       A    So in 2000 — it was around 2001 or 2002 when
2   I approached Tom Bendheim about — was it necessary for
3   me to be based in Connecticut and he said, "As long as
4   you can get to your accounts, you can be based wherever
5   you want, you're a rep, you can live in Manhattan if you
6   like. As long as you can service your accounts and get
7   to where you need to be."
8       So at that point Bob — I was involved with my
9   husband who had responsibilities in Maryland and he had
10  had — I think Peter had told him he could work from
11  home, you can do whatever you're doing from Maryland.
12  So then Bob and I started to date and I said to Tom,
13  like, I think we're going to get married and I would
14  like to move to Maryland, and he said, "That's not a
15  problem, you're a rep like everybody else."
16      So then I went to move. That was a little bit
17  of an issue, me moving down there. So when I moved to
18  Maryland, I used to come up here and stay at my parents'
19  four days a week.
20      Q    When did you first move to Maryland?
21      A    In 2002. April.
22      Q    After you moved, you still worked out of the
23  Dooney & Bourke offices in Connecticut four days a week?
24      A    I would drive up on either Tuesday night or
25  early Wednesday morning and work there Wednesday

13 (Pages 46 to 49)

Electronically signed by ANDREA KINGSLEY (301-083-252-2637)                    4dca70e7-443e-4c48-a893-87d084bffcbb

ANDRUS v. DOONEY & BOURKE                        October 24, 2013

**Page 62**

1   payment?
2       A   Correct.
3       Q   Were there also reductions in your commissions
4   if some of the product that you shipped was marked down
5   by the store that purchased it?
6       A   Yes.
7       Q   Can you explain that to me?
8       A   At first that was pretty much the exact
9   same -- we would get -- if a store took a markdown on
10  the merchandise -- if they sent it through a charge back
11  that was considered a markdown allowance, we would get
12  deducted the same amount like the 1 percent. And then
13  at one point they changed that policy and I can't really
14  explain it. What they would do is they would figure out
15  at the time -- this is kind of complicated. At the time
16  you shipped in the product, they would -- it's hard for
17  me to describe it -- as opposed to just taking a
18  straight 1 percent off, it was almost like it was
19  getting doubled because they assumed that -- I can't
20  remember.
21      Q   Without doing the math necessary, let me see
22  if this is correct.
23          If a store marked down some of the goods that
24  had been shipped and sold those at a discounted rate,
25  then the store would ask for a credit from Dooney &

**Page 63**

1   Bourke; correct?
2       A   Not always at the exact time of a markdown.
3       Q   Sometimes it would be after a markdown?
4       A   Usually, a lot of the accounts had a margin
5   number that they had in mind that they wanted to get to
6   and at the end of the season they might ask for moneys
7   to get them towards that, to that number or closer to
8   that number, and that is what they would issue a
9   markdown allowance for.
10      Q   So the store would ask Dooney & Bourke for a
11  markdown allowance?
12      A   Right.
13      Q   And that would essentially reduce the money
14  that Dooney & Bourke had received for the shipment of
15  goods; correct?
16      A   Correct.
17      Q   And because as a -- because your commissions
18  had already assumed that the goods were being sold at
19  full price, there had to be a credit to your commissions
20  or an adjustment to your commissions to reflect the
21  markdown?
22      A   Correct.
23      Q   So, again, without going through the math, if
24  a store marked down the Dooney & Bourke goods, that
25  resulted in a reduction in your commissions?

**Page 64**

1       A   Correct.
2       Q   Could your commissions also be reduced based
3   upon some type of shared advertising or shared marketing
4   costs?
5       A   Yes.
6       Q   Could you explain that without the math? Just
7   the general concept.
8       A   Basically, it followed the same suit: If
9   Nordstrom was doing an advertisement and it cost $30,000
10  for the page, they would issue an advertising claim for
11  that amount and then we would get deducted the same
12  amount as our commission.
13      Q   So Nordstrom would essentially get a credit
14  from Dooney & Bourke related to the advertising and that
15  would result in a reduction to the commission to whoever
16  was working on the Nordstrom account?
17      A   Correct. To anyone on that account.
18      Q   Were there any employees of Dooney & Bourke
19  who, like yourself, were paid a salary by the company
20  but who also received commission payments?
21      A   Yes.
22      Q   Who were those other employees?
23      A   Mairead Ainley, Ian Ray. And Anne Marie
24  Jones I believe was making commissions on foreign
25  accounts.

**Page 65**

1       Q   All those people also were being paid a salary
2   by the company?
3       A   Yes.
4       Q   Anyone else that you can think of in that same
5   position?
6       A   No.
7       Q   When you were living in Maryland and working
8   at the company, did you have your paychecks sent to an
9   address in Connecticut or an address in Maryland?
10      A   I can't remember. It might have been in
11  Maryland at first and then I think it was in
12  Connecticut.
13      Q   So from 2005 to 2012 you had your paychecks
14  sent to an address in Connecticut? Around that time
15  period?
16          MR. McGUIRE: Objection to the form.
17      A   Yes. I can't remember when I made that
18  switch.
19      Q   Why did you make that switch?
20      A   Because I think at the time our accountant was
21  looking at our taxes or maybe the Connecticut taxes and
22  I do have a house still in Connecticut, own a home, so
23  she suggested we use a Connecticut address because it
24  was a Connecticut company. I can't remember if she had
25  the conversation with Bob and, I'm sorry, I just -- so

17 (Pages 62 to 65)

Page 74

1    the store, the more the company wanted merchandisers
2    utilized to show off the product, make sure the product
3    was being displayed correctly and sold correctly?
4        A    Yes.  That's the thing, getting it out onto
5    the selling floor in a timely fashion because a lot of
6    department stores had cut back that service.  Anyway, so
7    at that time Tom had set limits -- guidelines of how
8    many people needed to be in the stores and we were
9    required to get back to the department stores with the
10   info.
11       Q    This is probably a good time to take a short
12   break before I go on to the next topic.
13           (Recess taken.)
14       Q    During the time period that you worked as a
15   sales representative at Dooney & Bourke, were there any
16   changes to your commission rate or commission structure?
17       A    Yes.
18       Q    When was the first such change?
19       A    The first such change happened in 2000 -- I
20   believe 2008, May of 2008.
21       Q    How was the change communicated to you?
22       A    Well, Macy's had merged and my -- the New York
23   Macy's was merging with a division that was in the
24   midwest that had about 70 stores and they put -- usually
25   in the past -- can I back up?

Page 75

1        If an account -- if there was an account that
2    got merged within another account, usually the buyer and
3    management structure from the -- let me back up --
4        Let's stay Macy's midwest was merging into New
5    York, obviously they kept all the New York buying,
6    everybody stayed the same there.  As a rule, any time
7    that had happened with Dooney, the rep who was
8    inheriting the account stayed on that account.  So, in
9    other words, I would have gotten -- just gotten the
10   additional 70 doors.  Jeff's two divisions were both
11   being merged, it was a midwest division and north
12   division.  The north division was going to Bob Goodwyn's
13   Macy's which was based in Atlanta and the midwest
14   division was going to the New York buying office.
15       So that May market, I came up to market, I
16   guess it was Phil and Jeff and Bob and Peter, I wasn't
17   involved in that part of the meeting, and Jeff told me
18   he was going to be on the Macy's account with me and
19   that they would keep me whole.  They were lowering my
20   commission rate.  And then he was also being put on the
21   Macy's.com account which I had always handled.  At that
22   point, he was getting higher commissions on that account
23   than I was making.  So that was the first time I was
24   told my commission was changing.
25       Q    Let me see if I understand this.  This is in

Page 76

1    2008; correct?
2        A    Um-hmm.
3        Q    Macy's has gone through some type of merger?
4        A    Correct.
5        Q    Did Macy's merge with another company?
6        A    No.  That was in 2004, 2005 -- it was 2005, I
7    believe, Federated or Macy's bought May Company.  So the
8    May Company stores merged into the Macy's stores.
9        Q    And the May Company stores were what?
10       A    Hecht's Company, Foley's, Filene's, Robinson
11   May.
12       Q    So those stores became Macy's now?
13       A    Yeah.  They all got -- depending where they
14   were situated in the country.
15       Q    That was 2004/2005?
16       A    Correct.
17       Q    We're talking about a commission change that
18   occurred in 2008?
19       A    Right.
20       Q    So in 2008, Macy's hasn't gone through a
21   merger but it's consolidating its buying operations?
22       A    Correct.
23       Q    Prior to 2008, you had worked with certain
24   Macy's buyers; correct?
25       A    I worked with Macy's New York.

Page 77

1        Q    So you worked with the buyer from Macy's in
2    New York?
3        A    Correct.
4        Q    If I understand what you're telling me,
5    because of the consolidation, Macy's merged its buying
6    operations from the midwest into New York; correct?
7        A    Yes.  One went to New York, one went to
8    Atlanta.
9        Q    The divisions that went to Atlanta and went to
10   New York had previously been serviced by Jeff Mazzaro?
11       A    Correct.
12       Q    So as a result of this consolidation of the
13   Macy's buying operations, Dooney & Bourke decided it was
14   going to change the way it handled the account for
15   purposes of selling its product to Macy's; is that fair
16   to say?
17       A    That they decided to change -- sorry.  Say the
18   last word again.
19       Q    Dooney & Bourke decided to restructure the
20   manner in which it services the Macy's account?
21       A    I guess, yes, that's fair to say.
22       Q    Who informed you of this change?
23       A    I think Jeff was the one who told me.
24       Q    That would be Jeff Mazzaro?
25       A    Correct.

