EXHIBIT C

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1

1    UNITED STATES DISTRICT COURT
2        DISTRICT OF CONNECTICUT

3    * * * * * * * * * * * *

4    LYNN ANDRUS,                    *    **COPY**
                                     *
5            Plaintiff              *
                                     *
6        VS.                        *
                                     *    Case No. 3:13CV146(RNC)
7                                    *
     DOONEY & BOURKE, INC.          *
8    AND PETER DOONEY,              *
                                     *
9            Defendants             *
                                     *
10   * * * * * * * * * * * *

11                                  Westport, CT
12                                  January 9, 2014
13                                  10:00 a.m.
14                   - - -
           DEPOSITION OF H. PETER DOONEY
15     CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
                     - - -
16   APPEARANCES:
17       FOR THE PLAINTIFF:
18           HALLORAN & SAGE, LLP
             BY:   TIMOTHY J. McGUIRE, ESQUIRE
19               315 Post Road West
                 Westport, CT 06880
20               Phone:  203-222-4304
                 Fax:  203-227-6992
21               E-Mail:  Mcguire@halloransage.com
22               - Cont'd -
23
24                              CONFIDENTIAL
25

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2

1    FOR THE DEFENDANTS:
2        DAY PITNEY, LLP
         BY:  DANIEL L. SCHWARTZ, ESQUIRE
3              One Canterbury Green
               Stamford, CT 06901
4              Phone:  203-977-7536
               Fax:  203-399-5899
5              E-Mail:  Dischwartz@daypitney.com
                    - and -
6        LAW OFFICE OF THOMAS J. McANDREW
         BY:  THOMAS J. McANDREW, ESQUIRE
7              One Turks Head Place, Suite 205
               Providence, RI 02903
8              Phone:  401-455-0350
               Fax:  401-455-0882
9              E-Mail:  Tmcandrew@tjmcandrewlaw.com
10   ALSO PRESENT: PHILLIP KINSLEY
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

3

1

2

3

4

5

6

7

8          Deposition of H. PETER DOONEY, one of the

9    defendants herein, taken on behalf of the plaintiff

10   herein, for the purpose of discovery and for use as

11   evidence in this cause, pending in the United States

12   District Court for the District of Connecticut,

13   pursuant to Notice, before Stephanie Marchand,

14   Licensed Shorthand Reporter, No. 00461, and a Notary

15   Public within and for the State of Connecticut, at

16   the law offices of Halloran & Sage, LLP, 315 Post

17   Road West, Westport, Connecticut, on the 9th day of

18   January, 2014 at 10:00 a.m., at which time counsel

19   appeared as hereinbefore set forth . . .

20

21

22

23

24

25

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

23

1    accurate period for which these conversations took

2    place?  Late 90's, I mean 1997 through '99.

3         A.    I don't know, honestly.  I can't -- I

4    can't take one person and remember clearly, you

5    know, out of dozens and hundreds of these kinds of

6    conversations, tell you exactly when that happened.

7         Q.    Did you ever speak directly with Tom

8    Bendheim about switching Lynn from salary plus bonus

9    to salary plus commission?

10        A.    We had a discussion.

11        Q.    What was the topic of that discussion?

12        A.    You know, at the time, he was switching

13   a lot of the sales force around.  I had put him in

14   charge of that duty, and he was more or less

15   reflecting with me some of his ideas of who could do

16   what and so forth.

17                   MR. McGUIRE:  Can you mark this?

18                   (Whereupon, the Dooney & Bourke Sales

19   Restructuring dated 1/28/98 was marked as

20   Plaintiff's Exhibit 1 for Identification.)

21        Q.    Do you recognize this document?

22                   MR. SCHWARTZ:  Do you have extra

23   copies?

24                   MR. McGUIRE:  I'll make them.

25        Q.    If you don't recognize it, it's okay.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

25

1    Dooney & Bourke on January 28th, 1998?

2        A.    I can't honestly say one way or the

3    other whether that was the year he was there.

4        Q.    I think you mentioned that he -- I don't

5    want to put words in your mouth.  What did you say

6    he was doing with the sales force?

7        A.    He was redoing, you know, some of the

8    territories.  He let some people go.