                              20  (Pages 74 to 77)

Electronically signed by ANDREA KINGSLEY (301-083-252-2637)                    4dca70e7-443e-4c48-a893-87d084bffcbb

## Page 78

1    Q   That would be at an in person meeting?
2    A   He just came up to me.
3    Q   Where were you?
4    A   It was a May market so we were getting ready
5  to go into the city that week for market week. And this
6  all happened on that Monday of May market.
7    Q   What exactly did Jeff tell you?
8    A   He just said he was going to be handling
9  Macy's with me and that they would keep me whole and
10  then he was also getting put on the Macy's.com account.
11    Q   Did you ask him any questions at that time?
12    A   I think I got really mad. Because it had
13  never gone that way before.
14    Q   What did you get mad about?
15    A   The fact that, you know, in the past, whatever
16  rep was servicing the account, that it got inherited to,
17  that rep had a potential gain because they just
18  inherited 70 doors or 40 doors or 20 doors. So there
19  was a monetary gain there. And when it happened to my
20  accounts, they put Jeff on it and gave him more
21  commission than I was making, and then for whatever
22  reason, they also gave him Macy's.com which he had had
23  no involvement with them.
24    Q   Who is the "they"?
25    A   Well, Peter and Phil. That's who he told me

## Page 79

1  was in the meeting with him and Bob Goodwyn.
2    Q   When Jeff said they were changing your
3  commission, did you discuss that in more detail with
4  him?
5    A   No, I think I was too upset to speak at that
6  point, and, you know, just continued with the meetings,
7  and the next morning I called Phil and the next morning
8  I went in and talked to Phil about it.
9    Q   What did you say to Phil?
10    A   "I don't get it. What's going on? Why did
11  that happen?"
12    Q   What did Phil say to you?
13    A   You know, I kind of was explaining to him
14  everything I did -- I think he felt bad, expressed -- I
15  guess it was just the way it was. Like, that's the
16  decision that had been made.
17    Q   Did Phil explain why the decision had been
18  made?
19    A   No.
20    Q   Did Phil tell you that Macy's was
21  consolidating its buying operations and Dooney & Bourke
22  wanted a team approach in order to make sure it was
23  properly servicing the Macy's account?
24    A   You know, he might have said that. I don't
25  remember. I just --

## Page 80

1    Q   Do you remember anything that Phil said to you
2  during that meeting?
3    A   No. I think I had said to him can I at least
4  stay on 1 percent on the doors I originally had versus
5  getting lowered, and he said he would look into that.
6    Q   Did he come back to you on that issue?
7    A   No. I think I just wound up going on .75
8  percent. Like I don't think it was resolved.
9    Q   So your commission was reduced from 1 percent
10  to .75 percent on the Macy's sales?
11    A   Correct.
12    Q   Mr. Mazzaro had been servicing Macy's before
13  this consolidation of the Macy's buying; correct?
14    A   He had -- yes.
15    Q   Do you know what his commission rate had been
16  prior to the consolidation?
17    A   I think at that point the reps were making 3
18  percent or 3 and a half percent.
19    Q   After the consolidation, when Mr. Mazzaro
20  began working with you on the account, this kind of team
21  approach, was his commission rate also reduced?
22    A   No. As far as I know, he was put on the
23  account at 3 percent or whatever he was making at the
24  time on the other accounts, on wholesale accounts.
25    Q   Wasn't his account reduced at that time,

## Page 81

1  wasn't his commission rate reduced at that point to
2  something like 1.35 percent?
3    A   No. I think that happened when Bob Goodwyn
4  was put on the Macy's corporate account two years later.
5  When mine and Jeff's division first merged, it was
6  almost like they put him on my account and he was
7  making -- let's say he was making 3 percent on his
8  Macy's or 3 and a half percent, they put him on the
9  Macy's account making that and then they lowered mine.
10  Mine was .75.
11    Q   When you were making .75, you were now making
12  the .75 percent on a greater volume of sales; correct?
13    A   Well, yes, because there were more doors. I
14  had 158 stores, he had 70, so the account went up to
15  213.
16    Q   So when you say more doors, you mean more
17  stores?
18    A   Yes. Stores and doors, same thing.
19    Q   So instead of making 1 percent on 140 stores,
20  after this change you were making .75 percent on 213
21  stores; is that correct?
22    A   Yes.
23    Q   So overall in terms of your commissions on
24  Macy's in terms of the total amount, did you ever do a
25  calculation to see whether or not your total commissions

21 (Pages 78 to 81)

Electronically signed by ANDREA KINGSLEY (301-083-252-2637)                    4dca70e7-443e-4c48-a893-87d084bffcbb

ANDRUS v. DOONEY & BOURKE                    October 24, 2013

Page 82

1    arising from Macy's increased or decreased after this
2    time that Jeff Mazzaro was brought on to work with you
3    on it?
4        A   Yeah, it depended on the business. I can't
5    remember that year if it was -- if I made the same or
6    not. I think that the thing that upset me the most, I
7    was told they would just keep me whole. They were doing
8    this almost so I could make what I did last year or at
9    least -- but I wasn't -- like the upside -- I can't
10   explain it. I didn't understand why they put him on the
11   Macy's.com account because he never even worked with the
12   account.
13       Q   Did you ever ask anyone why they put him on
14   the Macy's.com account?
15       A   I might have asked Phil. I was really upset
16   at that whole thing.
17       Q   After awhile, you must have realized this was
18   what was happening and you presumably became less upset
19   over time?
20       A   Yeah, I was just -- it was business as usual
21   and I just kept working.
22       Q   At any time after you kept working and after
23   you kind of calmed down from the situation, did you talk
24   with Phil or Peter or anyone else in management of the
25   company about why this change had been made?

Page 83

1        A   No. With the exception of that conversation I
2    had with Phil the next morning.
3        Q   That's the only time you talked about it with
4    Phil or Peter or anyone in management?
5        A   Yes, it was, and then I had the conversation
6    with Jeff. That went on a pretty good part of that
7    whole week.
8        Q   What else did you and Jeff discuss in that
9    regard throughout that whole week?
10       A   About how business was going to be handled
11   going forward. My buying team, I will be really honest,
12   was not really happy with that decision and I feel like
13   I smoothed the way for Jeff. They felt like when they
14   looked at those businesses, that they were being managed
15   poorly and I was really instrumental in kind of saying
16   it will be okay and this is the way Dooney wants to
17   handle it, so we'll go forward. My buyer, Phyllis
18   Milliken at the time, and her assistant Heather who then
19   became the buyer for Macy's, they came around, but they
20   had some real issues at first.
21       Q   So you introduced Jeff to those two ladies
22   that you just mentioned?
23       A   Um-hmm. They might have seen him at corporate
24   meetings because Macy's used to have some corporate
25   meetings when he was with the other two divisions.

Page 84

1        Q   So they may have already known Jeff?
2        A   Yeah. They might have seen him in the
3    showroom because a lot of these reps -- a lot of the
4    buyers and reps were the same for a very long time.
5        Q   Was Jeff able to work effectively with Macy's?
6        A   I guess so. And then at some point I guess he
7    felt that he wasn't being effective and that's why he
8    wanted Bob Goodwyn to join the team. That was later.
9    I'm jumping ahead. I'm sorry.
10       Q   When did Bob Goodwyn join the Macy's team?
11       A   I should back up a lot. That was the first
12   merger when Macy's went from six buying offices to
13   three. So there was a Macy's west, a Macy's --
14   actually, there might have been four. It was Macy's
15   west, Atlanta, Florida and then New York. Northeast
16   they were calling it.
17       Q   Atlanta, Florida, New York and --
18       A   West coast. Macy's west. Then literally
19   about a year later, spring 2009, Macy's announced that
20   they were merging to one buying office in Manhattan and
21   there were -- it was Jeff and I on that account for at
22   least a year. And then Jeff had said he wanted to bring
23   Goodwyn onto the account -- I guess he was feeling -- I
24   don't know -- overwhelmed or he felt Bob could sell
25   product. I don't really understand. That was a whole

Page 85

1    other thing that went on that I wasn't part of.
2        Q   Did Jeff talk to you before he indicated he
3    wanted to bring Bob onto the account?
4        A   It was hard because it was a big deal when
5    Macy's merged into one division because Bob Goodwyn had
6    a lot of Macy's stores and he lost them, but he did
7    handle Dillard's and Belk's which is two other huge
8    corporate accounts. And he always had Dillard's,
9    Dillard's had the same type of scenario that went on
10   years before. There were a lot of different buying
11   offices, it all merged into Bob Goodwyn's Little Rock
12   office and he became the lead rep on that and got all
13   the commissions on it.
14           So then when Macy's merged, that was a big
15   loss and for a lot of people. The girl that was
16   handling Macy's on the west coast, Mairead, lost her
17   division, there was Sue Clifton down in Florida who lost
18   her division and Bob lost his Atlanta division. So it
19   was Jeff and I on the account. We inherited 603 stores
20   total and were managing those for about a year.
21   Obviously business --
22       Q   Let me stop you there for a second.
23           When you inherited -- when you and Jeff
24   inherited the 600 stores, at that point, even with your
25   commission rate having been reduced from what it was

22 (Pages 82 to 85)

Electronically signed by ANDREA KINGSLEY (301-083-252-2637)                    4dca70e7-443e-4c48-a893-87d084bffcbb

ANDRUS v. DOONEY & BOURKE                     October 24, 2013

Page 86

1    previously, were your total commissions from Macy's
2    larger than they had been before you started working
3    with Jeff?
4        A  Yeah, because of the amount of doors that were
5    inherited to both of us.
6        Q  So that was really kind of a windfall for both
7    you and Jeff?
8        A  Yes.
9        Q  At some point that changed?
10       A  That changed when Bob Goodwyn was put on the
11   account.
12       Q  Who made the decision to put Bob Goodwyn on
13   the account?
14       A  I don't know if Jeff asked him to join the
15   account or Peter wanted Bob Goodwyn on the account or it
16   was a bit of both.  You know --
17       Q  How did you find out about it?
18       A  We were in August market and Jeff had said,
19   you know, Bob's going to come on the Macy's account and
20   we literally had an RMM the following week and that's
21   all the regional managers come in from all over the
22   country and, you know, you discuss the product with
23   them, et cetera, and --
24       Q  The regional managers coming from Macy's?
25       A  From Macy's to our showroom.

Page 87

1        Q  This is the August 2009 market week?
2        A  Yes.  And these were meetings I had
3    technically run in the Macy's buying offices or in our
4    showroom had this happened prior.  And he said Bob was
5    coming on the account and Bob ran the whole meeting and
6    I just kind of helped.  That's how I found out.
7        Q  So as far as you were aware, that was Jeff
8    Mazzaro's decision?
9        A  I don't know if it was his ultimate division,
10   but I think him and Bob must have discussed it and
11   brought it to Peter I guess.
12       Q  Did you ever discuss any of these Macy's
13   consolidation issues with Peter?
14       A  No.  I just discussed it with Phil that time.
15       Q  You said you discussed it with Phil the first
16   time when Jeff was brought onto the account?
17       A  Correct.
18       Q  Technically Jeff had already been servicing
19   Macy's but he hadn't been servicing Macy's out of New
20   York?
21       A  He was servicing his own division.
22       Q  Where was his division of Macy's, where's Jeff
23   located?
24       A  Jeff lives in Cincinnati, Ohio.  He had one
25   buying office that was in -- he had two, Macy's north I

Page 88

1    believe was out of St. Louis, that was the old May
2    Company.  And Macy's midwest was -- it might have been
3    Chicago.
4        Q  So Jeff had been servicing a couple of Macy's
5    buying offices, those buying offices got consolidated
6    with the buying office you serviced?
7        A  One of them did, one of them went to Atlanta
8    Bob Goodwyn serviced.
9        Q  And one went to New York?
10       A  Correct.
11       Q  And at that time Jeff and you started working
12   together on the buying office out of New York?
13       A  Yes.
14       Q  Then it's a year later when Bob Goodwyn gets
15   brought into the mix because everything has been
16   consolidated in New York now?
17       A  Right.  But he was not part of it for about a
18   year.
19       Q  Did you indicate to anyone that you objected
20   to Bob Goodwyn coming in and joining you and Jeff?
21       A  I definitely said something to Jeff like why.
22   Because for so long he fought to have it for himself
23   when all this stuff was going down and I don't know why
24   he decided to bring Bob Goodwyn on board.  And it did
25   create a little bit of tension with Dillard's I believe.