9        Q.    What do you mean by "redoing"?

10       A.    These were the times when the

11   consolidation of the department stores was really

12   beginning.

13       Q.    Consolidation of ownership or

14   consolidating purchasing areas?

15       A.    Well, there was consolidating in both

16   ways.  Okay?  The amount of buyers that we had to

17   deal with in -- call it the mid-90's was, I would

18   say, around 200.

19       Q.    I don't mean to go off topic.  I want to

20   go back to where we were before.  How many buyers

21   does Dooney & Bourke deal with now?

22       A.    Less than 10.

23       Q.    Wow.  That's a big change.  Ownership of

24   the department stores is consolidating and the

25   purchasing areas are consolidating.  What was Tom

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

26

1    Bendheim doing to react to that?

2         A.      Well, at that time, we were trying to

3    retain the geographical nature of where the

4    positions of these -- you know, our salesmen were in

5    relationship to where the buyers' offices were.

6         Q.      If there was a buyer in Texas, you'd

7    want the salesperson to be in Texas?

8         A.      Yes.

9         Q.      Or around there?  When I said earlier

10   what was Tom Bendheim doing, was that only Tom

11   Bendheim's goal or was that also Dooney & Bourke's

12   goal to have the buyers and the sales reps be

13   geographically --

14        A.      At that time, you have to go back and

15   sort of look at the historical nature of our

16   existing sales force.  A lot of these guys started

17   out as multiple line people, you know, around the

18   City.

19              We had many more salespeople in the 70's

20   and 80's because we were really catering mostly in

21   the beginning to the men's stores that were close to

22   college campuses, big cities and so forth.

23              And at that time, the job of a salesman

24   was to go into an individual store and count the

25   belts that were hanging on the rack, go to the buyer

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

31

1   specialty other things.  Maybe we were involved in

2   the golf shop business for a while, and so some of

3   them may have gotten commissions from golf clubs

4   and --

5          Q.      Were these reps listed on page 11 of

6   Exhibit 1 all the reps that were selling handbags in

7   1998?

8          A.      I wouldn't say "all."  I don't remember

9   any more, but I'm not going to say that's all of

10  them.

11         Q.      Is there anybody at Dooney & Bourke that

12  would know if that was the total list of sales reps

13  that were selling handbags at Dooney & Bourke in

14  1998?

15         A.      I think Phil Kinsley could go back and

16  get that information for you.

17         Q.      I think you said earlier that you don't

18  recall exactly the time frame that Tom Bendheim was

19  with Dooney & Bourke, but I think you did say that

20  he was there for around three years?

21         A.      I did say three years, I think.

22         Q.      What was he hired to do?

23         A.      He was hired to be a direct report under

24  me.

25         Q.      With what tasks?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

32

1     A.     You know, no specific tasks, you know.

2  General.

3     Q.     What was his position?

4     A.     Vice President.

5     Q.     Is he Executive Vice President or --

6     A.     I don't remember whether he was

7  Executive Vice President.

8     Q.     Why after three years did his

9  relationship with the company end?  Was he

10  terminated?

11     A.     No.  He left.

12     Q.     Was he replaced?

13     A.     He was not immediately replaced.

14     Q.     Was he eventually replaced?

15     A.     Yes.

16     Q.     Who was he replaced by?

17     A.     Gary Dembart.

18     Q.     When was Gary Dembart hired?

19     A.     I don't remember the date.

20     Q.     Do you know what year he was hired?

21     A.     It was in the mid-2000's somewhere.

22     Q.     What do you mean by "mid-2000's"?  What

23  years does that encompass?

24     A.     In the mid-2000's.  I don't remember

25  exactly what year.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

33

1       Q.      2004 to 2006?

2       A.      It could have been.  I don't remember.

3       Q.      What was he hired to do?

4       A.      He was hired to work with the sales

5   force, act as general sales manager and work on our

6   retail stores.

7       Q.      What was his position?

8       A.      Vice President.

9       Q.      Do you know if he was Executive Vice

10  President?

11      A.      Actually, don't know if he had the title

12  of Vice President.  I'm going to correct myself.

13  I'm not positive whether he was Vice President or

14  not.