Page 89

1        Q  When you asked Jeff why, how did he respond?
2        A  Just like another level of management.  I
3    think it was almost like he said Peter wants Bob -- he
4    wants to line up everybody with the levels of management
5    at Macy's.  And at that time -- so at Macy's there's a
6    GMM general merchandise manager, then there's a DMM,
7    divisional merchandise manager, then the buyer are under
8    them.  It just reports up.  So Jeff kind of aligned it
9    as Bob would be dealing with the GMM, big picture, he
10   would be dealing with the DMM, and then I would be at
11   buying level and this other girl that we worked with
12   Kristin would be, like, working with the assistants or
13   whatever.  That's kind of way the Peter wanted it.
14       Q  Did you talk to Peter about him wanting it
15   that way?
16       A  No, I did not.
17       Q  So the information you got about what Peter
18   wanted, that came to you from what source?
19       A  From Jeff.
20       Q  So Jeff told you this is what Peter wanted?
21       A  Yes.
22       Q  Did Jeff tell you that Pete wanted this in
23   order to strengthen the relationship with Macy's and to
24   have relationships at multiple different levels at
25   Macy's?

23  (Pages 86 to 89)

Electronically signed by ANDREA KINGSLEY (301-083-252-2637)                    4dca70e7-443e-4c48-a893-87d084bffcbb

ANDRUS v. DOONEY & BOURKE                    October 24, 2013

**Page 90**

1      MR. McGUIRE: Objection to the form.
2      A   I don't remember. Say that question again.
3      Q   Sure. Did Jeff give you an explanation as to
4   why Peter wanted this -- why Peter wanted Bob brought on
5   to the Macy's team?
6      A   He basically said if we set it up this way,
7   there will be a level for everybody.
8      Q   Did that make sense to you?
9      A   You know, coming from -- I guess they were
10   trying to pick up where we did not have a direct person
11   in charge of wholesale. We no longer had one. There
12   had been Tom Bendheim, Gary Dembart and Jim Leamy, and
13   really, when people would come into the showroom, there
14   was really no levels of management at Dooney, it was
15   just the reps and the accounts. And I think they were
16   trying to structure this type of same management that
17   the department stores had. So they would have different
18   levels to talk to at Dooney & Bourke.
19      Q   So they thought this was a better alignment
20   for working with the customer?
21      A   Correct.
22      Q   Now both Jeff and Bob were independent sales
23   representatives; correct?
24      A   Yes.
25      Q   None of them were Dooney & Bourke employees;

**Page 91**

1   correct?
2      A   Correct.
3      Q   Neither of them received any type of salary or
4   health insurance from Dooney & Bourke; correct?
5      A   Correct.
6      Q   In terms of operating their own companies, did
7   they have employees that they were responsible for?
8      A   Yes.
9      Q   So both Jeff and Bob in running their own
10   sales organizations had to pay out salaries to
11   employees?
12      A   Well, I guess, it was their decision to bring
13   these employees on to help them with their territories.
14      Q   So they hired and paid for employees?
15      A   Yes, but -- it might have been -- they might
16   have been 1099s. I think that's what the merchandisers
17   were.
18      Q   Did Jeff's company have a name?
19      A   Yeah. I believe it was Mazzaro Associates.
20      Q   What about Bob's company?
21      A   His was Goodwyn & Goodwyn.
22      Q   Do you know who the other Goodwyn was?
23      A   His wife.
24      Q   Was she a part owner of the business, do you
25   know?

**Page 92**

1      A   I have no idea. She used to come up to -- she
2   was a lot more involved in the early '90s, mid '90s --
3   in 2000 -- well, maybe in the beginning of 2000 -- I'm
4   getting my '90s and 2000s mixed up. Barbara was around
5   in the late '90s and up until the mid 2000s, she would
6   come up and help Bob in the showroom and stuff like
7   that.
8      Q   Was Sue Clifton also an independent sales
9   representative that worked with Dooney & Bourke?
10      A   She was.
11      Q   Is she still?
12      A   Yes. As far as I know.
13      Q   Did she have responsibility for certain
14   accounts?
15      A   She handled Dillard's and a Macy's division.
16      Q   Was she an independent sales representative?
17      A   Yes.
18      Q   So she didn't receive a salary?
19      A   She did not.
20      Q   Did she also have her own company?
21      A   I can't remember if she had a separate name or
22   if she was just Sue Clifton independent rep.
23      Q   Do you know if she hired employees or paid
24   employees?
25      A   She did -- yes, they might have had a couple

**Page 93**

1   merchandisers down in Florida.
2      Q   Where was she based out of? What was her
3   geographic area?
4      A   She originally moved from Texas then she was
5   down in Florida, she was in southern Florida I guess.
6   Around the Jupiter area.
7      Q   When Bob Goodwyn came on and joined you as
8   part of the Macy's team, did that affect people's
9   commission rates?
10      A   Yes, that's when all those commission rates
11   changed.
12      Q   How were you told that the commission rates
13   were changing then?
14      A   I don't know. Jeff and Bob or --
15      Q   Somebody told you?
16      A   Yeah. They worked up a commission -- a
17   proposal, I guess, they sent to Phil. I'm not quite
18   exactly sure how that happened. Again, it was with the
19   intention, again, we're going to keep you whole.
20      Q   So you would receive a reduced commission rate
21   but on greater volume?
22      A   Correct.
23      Q   Did both Bob Goodwyn and Jeff Mazzaro also
24   receive a reduced commission rate at that time?
25      A   From what they were making?

24 (Pages 90 to 93)

Sanders, Gale & Russell
(203) 624-4157

Page 94

1    Q   Yes.
2    A   Yes.
3    Q   So both of their commission rates were also
4  reduced?
5    A   Yes.
6    Q   Was the notion the same as with you, that
7  everyone would have a reduced commission rate but it
8  would be on greater volume so everyone would stay whole?
9    A   Yes, I guess.  Yes.
10   Q   Did you ever express to Peter Dooney or Phil
11 Kinsley or anyone else in computer management that you
12 were unhappy with this change in how the Macy's account
13 was being handled?
14   A   No.  I think I might have talked to other
15 people I worked with, but no.
16   Q   You didn't go to anyone in management about
17 this?
18   A   No.
19   Q   Why not?
20   A   I guess at that point, after hearing Jeff and
21 Bob and what they had to say, there was really nothing I
22 could do, this is the way it's going to be and this is
23 how they want it.  It got to a point when I would come
24 up for meetings and they would say, "Don't go upstairs,
25 Peter's in a bad mood.  Don't go upstairs, Peter doesn't

Page 95

1  like it when you work on your computer upstairs during
2  market week."  Just like -- they were -- they just kind
3  of were setting a tone that this is how it is and don't
4  rock the boat and --
5    Q   So you didn't talk to anyone in management to
6  suggest that you were dissatisfied with this change in
7  the Macy's account?
8    A   No.
9    Q   How did you decide when and how often you
10 would visit the accounts with which you were working?
11   A   It depended on the account.  A lot of them
12 worked different.  Usually, after market week, we would
13 set up meetings to go back with the accounts to detail
14 the lines.  To rework what they saw at market because
15 many times we would go to market and product and designs
16 weren't finalized.  So it was kind of an evolving
17 process.  So we would go up and workup, to the best of
18 our ability, what we had seen that was going to happen,
19 and then if a collection changed from what we had
20 originally shown them, we would go back to rework it
21 with them or send them new proposals.  It really varied
22 by account.
23   Q   Did anyone at the company ever indicate to you
24 expectations that they had with respect to visits to the
25 accounts?

Page 96

1    A   You mean how often you should be at the
2  account?
3    Q   Yes.
4    A   No.  Any time the accounts wanted meetings or
5  we felt we should have a meeting, we would have a
6  meeting.  Nordstrom, they really wanted to get
7  everything done during market week.  They were not very
8  open to having people in and out of their offices all
9  the time.  They liked to get everything done, write
10 their orders up and be done for the season -- not the
11 season but the period.  And if we didn't have any new
12 product to show them, they really didn't -- I don't want
13 to say -- they just felt like we could handle a lot of
14 things via conference calls, via e-mail, via order
15 writing.  So it really depended on the account.
16   Q   From 2008 through the termination of your
17 employment in early 2012, what were your primary
18 accounts?
19   A   I had Lord & Taylor, Macy's, Bloomingdale's,
20 Macy's.com, Boscov's, and Nordstrom -- I'm sorry, did
21 you say from when to when.
22   Q   Approximately 2008 to 2012.
23   A   Because the May Company stores had dissolved
24 to Macy's.
25   Q   Setting aside -- if I understand the market

Page 97

1  week correctly, during market week, you would meet with
2  the buyers typically either in New York at the showroom
3  or perhaps in Connecticut; correct?
4    A   Well, it was always -- most accounts always
5  went to market week so it was always in market week and
6  then Macy's did used to do separate accounts, it was
7  during market week, maybe a month after or a month
8  prior, maybe if we were going to design some special
9  product for them or if Peter had something special he
10 wanted to show them, they would go to the Connecticut
11 offices.  But Macy's was the only big major that had
12 gone there, maybe PVC.
13   Q   So market week, those visits were in New York?
14   A   Market week was all done in the showroom.
15   Q   Let's set aside market week.  Not including
16 market week, on an annual basis, how often would you
17 typically go to see your buyers and your account at Lord
18 & Taylor?
19   A   I don't know.  It was as needed.  And a lot of
20 times if we had detailed all the product for market,
21 there was really no need to go see them if I didn't have
22 any product to show them.  I would work through
23 assortments or models and send them over to them for
24 review.  I would write the orders during market week for
25 them.  Anything we detailed at market, I would write-up

25 (Pages 94 to 97)

Electronically signed by ANDREA KINGSLEY (301-083-252-2637)                    4dca70e7-443e-4c48-a893-87d084bffcbb

ANDRUS v. DOONEY & BOURKE                    October 24, 2013

Page 98

1    orders by style, by color, suggested orders depending on
2    the receipt plan and send them to the buying offices.
3    They would sign off on them.  If there was change to
4    product, I would change it, revise it and send it back
5    over to them.
6        Q    Aside from market week, would you only go to
7    visit a client if there was some specific problem or the
8    client had made some specific request of you to go out
9    there?
10       A    Yeah.  Or if they said we have brand new
11   collection that needs to be seen before market, it
12   didn't really happen that often, that's when I would go,
13   yes.  Or if they said, "Lynn, come in, we want to revise
14   all the models."  A model is more of a basic assortment
15   that the store might have at all times and then you have
16   the fashion collections that work around that.  So
17   depending on different needs.  Or, "Lynn, we want to
18   revise these models, we want to go through by style and
19   color what's up on model."  We did lots of conference
20   calls.  A lot of conference calls.
21       Q    So you did most of your business with
22   conference calls and e-mails?
23       A    Conference calls, e-mails and appointments.  I
24   was constantly -- definitely way more by phone,
25   conference calls, e-mails because that was the