15      Q.      If you want to correct something or

16  supplement anything you've said earlier, feel free

17  to do so.

18      A.      Thank you.

19      Q.      So you're not sure if he was Vice

20  President.  Does that mean you don't know what

21  position he was at all or whether he was something

22  else?

23      A.      We're not a company where titles are

24  really important.  I'm President, but I also sweep

25  the floor.  So that's the way it works.  So we're

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

35

1      Q.    Do you know what his first position at

2  Dooney & Bourke was?

3      A.    His first position was basically the

4  position he has now.

5      Q.    Which is what you said, Vice President?

6      A.    He's Vice President of Finance.

7      Q.    What are Phil's responsibilities?

8      A.    Counting money.

9      Q.    What else?  Does he deal with sales

10  reps?

11      A.    Yes.

12      Q.    How does he deal with sales reps?  Is it

13  just as far as their compensation goes or does he

14  deal with their responsibilities and does he assign

15  tasks and give them feedback?

16      A.    His is more of a financial role with

17  them sorting out -- There's a lot of, you know,

18  offsets that occur from department stores that we

19  deal with.  There's credits.  There's returns.

20  There's advertising allowances and collection of

21  money from the stores.

22      Q.    So the sales reps do or do not report to

23  Mr. Kinsley?

24      A.    I would say they report to Mr. Kinsley.

25      Q.    In all respects or only respect to the

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

45

1     A.     I can't really tell you that, honestly.

2     Q.     Is Mr. Kinsley really the person to

3 answer that question?

4     A.     Yes.

5     Q.     Your sales force from the period 2000 to

6 2012 -- And if you have to break this up into

7 different periods -- what percentage of your sales

8 force was 1099 subcontractors and what percentage of

9 your sales force was employees?

10     A.     What was the time period again?

11     Q.     2000 to 2012.  If you have to break it

12 up and change percentages for any two-year or

13 three-year period, please do so.

14     A.     I really don't know the answer to that

15 question.  I really don't know.

16     Q.     Were there any sales reps that were

17 employees, other than Ms. Andrus, during that time

18 period?

19     A.     Mairead Ainley.

20     Q.     Can you spell that?

21     A.     No.

22            MR. KINSLEY:

23 M-a-i-r-e-a-d-A-i-n-l-e-y.

24            MR. McGUIRE:  Just for the record,

25 that's Phillip Kinsley, K-i-n-s-l-e-y.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

58

1    Q.    So then jeff Mazzaro is probably third?

2    A.    Could be.  I'm not sure.

3    Q.    Who would have been fourth?

4    A.    I don't know, honestly.

5    Q.    Who determines what percentage each

6    either independent sales rep or employee sales rep

7    earns?

8              MR. SCHWARTZ:  I have to object to

9    the form.  What time period?

10              MR. McGUIRE:  Between 2000 and

11    2013.

12    Q.    And if it's changed, then tell me which

13    person for which time period.

14    A.    You're asking for a very general answer;

15    but when it comes to the independent reps, it's a

16    negotiated rate based on the services that that rep

17    is going to provide.

18    Q.    Who negotiates the rate?

19    A.    Phil would negotiate it.

20    Q.    Do you ever negotiate it?

21    A.    I would be kept up with the discussions.

22    Q.    Are you ever involved directly in the

23    negotiations?

24    A.    No.  Phil handles that.

25    Q.    Phil was the only person that did it

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

60

1   inventory control, getting the labels on the boxes

2   correctly, whatever you want to do.  In his office,

3   he has that staff.  Underneath them, there are 62

4   merchandisers that work for him, and so he needs to

5   be able to -- Because he's outside and -- It's a

6   very big relief for him to take this responsibility

7   off me.

8           I don't want to deal with insuring all

9   these people, automobiles for all these people.  And

10  it costs a lot of money; and there's -- whenever you

11  have a employee, you have a problem.  You have

12  potential liability.  And for him to take off my

13  plate 50 or 60 people that are both high level and

14  low level and have them moving around the country

15  counting bags and going into stores --

16          Now, the most important thing that a

17  sales rep can do is be physically in the stores.  I

18  want sales reps to be in the stores at least

19  50 percent of the time.  They have to go in there.