Page 99

1    day-to-day.
2        Q    So getting back to my question:  Can you tell
3    me on an annual basis between 2008 and 2012 how often
4    you would typically go visit Lord & Taylor?
5        A    I don't know, maybe two or three times a year.
6    Or four.  Depending on what I had.
7        Q    What about Macy's?
8        A    Or if I was in Manhattan, I would just go see
9    the buyers when I was there, if I was in for
10   merchandising the stores with the merchandisers.
11   Macy's, we did do -- they required a little bit more
12   because of the volume.
13       So we would have our market week and maybe the
14   week after or the following week I would go back to --
15   because a lot of times Peter would change things, so
16   things would change, what they sell at market, so we
17   would go back and work through everything they saw and
18   then, you know, write-up all the orders, get it onto
19   their spreadsheets, the computers.
20       And then depending on what year, a lot of
21   times they wanted me to go up for the RMM meetings where
22   they had the retail -- oh, my gosh, the retail
23   merchandisers, the Macy's people that would come to
24   corporate.
25       Q    Can you give me an estimate in terms of annual

Page 100

1    visits to Macy's, not including market week?
2        A    Not including market week?  Let's say if it
3    was -- not including market week -- okay -- I don't
4    know, it could be 24 visits.
5        Q    A year?
6        A    Maybe.  Twice a month.  And you're not --
7    you're just talking about the buying office, not going
8    to stores?
9        Q    I'm talking about buying office, not going in
10   to see a particular store.
11       A    So maybe it was twice a month or once a month
12   if they wanted to have a management meeting about models
13   or --
14       Q    What about Bloomingdale's?
15       A    Bloomingdale's, that was a little bit
16   different.  In 2007 -- I'm trying to think when --
17   Dooney & Bourke was on consignment with Bloomingdale's.
18   I can't remember what year, I have to look in my notes.
19   They said -- the line wasn't fitting in with their
20   matrix anymore, but because of the relationships they
21   had, they really wanted us to see if we could go on
22   consignment.  Peter did agree to it.  So we were in
23   about six or seven stores on consignment with
24   Bloomingdale's.  I made sure they had all of the top
25   selling, best selling styles Peter had introduced.  Core

Page 101

1    assortment set.  It went through ebbs and flows.
2    Sometimes we had some great new product and they wanted
3    to roll us on consignment into more doors, 20, 22 doors.
4        Q    I want you to be able to answer the question.
5    About how often --
6        A    Twice a year.
7        Q    How about Boscov's?
8        A    I don't know.  Once a year.
9        Q    How about Nordstrom?
10       A    It changed too as they merged.  When they were
11   in Seattle, I don't even know if I went once a year.
12       Q    So maybe less than once a year?
13       A    Yes.  Because they wanted to do everything
14   here in Manhattan and we would detail the entire line
15   and write the orders for the entire season.
16       Q    Whenever you traveled for business, you would
17   submit an expense reimbursement?
18       A    Yes.
19       Q    So if I went through all your expense
20   reimbursements that --
21       A    It might say a Lord & Taylor trip or Macy's
22   trip.
23       Q    Did you ever have any discussions with anyone
24   at the company that suggested that you should be
25   visiting Nordstrom on a more regular basis?

26 (Pages 98 to 101)

Sanders, Gale & Russell
(203) 624-4157

ANDRUS v. DOONEY & BOURKE                    October 24, 2013

Page 102

```
 1      A   Did I ever have a conversation with?
 2      Q   Yes.
 3      A   Bob Goodwyn said that we've got to get out to
 4   see Nordstrom more often.  And many times we could say,
 5   "Do we have new product?"  We didn't have new product,
 6   we just need to go out and see them.  And Nordstrom is
 7   very particular about what they want to see and who they
 8   want to see.  If we had new product, great, but if we
 9   didn't have anything to present them they didn't feel it
10   necessary for a meeting.  If we had detailed their
11   entire ad strategy for the entire year or season and we
12   had all their orders written, unless there was a change
13   to a product or we were bringing something better in,
14   they really didn't feel the need to have meetings at
15   their offices.
16      Q   Did Bob Goodwyn also work with Nordstrom, was
17   that one of their accounts?
18      A   When he assumed that kind of position in
19   wholesale, yes, he was sitting in on all the meetings
20   and reporting to Peter about it.
21      Q   That started when?
22      A   Probably around the same time all the
23   Macy's -- that Macy's merger.
24      Q   2009 or so?
25      A   Yeah.  I think Jim Leamy might have been gone
```

Page 103

```
 1   for a year and there was a void in that position.  When
 2   accounts would come in, they would want to talk to
 3   someone about big issues and if Peter wasn't available
 4   to talk to, they wanted to talk to someone.
 5      Q   So Bob started to play more of a lead role
 6   with some of the major accounts?
 7      A   I guess.
 8      Q   Was it more than one occasion on which he kind
 9   of indicated to you that he thought there should be more
10   visits to Nordstrom?
11      A   No -- if he said, "Let's get a meeting with
12   Nordstrom," we got a meeting with Nordstrom and we went
13   out to see Nordstrom.
14      Q   Do you recall any visits to Nordstrom that you
15   took out to Seattle?
16      A   Yes.  I was with Bob Goodwyn and Bill Tripodi
17   and Ron Moholt.
18      Q   When was that?
19      A   I would have to -- probably in 2011.
20      Q   Other than that one trip to visit Nordstrom in
21   Seattle, do you recall being out there on any other
22   occasions?
23      A   No.  Because the buying office -- I can't
24   remember when it merged to Seattle.  That was another
25   thing that went through a bunch of mergers.  My buyer
```

Page 104

```
 1   was originally -- it was DC and New Jersey, then it got
 2   merged to Chicago and then it got merged to Seattle.
 3      Q   After it got merged to Seattle, you can only
 4   recall taking one trip out to see the consolidated
 5   buying office in Seattle?
 6      A   Yes.
 7      Q   Were there any issues that arose with respect
 8   to the return of product by Nordstrom?
 9      A   Meaning did they want to return product?
10      Q   Let's start there.
11      A   Yes.
12      Q   Did they want to return product?
13      A   They wanted to return product or they wanted
14   to mark it down.  Nordstrom held all vendors to a really
15   high standard.
16      Q   Did Nordstrom return more product or greater
17   percentage of product than the other accounts that you
18   were working with?
19      A   Oh, yes.  At one point I'm sure Nordstrom --
20   it was probably 50 percent -- Nordstrom -- a lot of
21   times what would happen with Nordstrom is that they
22   would want to get new product in before everybody else.
23   So let's say they received this new product and might
24   have had two or three months to sell it, the other major
25   accounts were just getting it, well, Nordstrom was done
```

Page 105

```
 1   with it.  They wanted to start marking it down or
 2   returning it.  We don't want that to go on because we're
 3   just shipping all this new product to Macy's and
 4   Dillard's and Belk and everybody else.  So as opposed to
 5   marking it down, we would propose RTVs.  Or because
 6   Nordstrom wanted such a high margin from us, they would
 7   mark their inventories down to 30 percent off which with
 8   our markup structure it really wouldn't cover our
 9   markdown.  So at the end of a season, they would want to
10   recoup a lot of margin dollars from us.  So in order to
11   alleviate that, at each end of a season it was more
12   effective if Dooney could take back the product and then
13   sell it in our own outlets.  Also, too, we ran into
14   situations where they want to mark something down that's
15   a best selling style and Peter doesn't want that marked
16   down --
17      Q   It sounds like Nordstrom was a challenging
18   account to deal with?
19      A   They just had high expectations.  They wanted
20   a 12 percent sell through every week which a normal sell
21   through for Dooney & Bourke was about 3 percent a week.
22      Q   What does a sell through refer to?
23      A   It's the rate of sale of a product.
24      Q   So if you give them 100 handbags, they want to
25   sell 12 of them per week?
```

27 (Pages 102 to 105)

Electronically signed by ANDREA KINGSLEY (301-083-252-2637)                    4dca70e7-443e-4c48-a893-87d084bffcbb

ANDRUS v. DOONEY & BOURKE                          October 24, 2013

Page 106

1    A   Correct. 12 percent.
2    Q   Did you have any internal conversation with
3  Phil Kinsley, Peter Dooney, Bob Goodwyn, Jeff Mazzaro,
4  anyone, about the challenge of dealing with the
5  Nordstrom account and the fact that Nordstrom was
6  returning a lot of product?
7    A   Was returning a lot of product?
8         MR. McGUIRE: Objection to the form.
9    A   Jeff, Bob, Bill, Ron and I always had
10 conversations about the amount of product or the
11 markdowns they wanted to take. That's when it became --
12 before it was Jim Leamy was kind of the one who was
13 responsible for doing RTVs and margin issues and then
14 when we didn't have that person and it became this group
15 type of effort, yes. It was Jeff and Bob, Bill Tripody
16 and Ron Moholt and myself.
17   Q   So there were five of you working on this
18 account?
19   A   Well, yes, for any of those decisions that
20 went on.
21   Q   What was the discussion with respect to what
22 if anything should be done in order to reduce the amount
23 of returns from Nordstrom?
24   A   Wait, I'm sorry -- what was done to reduce the
25 amount of returns from Nordstrom?

Page 107

1    Q   Yes.
2    A   Many times, in most instances, Nordstrom would
3  want to return a lot of inventory. We would go through
4  by style and color and say, "Okay, well, this one they
5  have owned forever, it's not turning." A lot of times
6  they wanted to return something they hadn't given a
7  chance which clearly we would never approve, but if it
8  was older styles that they had been sitting on or
9  clogging their inventories, and then they would say they
10 have no open to buy to buy new product, that's when we
11 would say, "Let's look at RTV'ing some of the older
12 merchandise.
13   Q   Who would make the decisions as to whether or
14 not to accept a return of product from Nordstrom?
15   A   Again, we would all look at what they were --
16 it was basically myself, Bill and Ron. Clancey or her
17 assistant would send us their inventories and what they
18 were proposing. I would go through it by style and
19 color. Sometimes they wanted to return 2 million
20 dollars -- there were a lot of instances they would send
21 these huge lists and the net/net was we might bargain
22 with them to return a quarter of it just to get them to
23 place a new product order or just to get them to bring
24 in a better selling style that they said they already
25 had and didn't want. It was a constant kind of -- I

Page 108

1  don't know.
2         But who had the final result -- we would
3  detail what we thought and we would have a conference
4  call about it and Bob and Jeff would say, "Yes, I think
5  that's a good idea," or, "No, that's not a good idea."
6  "Okay, that sounds great, tell them we'll take 450,000
7  versus 2,000,000. Okay, good."
8    Q   If I understand your answer correctly, when
9  Nordstrom would propose a return, you would look at it,
10 try to decide what was reasonable, what was not
11 reasonable, and then discuss with Bob Goodwyn and Jeff
12 Mazzaro what should be done?
13   A   Yes. Because they had said that they had a
14 conversation back in Connecticut with whether it was
15 Phil or Alan about approving RTVs or markdowns, markdown
16 allowances.
17   Q   Meaning they wanted you to come to them for
18 approval before doing it?
19   A   Yes, basically.
20   Q   Is it fair to say that Bob and Jeff expressed
21 to you concern that Nordstrom was returning too much
22 product and that Dooney & Bourke should take steps to
23 limit that?
24        MR. McGUIRE: Objection to the form.
25   A   Well, every account wanted to return product

Page 109

1  so I don't feel like Nordstrom -- they might have wanted
2  to return more product than most people, but we didn't
3  let them. It was either that or let them mark it down
4  which would have caused all the other accounts to want
5  to mark it down.
6    Q   Whose decision was it not to let them return
7  some of the items?
8    A   Collaboratively we all -- they would give us a
9  return and of 2,000,000, clearly we're not going to
10 authorize a $2,000,000 return until you look at it. So
11 we would have to sign off on what we thought they could
12 return. And if there were certain styles they would say
13 they want to take a markdown down on that Dillard's down
14 the hall owned, clearly we didn't want them to mark it
15 down.
16        Plus then with this, quote, unquote, margin
17 agreement they said we had, they would want you to give
18 them margin money at the end of each season. So the
19 answer to not having to pay out all this margin money
20 was taking a bigger hit on returns coming back.
21   Q   Either way, that's a loss though; correct?
22   A   Yeah. I guess -- a loss, but your product is
23 in Nordstrom and I think that was --
24        MR. SCHWARTZ: Can we mark this as
25 Defendant's Exhibit 2 please.