20  They have to look at what our displays look like.

21  They have to talk to the sales help in the stores,

22  which is our first line of offense.

23          We have to tell the people selling the

24  bags at Macy's how good the bags are.  Physical

25  presence is a big thing.  Now, I know Bob Goodwyn,

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

62

1    question.

2         Q.      Do you ever recall being involved in a

3    conversation negotiating these rates that Gary

4    Dembart was involved in as well?

5         A.      I can't remember that.

6         Q.      I'm going to ask the same question for

7    Tom Bendheim.  Was he involved --

8         A.      Tom Bendheim reported to me the changes

9    that he wanted to make and he made them.  When Tom

10   Bendheim was there, things were very simple.  It

11   wasn't the complexity you have today with so few

12   points of sale and so much money involved in each

13   one.

14              As I said before, in that 10 years, our

15   point to point contact of people at these stores

16   were probably over 200 and now they're 10.  So we

17   don't need the same type of people or the amount of

18   people that we used to have then to run the

19   business.

20        Q.      You said it was over 100 in 1998?

21        A.      Could have been over 200, but it was

22   definitely over 100.

23              MR. SCHWARTZ:  Would this be a good

24   time for a break?

25              MR. McGUIRE:  Sure.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

74

1    an answer without detail.

2         Q.      If there's a split, I'm talking about

3    the highest percentage that a single person or

4    individual sales rep company was making.

5               If Bob Goodwyn were splitting a certain

6    account with somebody, whatever he was making, would

7    that have been the highest percentage?

8         A.      You know, it's too complicated a subject

9    for me to guess at.  So I think you're going to have

10   to look to Mr. Kinsley for that answer.

11        Q.      Were you involved in the decision to

12   terminate Ms. Andrus?

13        A.      Yes.

14        Q.      Who else was involved in that decision?

15        A.      Phil.

16        Q.      What were the reasons that she was

17   terminated -- or reasons?

18        A.      There's always more than one.  We

19   honestly thought about doing it -- I mean it wasn't

20   the first time that the subject had come up.  It

21   wasn't a snap or an easy decision to do.

22               But three or four years ago, we had had

23   a situation with Bloomingdale's, which was Lynn's

24   account, and we lost the account.  And it appeared

25   that Nordstrom was going in the same direction and

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

75

1    was having the same business decline.  Went from

2    being an almost $10 million business to a $3 million

3    business.

4              And for whatever reason, when that

5    happens, I can't sit idly by and say, We're going to

6    do nothing.  We're going to look at it and say, What

7    is the problem and do we need to change horses here,

8    change salespeople?  What do we need to do to get

9    this back on track?

10             At the end of the day, although it was a

11   difficult decision -- Lynn is a long-time person --

12   we decided to make the change.  As far as the other

13   accounts, Macy's had gone into a much more

14   sophisticated buying deal being down to one office,

15   and we really didn't need her on that account.

16        Q.    So three or four years ago,

17   Bloomingdale's left and that was Lynn's account.  So

18   that's one reason?

19        A.    That's one reason.

20        Q.    Second reason was Nordstrom --

21        A.    Nordstrom business was heading down at a

22   very quick rate, and I was fearful it was going to

23   end up in the same way that Bloomingdale's did; and

24   I didn't want another one of those.

25        Q.    Macy's, you said they just became more

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

76

1    complicated?

2        A.    We really didn't need Lynn on there.

3    That was the financial end of the thing.  It was

4    really -- It developed into a much more -- We needed

5    a bigger organization like the one that Jeff and --

6    to run the business.

7              You needed 50, 60, 70 people in the

8    stores all the time.  You needed professional

9    planners, which I really didn't want to hire.  You

10   needed people to -- It's an operation of 700 stores.

11   It's not a one-man operation.  You need a company to

12   run it.

13       Q.    Are there any other reasons?

14       A.    Those were the primary reasons.  Really,

15   my fear of the Nordstrom business -- you know, it

16   went from almost 10 million to less than 4 million

17   in a very short time.  From my point of view, that

18   was a very big red flag.