28 (Pages 106 to 109)

Electronically signed by ANDREA KINGSLEY (301-083-252-2637)                    4dca70e7-443e-4c48-a893-87d084bffcbb

ANDRUS  v.  DOONEY  &  BOURKE                                    October 24, 2013

Page 110

1          (Defendant's Exhibit 2, Merchandise
2     Returns For Credit, marked for identification, as
3     of this date.)
4          Q   Would you look at Defendant's Exhibit 2 which
5     is three pieces of paper each entitled, "Merchandise
6     Returns For Credit."  Would you tell me if you recognize
7     those documents, Ms. Andrus?
8          A   Do I recognize them?  No, I never saw this
9     before.  That's Voula's writing.  She was in-store
10    servicing.
11         Q   When you say Voula's number, what are you
12    referring to?
13         A   Just the RA number.
14         Q   Is that her writing on the top right-hand
15    corner under RA number on all three sheets of
16    Defendant's Exhibit 2?
17         A   Yes.
18         Q   Am I correct in my understanding these
19    Merchandise Returns For Credit, all three of them are
20    returns that came from Nordstrom back to Dooney & Bourke
21    in either January or February of 2012?
22         A   Yes.
23         Q   On each of these it says, "Inspected by rep
24    name," and then it says Lynn Andrus.
25         A   Right.

Page 111

1          Q   Is that correct?
2          A   Yes.
3          Q   Did you need to approve the returns of these
4     particular products from Nordstrom?
5          A   Well, like this (indicating) was the return --
6          Q   When you say this, you're pointing to the
7     first page -- you're pointing to the second page?
8          A   This (indicating) was a return from Nordstrom.
9          Q   Did you approve --
10             MR. McGUIRE:  I think there may be -- you
11    switched from the second page back to the first
12    page -- when you said this, what were you talking
13    about?
14             THE WITNESS:  The document --
15         A   It's clearly a Nordstrom return for this
16    department 44, smaller goods department 44 is handbags.
17         Q   Let's stick with the first page of Defendant's
18    Exhibit 2.  Does this show a return of product from
19    Nordstrom that you authorized?
20         A   Yes, this does, but I didn't authorize it.
21         Q   How do you know you didn't authorize it?
22         A   Because I was on a conference call with Jeff,
23    Bob and Bill and Ron about it.  And, actually, Jeff or
24    Bob were supposed to sign all these.
25         Q   Do you know whether or not Jeff or Bob signed

Page 112

1     these?
2          A   Well, clearly they didn't.
3          Q   When you're saying that this was -- did you
4     authorize the return of this product that's reflected on
5     Defendant's Exhibit 2?
6          A   No.  I didn't have the authority to authorize
7     any RTVs on my own.
8          Q   Were you part of a team that authorized this?
9          A   Yes.
10         Q   Who else was on that team?
11         A   Bill Tripodi, Ron Moholt, Bob Goodwyn and Jeff
12    Mazzaro.
13         Q   Was each of those individuals aware of the
14    particular return reflected on the first page of
15    Defendant's Exhibit 2?
16         A   Yes.
17         Q   Do you know why this form says it's,
18    "Inspected by," and then lists your name?
19         A   I don't know if it was just -- if we sent it
20    over or they said send the paperwork over.  So we could
21    get Nordstrom the RTV number so they could get it out of
22    their inventory.
23         Q   Down here in the middle of the first page, it
24    says quantity, 280 units.
25         A   Right.

Page 113

1          Q   What is the monetary value of that 280 units?
2          A   Well, if it was $195 retail item or 198, you
3     know, the markup -- I need a calculator -- half of that.
4     So let's say it was $95 cost --
5          Q   Let's make it easy and say it's a $100 cost.
6          A   So 280 times $100.
7          Q   So $28,000?
8          A   Correct.
9          Q   Would the same approximate cost apply on pages
10    2 and 3 on Defendant's Exhibit 2 when we have 848 units
11    and 900 units?
12         A   Yes.
13         Q   So a return of 848 units at about $100 a unit
14    would be about $84,000 in terms of value; correct?
15         A   Say that again.  848 units --
16         Q   At $100 per unit?
17         A   Yes.  But department 4 was handbags, so it
18    might have been more.  It might have been maybe $200 a
19    handbag.
20         Q   So this could have represented --
21         A   I'm trying to think of our average price
22    point --
23         Q   This could have represented a return cost of
24    somewhere between 80,000 an $160,000?
25         A   Correct.

29  (Pages 110 to 113)

Electronically signed by ANDREA KINGSLEY (301-083-252-2637)                    4dca70e7-443e-4c48-a893-87d084bffcbb

Page 114

1    Q   Would that be a payment that Dooney & Bourke
2  would then have to provide to Nordstrom?
3    A   No.  The merchandise would come back to Dooney
4  & Bourke and it would get credited into our system, the
5  merchandise, so they didn't pay Nordstrom for this -- it
6  got credited back to Dooney & Bourke.
7    Q   Right.  So did Dooney & Bourke then have to
8  send a check to Nordstrom to pay them back for this
9  product that they returned?
10   A   I don't think they had to send them a check.
11 I think it just became a credit.
12   Q   So they would have to provide them future
13 product worth this amount of money?
14   A   I guess so.  I'm not sure about the accounting
15 logistics of whether we paid them a check or not.
16   Q   On the second page of Defendant's Exhibit 2,
17 is this a return that you approved?
18   A   Again, that was part of, you know, a
19 conversation coming out of Christmas that they had a lot
20 of inventory and were trying to get to a stock number
21 and it was all part of the same call.
22   Q   How do you know it was all part of the same
23 call?
24   A   I guess it wasn't.  In December they submitted
25 a list -- I can't remember if it was November or

Page 115

1  December they submitted a list of things to return or
2  December and January.  There were two different
3  instances when Nordstrom came to us for RTVs.
4    Q   And then the third page of this document --
5    A   I don't know what that says.
6    Q   This shows the return of 900 units; correct?
7    A   Yes.
8    Q   Is that also handbags that are being returned?
9    A   Department 4, yes.
10   Q   So they could be valued at somewhere between
11 $100 and $200 for return purposes?
12   A   Yes.
13   Q   It says down here the reason, it looks like it
14 has a numerical code, 50, accommodation return.  What
15 does that mean?
16   A   That just means we're crediting -- we're
17 crediting them back for the merchandise or it's a
18 credit.  Accommodation return.  It just means a return
19 to vendor.
20   Q   Did anyone at Dooney & Bourke ever tell you
21 that they thought you were -- that you needed to work
22 more effectively with Nordstrom to persuade them not to
23 return as much product?
24       MR. McGUIRE:  Objection to the form.
25   A   No.  I really -- I can't control what they're

Page 116

1  selling or not selling of the product.  It's whether or
2  not the customers like the product going into the
3  stores.  You know, that was -- on numerous occasions I
4  brought up the fact it was really tricky with Nordstrom
5  if we ship them product early and they want to mark it
6  down and other people are just receiving the product.
7  What would you rather do, have them mark it down and
8  have Macy's and Dillard's who owns hundreds of thousands
9  of dollars or millions -- mark it down or do you RTV it?
10 Or do you make them sit on it a month and then take it
11 back?  So it was a constant struggle.  They just moved
12 through merchandise faster.  And everybody knew it.
13 Peter knew it, Jim Leamy knew it, Bob Goodwyn knew it,
14 Jeff knew it.  They were -- they didn't want to be
15 Dillard's, they didn't want to be Macy's.
16   Q   Did any of those gentlemen you just named who
17 said they knew it, did any of them suggest to you that
18 you should persuade -- you should try to persuade
19 Nordstrom to hold on to the product longer and --
20   A   We always did that and I always did that and
21 that's why they didn't return $2,000,000 worth of
22 product.
23   Q   So you did have conversations --
24   A   Constantly.
25   Q   You did have conversations with Jeff Mazzaro

Page 117

1  and Bob Goodwyn about the need to try to persuade
2  Nordstrom not to return as much product?
3    A   Yes.  That was obviously the goal.  You don't
4  want people returning your merchandise, or marking it
5  down for that matter.
6    Q   How did you learn that your employment was
7  being terminated?
8    A   Phil called me.
9    Q   What did he tell you during that call?
10   A   Well, I answered and he said -- sorry, let me
11 just have a sip of water.
12   Q   I will interrupt your answer.  Where were you
13 when Phil called?
14   A   In my office.
15   Q   In your office in Maryland?
16   A   Maryland.
17   Q   So working our of your home?
18   A   Yes.
19   Q   You didn't have a separate office in Maryland,
20 did you, you worked out of your home?
21   A   Yes, we had an office in our house.
22   Q   Where both you and Bob work?
23   A   Yes.
24   Q   Did you have separate offices?
25   A   No.  We sat back to back believe it or not.