19       Q.    Where is the Nordstrom business --

20   What's the Nordstrom business like per year?  When

21   you say "10 million," you're saying 10 million per

22   year?

23       A.    I think it was somewhere around 9-ish

24   plus.

25       Q.    So you're talking about per year?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

77

1       A.      Per year.

2       Q.      And then 4 million per year?

3       A.      And then it went down to 3.

4       Q.      When did it go down to 3?

5       A.      The last year Lynn was involved in it.

6       Q.      March 2011 to March 2012, it went down

7   to 3?

8       A.      I can't tell you exactly, but that was

9   the last.

10      Q.      Where is it now?

11      A.      The previous year to this one was about

12  6, and I think --

13      Q.      2013, it was 6?

14      A.      I think it's actually down to about 3

15  again, and I'm looking at it real hard again.

16      Q.      So the previous one to this one --

17      A.      It was one year that it rebounded to 6.

18      Q.      We're nine days into 2014.  You mean the

19  previous year -- What was it in 2013?

20      A.      I hate to give you the numbers.  I know

21  that the year that Jeff and those guys took over the

22  business, it went to 6 -- I think close to

23  6 million -- back up to 6 million.

24      Q.      When did Jeff take over the business?

25      A.      Well, Bob and whatever became

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

78

1    involved -- I'm trying to remember.  I can't put a
2    date on it, but they became involved when Lynn was
3    also involved because I asked them to jump in and
4    help because I said, I don't want to lose this
5    account.
6        Q.    Do you know when they did that?
7        A.    I can't put a date to it exactly, but I
8    think Lynn --
9        Q.    Can you put a year to it?
10       A.    Well, it was probably within a year of
11   when Lynn was let go.
12       Q.    So it was between March of 2011 and
13   March of 2012?
14       A.    I don't want to give you a date because
15   I don't know a date.
16       Q.    What time period would it have been that
17   it bounced back up to 6 million?
18       A.    It bounced up, I would say, shortly --
19   Again, I can't tell you exactly.  I don't want to
20   guess at it.
21       Q.    Was it after Lynn was fired?
22       A.    After.
23       Q.    So you're saying at some year period
24   between March 2012.  Would it have been 2013?  Are
25   you talking about calendar year 2013?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

79

1      A.      I'm talking calendar year.  Lynn left in

2  March.  I'm not sure if it was that calendar year or

3  the following year.

4                MR. SCHWARTZ:  We can produce these

5  records.  There's no reason to have this witness

6  guess.  We have financial records that --

7                MR. McGUIRE:  Can you?

8                MR. SCHWARTZ:  I thought they had

9  been produced; but if they haven't, we can get those

10 records to you.

11     Q.      How about Bloomingdale's, is

12 Bloomingdale's back as a customer?

13     A.      No.  They're gone.

14     Q.      Are you doing anything to get them back?

15     A.      We're trying.

16     Q.      What reasons did Bloomingdale's give you

17 for no longer being a customer?

18     A.      Well, they were -- they were concerned

19 that we were probably over distributed in their

20 competitors like Macy's, and they like to

21 differentiate themselves to a degree of -- they'd

22 rather be selling Ferragamo than Dooney & Bourke

23 because they have a customer in not all of their

24 stores.

25                Bloomingdale's didn't happen overnight.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

83

1     Q.     Kate Spade?

2     A.     Kate Spade.

3     Q.     Is Dooney & Bourke comparable to those

4  luxury brands?

5     A.     Yes.

6     Q.     Louie Vuitton, Ferragamo, those are the

7  luxury ones?

8     A.     Yes.

9     Q.     Did Nordstrom give you any reasons as to

10  why they were lowering their orders and why their

11  orders bounced back at a certain time or it just

12  happened that way?

13     A.     Nordstrom is difficult at best to deal

14  with.  They're very -- They have gotten into, over

15  the last five years -- They don't buy entire

16  collections of things.

17          They buy bits and pieces of things.  You

18  know, buy it, sell it, buy it, sell it.  They're not

19  easy people to get along with.  They're difficult.

20  It's a job.  You have to work it, you know.

21     Q.     How many stores does Nordstrom have?

22     A.     I think 50.

23          MR. SCHWARTZ:  This is in the U.S,

24  is your question?