Electronically signed by ANDREA KINGSLEY (301-083-252-2637)                    4dca70e7-443e-4c48-a893-87d084bffcbb

ANDRUS v. DOONEY & BOURKE                                    October 24, 2013

Page 118

1    Q    You shared one office?
2    A    Yes.
3    Q    Phil called you and you answered and what did
4  he say?
5    A    He said, "Can I talk to you a minute?"  And I
6  said sure.  He said, you know, "We want to make some
7  changes to Nordstrom.  We're thinking about reshuffling
8  or restructuring the way Nordstrom is being handled.
9  We're really happy with the way Macy's and Dillard's are
10  working, and so we're no longer going to need your
11  services."
12         And I kind of thought -- I said, "For
13  Nordstrom?"  He said, "No, for anything."
14         And I guess at that point I thought does Phil
15  even know I'm working with Macy's on a weekly basis,
16  having conference calls with the buyers every week,
17  doing their shipping, doing their forecasting?  I found
18  it odd he said he was happy with the way Macy's was
19  working and Dillard's but they no longer needed my
20  services.
21    Q    Were you surprised to get that phone call?
22    A    Yes.
23    Q    What did you say in response to Phil?
24    A    I said, "Wow, I don't know what to say.  I'm
25  literally speechless."  I've been -- I think I just hung

Page 119

1  up with heather or someone and I just -- I couldn't even
2  process.
3    Q    How long did your --
4    A    And I said to Phil, "Wow, I don't know what to
5  say," and I'm, like, who are all my -- I think I said to
6  him something about Jeff and Bob and just things are not
7  what they seem with those two.  And then I said, "Who
8  are my accounts supposed to call?"
9    Q    What did Phil say?
10    A    He just -- "I will call you back."  I don't
11  know.
12    Q    You need a minute?
13    A    Sure.  I don't know why I'm getting emotional.
14         (Recess taken.)
15    Q    Can you describe anything else that happened
16  in your conversation with Mr. Kinsley in which he told
17  you your services would no longer be needed?
18    A    He said it was a financial layoff or
19  financial.  And other than that, that was it.
20    Q    Did he indicate to you whether or not the
21  company was ending its relationship with any other sales
22  representatives at the same time?
23    A    No.
24    Q    Did you later learn that the company was
25  ending its relationship with Ron Moholt at the same time

Page 120

1  it ended its relationship with you?
2    A    I had heard that they really didn't want Ron
3  on the account with Nordstrom.  So when he called,
4  that's what I thought, maybe what was happening, and
5  then he just dropped the other bomb that I was no longer
6  needed.
7    Q    Who had you heard it from, that the company
8  didn't want Ron Moholt on the Nordstrom account any
9  more?
10    A    Rumor had it, like Jeff or Bob or -- I don't
11  know.  They just -- I don't know if Nordstrom, if they
12  had complained.  I know that when Nordstrom went to
13  Seattle, they had called me to say that they wanted me
14  to be the lead rep and at that point it was Ron and Bill
15  Tripodi on the account and myself.  When they merged to
16  Seattle, Andrea Saal who is the buyer said, "We really
17  want you to take the lead on this account."  And I said
18  it's really up to Dooney & Bourke, the way it's
19  structured, my territory, et cetera, you will have to
20  call Mairead or Peter.  So Andrea Saal and Jerry Olsen
21  who was the GMM at the time did call Peter and Mairead
22  did call Peter and ask that I stay on the account.
23    Q    How do you know that call occurred?
24    A    Well, Mairead had told me and Mairead worked
25  back there with Peter.

Page 121

1    Q    You didn't participate in the call but you
2  heard from Mairead the call was made?
3    A    Correct.  And Nordstrom had told me.
4    Q    Who at Nordstrom told you?
5    A    Andrea Saal.
6    Q    What else did you say to Phil during the call
7  in which he told you your services would no longer be
8  needed?
9    A    I think I said everything I said.  I said be
10  careful of Jeff and Bob because things are definitely
11  not what they seem with those two.
12    Q    What did you mean by that?
13    A    I think there's a lot of smoke and mirrors
14  that go on there.  With Peter telling him what he wants
15  to hear versus what's really going on.
16         When I went out to a meeting in Seattle with
17  Bob Goodwyn, I heard him call Peter and we were leaving
18  the building and he said, "Oh, yeah, I'm just leaving
19  with Bill and Ron."  I was driving the car.  I'm, like,
20  clearly intentional.  I was part of the meeting.  I ran
21  the meeting and you can ask the Nordstrom buyers and the
22  Nordstrom DMM actually.  Because they --
23         These are yours; right?
24    Q    Yes.  So is the first one.
25    A    (Submitting).

31 (Pages 118 to 121)

Electronically signed by ANDREA KINGSLEY (301-083-252-2637)                    4dca70e7-443e-4c48-a893-87d084bffcbb

ANDRUS v. DOONEY & BOURKE                October 24, 2013

Page 122

1    Q   When Bob made that call, did you ask him why
2  he didn't mention --
3    A   I asked Bill. I said, "Bill, did you notice
4  when he was talking with Peter he said it's just you and
5  him here?" He said, "Yeah, that was real fed up."
6    Q   Did you tell Peter you had been there too?
7    A   No. I didn't see him when I got back.
8    Q   But your expense reimbursements would have
9  shown you were there too?
10   A   Of course.
11       And on another occasion when they were going
12  out to Nordstrom, I had a regional seminar that I was
13  doing here for Macy's and they told me, "Don't worry
14  about it, you don't have to come out to Nordstrom." So
15  Jeff and Bob -- "Keep the Macy's engagement here."
16   Q   So you felt that Jeff and Bob were working, to
17  a certain extent, to take the Nordstrom account away
18  from you?
19   A   No, I just think they like to tell -- I think
20  they like -- they want everyone to think they are the
21  only ones doing any work and it was so not true.
22   Q   After you were told that your services were no
23  longer needed by Phil, did you talk with anyone else in
24  management at Dooney & Bourke regarding this decision?
25   A   In management? There really wasn't anyone

Page 123

1  there.
2    Q   Did you contact Peter Dooney to tell him that
3  you thought this decision was inappropriate or unfair?
4    A   No, but I guess I just assumed the decision
5  came from Peter Dooney.
6    Q   Did you ever talk to Peter Dooney about the
7  decision to separate you from employment?
8    A   No.
9    Q   Did you ever have any follow-up conversations
10  with Phil Kinsley about the decision?
11   A   No. I was expecting a call back from him
12  about who my accounts are supposed to report to.
13   Q   But he never called you back?
14   A   No.
15   Q   And you never called him back?
16   A   No. I guess I assumed they would figure it
17  out.
18   Q   Have you had any contact with Phil Kinsley
19  since the day on which he called you to let you know
20  your services would no longer be needed?
21   A   Other than the time I saw him for two of
22  these -- at your office and at -- in Bridgeport related
23  to this.
24   Q   Other than related to your claim at the
25  Commission on Human Rights and Opportunities, other than

Page 124

1  that, you hadn't seen Phil Kinsley?
2    A   No.
3        MR. McGUIRE:  Off the record.
4        (Discussion off the record.)
5    Q   Have you ever spoken with Bob Goodwyn or Jeff
6  Mazzaro about your termination from employment?
7    A   Yeah, they both called me.
8    Q   Did they both call you on the day it happened,
9  the day after, couple days?
10   A   That was a big blur of a week for me so I'm
11  not going to be too accurate with dates.
12   Q   But within that week?
13   A   Yes.
14   Q   What did you discuss with Bob?
15   A   Maybe I never did talk to Bob.  I remember
16  talking to Jeff because Jeff was very upset by the whole
17  thing and, you know, had said -- he almost implied that
18  it had been brought up before, about the fact that I
19  don't really work or stuff, and he said how he defended
20  me and I guess I had wished I had known that was coming
21  up and maybe I would have -- if those conversations were
22  being had, I would have liked to have known about them.
23  But Jeff knew my work ethic and he knew what I did on a
24  daily basis because we were always on the phone.
25       I think Bob Goodwyn, it was more, oh, yeah,

Page 125

1  Bob Goodwyn tried to say he asked Peter if he could hire
2  me and Peter told him no.  I guess Bob and Jeff, maybe
3  they knew this was going on and at some point they might
4  have said, "Can we hire Lynn?"  And Peter said no.
5  That's what they told me.
6    Q   Did you ask either of them why Peter said that
7  or what reasons Peter gave?
8    A   No.  He just didn't like me.
9    Q   When you had the conversation with Phil -- the
10  day you had the conversation with Phil, do you recall
11  was that March 12, 2012?
12   A   I feel it was the 14th because I remember
13  thinking beware the Ides of March.
14   Q   March 14.
15   A   It was the next day I think.
16   Q   After that day, did you do any more work for
17  the company?
18   A   Well, yeah, I wound up doing some follow-up,
19  forwarding some information to whether it was -- like
20  any pending things that I might have forwarded maybe to
21  Kristen, Bill Tripodi called me for the Nordstrom buy --
22  he wanted to know the names of the buyers and phone
23  numbers.  The guy who was working on the account with
24  me,
25   Q   Did you wind up that follow-up work within a

32  (Pages 122 to 125)

Sanders, Gale & Russell
(203) 624-4157

Page 126

1  few days or so after --
2      A  Maybe a few weeks. I wasn't working eight
3  hours a day. I wasn't doing it 24/7. I was doing it as
4  it happened. So I don't know.
5      Q  The whole time you were working in Maryland,
6  you were never punching a clock; right?
7      A  No.
8      Q  You didn't have to keep track of your hours?
9      A  No.
10     Q  You didn't have to submit any time sheets to
11  the company?
12     A  No.
13     Q  You worked as you felt you needed to work?
14     A  I was at my desk -- it was a lot. Easily 10
15  hours a day. I used to go back to my desk at night.
16  Jeff and I would be on the phone until 11 o'clock at
17  night when he would say, "I've got to go to sleep."
18     Q  Did anybody at the company monitor your hours
19  when you were working out of Maryland?
20     A  I don't think so.
21     Q  You didn't have to submit any time sheets or
22  records or diaries or calendars or anything?
23     A  No.
24     Q  Did Phil tell you that the company was going
25  to continue to pay your salary through the end of June?

Page 127

1      A  Yeah, he said, "You have three months to get
2  your personal affairs in order," they would pay me for
3  three months.
4      Q  Did you also have a discussion at that time
5  whether you would be paid commissions through the end of
6  June?
7      A  No. They just said they would pay me through
8  the end of June, which at that point I was, like, wait,
9  I've written orders -- in February market, I detailed
10  orders with Macy's and every one of my accounts that
11  went into July, August and maybe September. Because it
12  was a lot of receipts that they were trying to flow and
13  couldn't do it all.
14     Q  Did you have a conversation with Phil or
15  anyone else at the company about what commissions if any
16  you would be paid after --
17     A  No, I never talked with anyone again from the
18  company other than Jeff or Bob when they called me,
19  people that worked for Jeff and Bob and called me up.
20     Q  But you didn't talk to those people about your
21  commissions?
22     A  No.
23     Q  After Phil called you to let you know that
24  your services wouldn't be needed any longer, did you
25  have any conversations with him about the commissions

Page 128

1  that you thought were due to you?
2      A  No.
3      Q  Did you have conversations with anyone else
4  who was employed by the company about the commissions
5  that you thought were due to you?
6      A  No. Can I just -- I know in the past when
7  other reps were either -- if their account was merged
8  into another account and then a rep found himself with
9  no accounts to work, I just remember they would just
10  keep paying until their commissions ran out. Until any
11  last order that they had written. And I remember
12  thinking, wow, that's odd, why aren't they doing that
13  for me.
14     Q  But you didn't speak to anyone about that?
15     A  After the next day I remember saying, wait, I
16  have orders in the system for way longer than June 30th.
17     Q  But, again, you didn't call Phil and talk to
18  him about that?
19     A  I didn't.
20     Q  You didn't talk to anybody else at the company
21  about how much you should receive in commissions or how
22  those commissions should be paid or when they should be
23  paid?
24     A  No.
25     Q  And you did continue to receive your salary