25          MR. McGUIRE:  Yes.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

84

1    A.    I think, but I'm not --

2    Q.    If you don't know --

3    A.    I don't know.  Could be 100.  It could

4  be 100.

5    Q.    What about Bloomingdale's nationally?

6    A.    I don't know.

7    Q.    Less than 50?

8    A.    I don't know.

9    Q.    Did you receive any complaints from

10  either Bloomingdale's or Nordstrom about Lynn as a

11  salesperson?

12    A.    No.

13    Q.    Bloomingdale's told you that the reason

14  they were no longer going to be a customer is that

15  you were too widely distributed?

16    A.    That was not what they told me.  I don't

17  think they really put exact reasons on what they

18  were going to do.  A lot of this runs in a cycle,

19  runs on the particular taste of the particular buyer

20  that might be there at the time and the management

21  and what they're trying to make their store look

22  like and how they're going to differentiate their

23  store from other stores and so forth.

24    Q.    You said you didn't receive complaints

25  from either store, but would you assign the same

88

1    have been this is the date that the request was

2    made.

3         Q.      Okay.  Department, what does that --

4         A.      It's a department number that a store --

5    some stores have different department numbers for

6    handbags and small leather goods and that would

7    signify what department these products are coming

8    back from.

9         Q.      What does do the letters RA mean to you?

10        A.      Return authorization number is the

11   number at which somebody at Dooney & Bourke entered

12   this information into their system and created a

13   document or a reference number, if you will, that

14   notifies -- this number is then requested by the

15   customer to be put on the outside of a box that's

16   returned to us, being Dooney & Bourke.

17                If an item is returned to Dooney &

18   Bourke with that number on the outside of the box,

19   they know what it is back at the warehouse.  When it

20   comes in, it's an authorized return.  If a box shows

21   up at our warehouse, the Dooney & Bourke warehouse

22   without that number on it, it shouldn't be accepted

23   under the spirit of which the thing was --

24        Q.      Does that happen?  Do customers send

25   back returns without return authorization numbers?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

95

1    A.    I believed what he told me.

2    Q.    Bob is not an employee of Dooney &

3  Bourke, is he?

4    A.    No.

5    Q.    Lynn didn't report directly to Bob

6  Goodwyn, did she?

7    A.    When I asked Bob Goodwyn to help Lynn

8  with this thing, he essentially became a person over

9  her.

10    Q.    Her boss?

11    A.    Yeah; in this thing.  I think it was

12  very clear that -- You know, when it happened, I

13  said, I'm sending these guys in to help you.  I

14  never talked to Lynn.  Bob and Jeff discussed it and

15  they said, This is on Peter's request.  He's

16  concerned about this account and he doesn't want it

17  to go the way of Bloomingdale's.

18    Q.    Was it Bob Goodwyn's decision to fire

19  Lynn?

20    A.    No.  He only reported back to Phil and I

21  about what he was going through, and we felt that --

22  First of all, Lynn never visited Nordstrom ever, and

23  this was something that required --

24    Q.    When you say "we," who do you mean by

25  we?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

105

1    something that he didn't want to get authorized

2    because we were trying to retrain Nordstrom into

3    behaving a little better.

4            This constant putting bags in and having

5    them returned, we're not making money at Nordstrom.

6    And with all the givebacks and things, they were a

7    difficult account.  They would be difficult for

8    Lynn, for myself or anybody, but that's life.

9    That's what you have to do, is deal with them.

10           But you can't deal with people by never

11   visiting them and being in their stores.  You can't

12   have a telephone operation and see customers four

13   times a year and that's your total exposure to them.

14       Q.     That's how many times Lynn saw

15   Nordstrom?

16       A.     Four times a year in New York City.

17       Q.     How many times did you have new product

18   each year.

19               MR. SCHWARTZ:  I'm sorry?  I didn't

20   hear the question.

21       Q.     How many times did you come out with new

22   lines each year?

23       A.     We're constantly coming out with new

24   collections.  Constantly.  We have four shows every

25   year, but we're constantly coming out and seeing

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

109

1          MR. SCHWARTZ:   I'm sorry.   Could

2   you rephrase your question?