Page 129

1  through June 30, 2012?
2      A  I did.
3          MR. SCHWARTZ:  This is probably a good
4      time to take a lunch break.
5          (Time noted: 1:08 p.m.)
6      Q  After you had your children, did you have any
7  assistance in your home with respect to childcare?
8      A  Yes.
9      Q  What kind of assistance did you have?
10     A  I had someone that came in everyday full time.
11     Q  Was that true after your oldest was born?
12     A  After my oldest was born?
13     Q  Your first son was born, how long after he was
14  born did you have someone come in for childcare?
15     A  It was set up so as soon -- she was there,
16  like, seamlessly, the first day.
17     Q  After your maternity leave?
18     A  Yes.
19     Q  Has she been there ever since? Has it always
20  been the same person?
21     A  Yes.
22     Q  One person?
23     A  One person.
24     Q  How much does she work?
25     A  It depended on the year, but when she first

33 (Pages 126 to 129)

Electronically signed by ANDREA KINGSLEY (301-083-252-2637)                    4dca70e7-443e-4c48-a893-87d084bffcbb

Page 134

1    Defendant's Exhibit 3.
2        (Defendant's Exhibit 3, amended
3    complaint, marked for identification, as of this
4    date.)
5    Q   Showing you what has been marked as
6    Defendant's Exhibit 3, Ms. Andrus, do you recognize that
7    document?
8    A   Yes.
9    Q   What is it?
10   Q   Do you want me to read it —
11   Q   Just tell me what it is.
12   A   My complaint?
13   Q   Yes.
14   A   The lawsuit or the complaint.
15   Q   This is the amended complaint that you filed
16   against the defendants in this case?
17   A   Yes.
18   Q   Did you read this amended complaint before it
19   was filed with the court?
20   A   Yes.
21   Q   Did you review it in its entirety to make sure
22   it was accurate?
23   A   Yes, I believe I did.
24   Q   Was it your understanding and belief that at
25   the time it was filed with the court it was completely

Page 135

1    accurate?
2    A   Yes.
3    Q   I would like to ask you about a number of the
4    allegations in here.
5        Would you go to count 1 of your complaint
6    which is on page 6 of the document.
7    A   I'm sorry, which one on page 6?
8    Q   Count 1, bold face about two-thirds down the
9    page.
10   A   Okay.
11   Q   Count 1 is the first cause of action in your
12   complaint. Can you tell me what you're claiming in
13   count 1?
14   A   That I had unpaid commissions?
15   Q   Is that your answer or is that a question?
16   A   Yes, I mean, this had to do with at the time I
17   was let go, I had open order reports and I basically
18   took what I was paid in commissions versus what was left
19   open on the order reports and came up with that number.
20   Q   That number being the $44,159.30 in unpaid
21   commissions?
22   A   Yes.
23   Q   Would you tell me again what you base that
24   claim on?
25   A   Okay. I had open order reports that would run

Page 136

1    every week. So it would tell me by account, by PO, by
2    style and color what I had open or it would give the
3    entire PO of what was open, et cetera. So at the time,
4    I had an open order report that I ran. So when I left,
5    I knew how much I still had that would be due
6    commissions. If everything was shipped 100 percent.
7    Q   When you left, what do you mean?
8    A   I mean not when I left but when Phil called me
9    that day. It was that week.
10   Q   So the week of March 14, 2012?
11   A   Right.
12   Q   So if I'm understanding you correctly, you
13   calculated the $44,000 number in commissions based upon
14   the open orders that you had as of March 12, 2012 and
15   subtracting what you were actually paid by Dooney &
16   Bourke in commissions?
17   A   Correct.
18   Q   Do you recall that we sent you some discovery
19   requests in this case and asked you to provide
20   information supporting your claims?
21   A   Yes.
22       MR. SCHWARTZ: Can we mark this as
23   Defendant's Exhibit 4.
24       (Defendant's Exhibit 4, open order
25   report, marked for identification, as of this

Page 137

1    date.)
2    Q   Do you recognize Defendant's Exhibit 4,
3    Ms. Andrus?
4    A   Yes.
5    Q   Can you tell me what it is?
6    A   It's an open order report.
7    Q   Is this the open order report that you relied
8    on in coming up with the calculation alleging that you
9    were owed approximately 44,000 in commissions?
10   A   Yes.
11   Q   When was this open order report generated?
12   A   So that was the thing too. That week I had a
13   bunch that were run that week. I feel like this one was
14   run — do I have the exact date? I can't remember.
15   Q   You would say it was run —
16   A   That week.
17   Q   Sometime the week of March 14, 2012?
18   A   Yes. And I had a couple different days of
19   reports. So depending on which day the report was run.
20   I noticed, unfortunately, that a bunch of orders were
21   keyed that week that I had written that were not
22   reflected.
23   Q   Just so we're clear, Defendant's Exhibit 4 is
24   from sometime in March 2012?
25   A   Yes. It was that week.

35 (Pages 134 to 137)

Electronically signed by ANDREA KINGSLEY (301-083-252-2637)                4dca70e7-443e-4c48-a893-87d084bffcbb

ANDRUS v. DOONEY & BOURKE                           October 24, 2013

Page 162

1    percent on those.
2        Q   So on some work they were doing they were
3    getting 2 percent, on some work they were doing they
4    were getting 3 percent, then after there was a change in
5    the commission structure at some point, they were
6    getting 3 and a half percent, and during that whole time
7    period you were getting 1 percent?
8        A   Yes, I was getting 1 percent.
9        Q   But during that time you were always an
10   employee who was getting health insurance; correct?
11       A   Yes.
12       Q   And you had access to the 401(k) accounts at
13   Dooney & Bourke; correct?
14       A   Yes.
15       Q   Did any of these other people, Goodwyn,
16   Mazzaro, Sabotka, were any of them eligible to use the
17   401(k) plan at Dooney & Bourke?
18       A   Not that I know of.
19       Q   I'm assuming Sue Clifton is a woman?
20       A   She is.
21       Q   Are there any other facts that you believe
22   support your Equal Pay Act claim that you haven't
23   described to me yet?
24       A   Well, I found it interesting when Ian became a
25   rep and he was getting his salary and commissions, the

Page 163

1    same commission rate that the others were getting.
2        Q   Who is Ian?
3        A   Ian Ray handles Dooney & Bourke Disney
4    accounts.
5        Q   How long has Ian Ray been employed there?
6        A   He's been there a long time.  Probably since
7    beginning of 2000.
8        Q   Do you know how he came to handle the Disney
9    account?
10       A   I think it was just, you know, a call that got
11   passed to him and he kind of -- he must have discussed
12   it with Peter and then decided -- been approved to be
13   the Disney rep or be on the Disney accounts.
14       Q   Was he the first Dooney & Bourke to sell to
15   Disney?
16       A   As far as I know, yes, but --
17       Q   As far as you know, he's the one that
18   originated that distribution channel?
19       A   I guess, yes.
20       Q   Do you know what his salary was at Dooney &
21   Bourke?
22       A   No, I don't.
23       Q   Do you know who decided his commission rate?
24       A   I don't.
25       Q   Were there other --

Page 164

1        A   If I had to say, it would be Peter because I
2    thought he decided on everyone's commission rates.
3        Q   But you don't know, you never talked to
4    Peter --
5        A   No, I didn't talk to him, no.
6        Q   Did you ever talk to Ian about who decided his
7    commission rate?
8        A   No.
9        Q   How do you know Ian had a 3 and a half percent
10   commission rate?
11       A   I don't know if I heard it through the
12   grapevine or I don't know.
13       Q   So you don't know what your source of that
14   information is?
15       A   No, I can't remember.
16       Q   Any other evidence that you have to support
17   your Equal Pay Act claim?
18       A   No.
19       Q   Did you ever tell anyone in management at the
20   company that you felt that you should be paid at the
21   same commission rate as the independent sales reps like
22   Bob Goodwyn and Jeff Mazzaro and Sue Clifton?
23       A   I think -- I know Mairead and I, she was the
24   one that was on the same route I was, had the
25   conversation that we didn't understand why we weren't

Page 165

1    being paid the way the other reps were.
2        Q   Mairead was paid the same way you were;
3    correct?
4        A   Correct.
5        Q   And she was also an employee; correct?
6        A   Yes.
7        Q   She didn't have any power or authority to
8    change your commission structure; did she?
9        A   To change mine, no.
10       Q   So did you ever speak to anyone at the company
11   who had the authority to change your commission
12   structure to say that you thought you should be paid at
13   the same rate as Mazzaro, Goodwyn, Clifton or Sabotka?
14       A   No.
15       Q   Did you have a conversation at some point with
16   Tom Bendheim in which you discussed the possibility of
17   you becoming an independent sales representative?
18       A   No.  Other than he said I could live wherever
19   I want.
20       Q   Do you recall a meeting in early 1998 that you
21   attended and that a number of the independent sales
22   representatives attended in which Mr. Bendheim discussed
23   the possible restructuring of the sales force?
24       A   I think that was the time -- I think that was
25   the meeting they proposed -- that's when the reps --

42  (Pages 162 to 165)

Sanders, Gale & Russell
(203) 624-4157

ANDRUS v. DOONEY & BOURKE                           October 24, 2013

**Page 166**

1  they came up with the whole sub rep. I think that's the
2  same meeting. I can't be sure. I don't know what year
3  it was.
4      Q  Do you remember as part of that meeting in
5  which they talked about the sub reps and lead reps and
6  change in the percentage structure that Mr. Bendheim
7  suggested to you that if you wanted to become an
8  independent sales representative without any fixed
9  salary, you could make that change?
10     A  No.
11     Q  You do not recall having that conversation?
12     A  I do not recall having that conversation.
13     Q  Do you recall telling Mr. Bendheim that you
14  weren't interested in making that change at that time
15  because you wanted your salary and you wanted to keep
16  your health insurance?
17         MR. McGUIRE:  Objection to the form.
18     A  No.
19     Q  Do you recall telling Mr. Bendheim in
20  connection with that meeting that you did not want to
21  become an independent sales representative because you
22  were risk adverse?
23         MR. McGUIRE:  Objection to the form.
24     A  Because I was what?
25     Q  Risk adverse.

**Page 167**

1      A  I don't know what that means. No, I don't
2  recall that.
3      Q  You don't know what the term risk adverse
4  means?
5      A  No.
6      Q  It means someone who doesn't like risk.
7      A  Oh, no. I did not have that conversation with
8  him.
9      Q  You're sure?
10     A  Yes.
11         MR. SCHWARTZ:  Can you mark this as
12  Defendant's Exhibit 7 please.
13         (Defendant's Exhibit 7, Sales
14  Restructuring January 28, 1998, marked for
15  identification, as of this date.)
16     Q  Showing you what has been marked as
17  Defendant's Exhibit 7, Mrs. Andrus, do you recognize
18  this document?
19     A  No, not at first glance.
20     Q  Take as much time as you need to look through
21  it.
22         Do you recall being at a meeting in Norwalk
23  with the other sales representatives at which
24  Defendant's Exhibit 7 and the material in Defendant's
25  Exhibit 7 was discussed?