3       Q.     I'll rephrase.   Is it fair to say you

4   did not like the way Nordstrom would return bags and

5   not make orders that would replace their returns?

6       A.     No.   I didn't like that.

7       Q.     Do you blame them returning bags and not

8   making new orders at the same time on a lack of

9   in-person contact with a sales rep?

10      A.     I think you're talking about two

11  different things.

12      Q.     You've been talking about the two

13  different straws that broke the camel's back.   These

14  are the two reasons.   Are they separate or are they

15  joined?

16      A.     When the bags get returned at Dooney &

17  Bourke, all right, a salesman's job is to be a

18  negotiator and you have to negotiate.   Everything

19  with these stores is negotiated.   There's no rule

20  that can't be broken.

21          When I asked Jeff and Bob to get

22  involved, I did it because they were much better at

23  negotiating than Lynn was, and Lynn needed some

24  help.   When I say "train Nordstrom's," I mean

25  Nordstrom's was so spoiled.   It was a free for all.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

146

1   a little pressure on deliveries to get things

2   moving.

3          They would call me and say, Hey, Peter,

4   can you do something about this?  They're unhappy.

5   They have an ad placed and the goods have to be in

6   there on this particular date.  What can you do?

7          I would say, Well, I can call the

8   factory.  I can do this.  I can do this.  I can do

9   that.  I would help them in that way, as I still do.

10     Q.     In the responses to the interrogatories

11  and requests for production, one of the questions

12  had to do with written hiring and firing policies.

13  I know you said you didn't have anything to do with

14  the preparation of this.

15         In sum and substance, the response to

16  the question about the existence of written hiring

17  and firing policies was that Dooney & Bourke doesn't

18  have them.  Do you agree with that?

19     A.     Yes.

20     Q.     Does Dooney & Bourke maintain personnel

21  files for their employees?

22     A.     Phil has access to whatever files we

23  have.

24     Q.     Do you know what's kept in these files?

25     A.     I don't know in particular.  There's

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

147

1   obvious information, Social Security number, name,
2   address, da, da, da, da, da.
3        Q.    Does Dooney & Bourke maintain any sort
4   of discipline files or any sort of performance
5   review files or anything like that?
6        A.    Whatever files there are, Phil has them.
7        Q.    So in addition to being the guy that
8   knows how to spell names, the VP of Finance, is it
9   fair to say that Phil is also the Head of HR?
10       A.    Well, we don't have an official HR.
11       Q.    Does Phil deal with HR issues?
12       A.    Phil deals with the issues when they
13   come up of -- Yesterday, somebody got in a fight in
14   the factory.  Phil went up there and dealt with it.
15   We've had theft problems about a year-and-a-half
16   ago, and Phil deals with those kinds of problems.
17       Q.    I remember reading about that in the
18   paper.  The van or something?
19       A.    Yeah.  The van kept taking a detour.
20       Q.    Saying Phil is the Vice President of
21   Finance doesn't really accurately describe his
22   duties.  He has duties well beyond finance?
23       A.    Yeah.  I encourage people to work
24   outside of the box that their title might put them
25   in, and it's been my style of running the company to

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

148

1    encourage people to come forward to me if they have

2    a problem.  I'm always ready to listen.

3              And also, I encourage people to -- if

4    they see a problem, don't think it's not their job

5    to fix it.  If I see trash on the floor, I don't

6    call anyone.  I pick it up and put it in the

7    garbage.  I'm not a delegator.  I don't look at

8    levels.  I like to treat people as --

9         Q.    I understand.  Is there anybody, other

10   than Phil, that would maintain a personnel file or

11   performance review file?

12        A.    If there is anyone else, they work for

13   Phil.

14        Q.    Does Dooney & Bourke have any sort of

15   formal system of evaluating employees and/or outside

16   sales reps?

17        A.    There is no formal system.

18        Q.    Are there any annual reviews where you

19   have interviews and provide feedback?

20        A.    Are you talking about for the

21   salespeople inside and outside?

22        Q.    Employees and/or outside sales reps in

23   general.

24        A.    There's no formal meeting.

25        Q.    Do you or does somebody else from Dooney