**Page 168**

1      A  Wow, in 1997? No.
2      Q  1998. I think it's dated January 28, 1998.
3      A  In Norwalk at our office?
4      Q  Yes.
5      A  I literally can't remember. Maybe.
6         MR. McGUIRE:  Off the record.
7         (Discussion off the record.)
8      Q  Is it possible, Ms. Andrus, that there was a
9  meeting conducted by Tom Bendheim to discuss
10  restructuring of sales and is it possible that you
11  attended that meeting?
12     A  Yes, it is possible, but I do not remember
13  being present with Geisler and Tajima, all these old
14  reps that are on there. I do not remember them being
15  there. Ann Roth Miller.
16     Q  I'm not saying all the reps were there. I
17  don't know who was there. Do you remember being at a
18  meeting with Mr. Bendheim and some of the other sales
19  representatives in which this document was discussed?
20     A  I'm like -- I'm not sure. I, literally,
21  cannot remember the meeting.
22     Q  So the meeting may have occurred, it may not
23  have occurred?
24     A  I remember him discussing the 3, 2 percent
25  thing, but I didn't know it was a big meeting with a

**Page 169**

1  bunch of people there.
2      Q  And the 3 percent, 2 percent thing, is that
3  what's reflected on page 9 of this document?
4      A  Yes.
5      Q  So this is the whole proposal that you were
6  talking about that Mr. Bendheim introduced about lead
7  reps and sub reps; correct?
8      A  Correct.
9      Q  Do you remember when he discussed that with
10  you, was it with you in just a one-on-one meeting with
11  you or was it with you and other reps that were present
12  at the time?
13     A  I just remember -- I don't remember if it was
14  in a meeting, I just remember them saying they were
15  restructuring and it was going to go to the 3 percent
16  and 2 percent thing if you weren't a lead and it wasn't
17  in your own territory. I don't know if I was with him
18  or in a meeting.
19     Q  Would you take a look at page 6 of this
20  document. That's entitled, "Current Situation By
21  Account Executive 1997," the letter P after 1997. Do
22  you have page 6 there?
23     A  Yes.
24     Q  It has a list of account executives; correct?
25     A  Yes.

43  (Pages 166 to 169)

Electronically signed by ANDREA KINGSLEY (301-083-252-2637)          4dca70e7-443e-4c48-a893-87d084bffcbb

ANDRUS v. DOONEY & BOURKE                    October 24, 2013

Page 174

1    Q   The next line after that refers to Clifton,
2  that's Sue Clifton; right?
3    A   Yes.
4    Q   According to these changes, she was going to
5  increase her compensation by 42.4 percent?
6    A   Right.
7    Q   Then line 28 -- not line 28. When it says
8  account executive 28, it refers to the Fentons
9  (phonetic). Do you see that?
10   A   Yes, Janice and Larry.
11   Q   Janice and Larry Fenton, they were a husband
12 and wife team?
13   A   Yes.
14   Q   Again, if this proposal went through, they
15 were going to increase by 34 percent; right?
16   A   Yes.
17   Q   The biggest increase in here was going to be
18 for yourself, Lynn Stone; correct?
19   A   Yes.
20   Q   It said if this goes into effect you will
21 increase by 82.1 percent; correct?
22   A   Yes.
23   Q   Do you recall a conversation with Mr. Bendheim
24 where he said, you know, in order to implement this
25 change, you're going to have to go on the same structure

Page 175

1  as the other account executives which is to be paid just
2  by commissions and not to be paid a base salary?
3    A   What was the question? He said to me --
4    Q   Did he say to you -- did he, I will ask the
5  question, did he say to you that in order --
6    A   For this to work I had to be a commissioned
7  rep? No, I do not remember him saying that to me.
8    Q   When Mr. Bendheim came in, did it increase the
9  number of doors that you had account executive
10 responsibilities for?
11   A   When this was going on -- oh, no. What
12 happened was Bob had Hecht Company -- he had some of the
13 accounts that were -- he had Hecht Company and maybe
14 Strawbridge, and since Tom was bringing him in to be
15 corporate planner, they needed an account rep for the
16 other two accounts so I inherited -- maybe it wasn't
17 Hecht Company.
18   Q   So did you increase your number of doors as a
19 result of the changes that Tom implemented?
20   A   Well, yes, because I inherited another
21 account, yes. So yes. I got Hecht Company added to
22 my --
23   Q   At this time you kept your salary and you
24 didn't become commission only; right?
25   A   No. 1998 -- no.

Page 176

1    Q   I phrased the question -- let me rephrase it.
2        Did you become commission only in 1998?
3    A   Commission only? No. I was never commission
4  only.
5    Q   Let's go back to your amended complaint which
6  is Defendant's Exhibit 3. Go to page 8 of it please.
7  When you get to page 8, I would like you to take a look
8  at count 46 your complaint.
9        My question to you is: What are you alleging
10 in count 4 of your complaint?
11   A   That the guys I was working with were making
12 more money than I was.
13   Q   Is that the same, in your mind, as your Equal
14 Pay Act claim?
15       Let me ask this question:
16       You see count 4 in your complaint?
17   A   Yes.
18   Q   You're claiming sex discrimination; correct?
19   A   Yes.
20   Q   What's the basis for your claim that you were
21 discriminated against on the basis of your gender?
22   A   Because even though -- I was a sales rep, all
23 the other sales reps, male sales reps were always making
24 a higher percentage and any time, like, something would
25 go my way, they would try to keep me whole, I wouldn't

Page 177

1  gain from it. So I was never put on a 5 percent
2  commission or a 3 percent commission.
3    Q   These male sales reps that you're comparing
4  yourself to, who are they?
5    A   Bob, Jeff, Ian, even -- like Ron and Bill were
6  making more percent commission on the Nordstrom account
7  than I was.
8    Q   Ron and Bill, that's --
9    A   Bill Tripodi and Ron Moholt.
10   Q   Both of them were independent sales
11 representatives; right?
12   A   Correct.
13   Q   Neither of them received salary or health
14 insurance from the company?
15   A   No.
16   Q   Neither of them participated in the 401(k)
17 plan?
18   A   No.
19   Q   Did they receive commission rates that were
20 comparable to Bob Goodwyn and Jeff Mazzaro?
21   A   Yes, they were all on the same commission
22 rates.
23   Q   Did Sue Clifton and Lisa Boco receive the same
24 commission rates as Bob Goodwyn and Jeff Mazzaro?
25   A   Yes -- you know what, I can't comment on Lee

45 (Pages 174 to 177)

Electronically signed by ANDREA KINGSLEY (301-083-252-2637)                    4dca70e7-443e-4c48-a893-87d084bffcbb

ANDRUS v. DOONEY & BOURKE                    October 24, 2013

Page 234

```
 1        A  No.
 2        Q  For the period between June 30, 2012 to the
 3   present for commissions that you were owed?
 4        A  No.
 5        Q  And prior to the commissions you were paid or
 6   owed prior to June 30, 2012?
 7        A  No.
 8        Q  When you said that you didn't believe Dooney &
 9   Bourke owed commissions, is that based on the way that
10   they decided they were going to pay you the commissions
11   or is that based -- is that base -- do you believe
12   Dooney & Bourke owes you commissions?
13        A  I believe they owed me --
14           MR. SCHWARTZ:  Objection to the form.
15           MR. McGUIRE:  Withdrawn.
16        Q  Do you believe that Dooney & Bourke currently
17   owes you commissions?
18        A  Yes.  I thought there was a 12 or $13,000
19   discrepancy.
20        Q  Between what the check that they wrote you --
21        A  That was unresolved.  It was never really
22   resolved.
23        Q  You currently believe that Dooney & Bourke
24   owes you 12 or $13,000 in commission?
25        A  Yes.
```

Page 235

```
 1           MR. SCHWARTZ:  Objection to the form of
 2   the question.
 3        Q  Can you elaborate a little more on your claims
 4   that Dooney & Bourke, the environment at Dooney & Bourke
 5   was sexually charged and hostile to you?
 6        A  Can I elaborate more?
 7        Q  Can you tell us all a little bit more about
 8   the comments that Peter Dooney made, what sort of
 9   comments he made, who they were directed towards?
10        A  Well --
11        Q  Sexually charged comments.
12        A  I just feel like it was -- they were made when
13   we were -- whether it was in the design room or out at
14   dinner or -- there were just jokes, sexually charged
15   jokes or banter going back and forth that I just felt
16   was inappropriate.
17        Q  Did he refer to female body parts?
18           MR. SCHWARTZ:  I object to the form.
19        A  Well, yes, to the top part maybe.  Boobs or
20   breasts or a rack.
21        Q  What sort of comments would he make that
22   referred to female breasts?
23        A  Maybe like, oh, referring to a buyer, "She had
24   a nice set," or something like that.
25        Q  Did he ever make those sorts of comments with
```

Page 236

```
 1   respect to Dooney & Bourke employees, female employees?
 2        A  Yes, I heard him say a couple things.
 3        Q  About who?
 4        A  He liked to watch Carolyn goodman walk,
 5   something about her behind.  I had heard -- if we're
 6   just talking about sexually charged -- just a comment
 7   about Elizabeth one time out at a restaurant.
 8        Q  What was that comment?
 9        A  That she's really a -- a piece or hot young
10   chick or something.
11        Q  Piece meaning?
12        A  You know, nice piece of ass.  I shouldn't say
13   you know.
14        Q  Was there ever any indication that Peter made
15   hiring and firing decisions based on a woman's anatomy
16   or looks?
17        A  I think that he just liked to have physically
18   appealing people working in stores and merchandising and
19   hot young chicks.  You know.
20        Q  Did he insist on having hot men working for
21   him?
22           MR. SCHWARTZ:  Objection to the form.
23        A  No.
24        Q  Did you ever hear him comment on men's looks?
25        A  No.
```

Page 237

```
 1        Q  Other than the jokes that he made about male
 2   body parts, did you ever hear him comment on any male
 3   body parts other than the jokes you already testified
 4   to?
 5        A  No.
 6        Q  How did it make you feel when you were exposed
 7   to that environment?
 8        A  It doesn't make you feel very good.  Kind of
 9   disgusted.  I just felt like it was very inappropriate
10   and just don't need to hear it.
11        Q  Did you express that disgust?
12        A  No.  I mean I didn't -- did I say it to him
13   or -- no, but I think I just removed myself from the
14   situation or would walk away or would walk out.  Not be
15   part of certain things.
16        Q  Do you think that had any -- when you would
17   walk away from a situation like that, do you think that
18   had any impact on your relationship with Peter Dooney?
19        A  Yes, I do.
20        Q  Do you think that ultimately had any effect on
21   Dooney & Bourke's decision to terminate your employment?
22        A  Yes.
23        Q  How so?
24        A  I just feel like I was not with the preferred
25   parties and, you know, if I said something -- almost
```

60  (Pages 234 to 237)

Electronically signed by ANDREA KINGSLEY (301-083-252-2837)                    4dca70e7-443e-4c48-a893-87d084bffcbb