# EXHIBIT D

```
 1              UNITED STATES DISTRICT COURT

 2               DISTRICT OF CONNECTICUT

 3

 4    * * * * * * * * * * * * *        COPY

 5    LYNN ANDRUS,                *

 6           Plaintiff,           *

 7        vs.                     *    Civil Action
                                       No. 3:13CV146(RNC)
 8    DOONEY & BOURKE, INC., and  *
      PETER DOONEY,
 9                                *
             Defendants.
10    * * * * * * * * * * * * * *

11                                     Westport, CT

12                                     May 14, 2014

13                                     10:20 a.m.

14

15              DEPOSITION OF PHILIP KINSLEY

16

17

18
      APPEARANCES:
19
          FOR THE PLAINTIFF:
20
                  HALLORAN & SAGE, LLP
21                BY:  JOSHUA M. AUXIER, ESQUIRE
                       TIMOTHY McGUIRE, ESQUIRE
22                315 Post Road West
                  Westport, CT 06880
23                Phone:  (203) 227-2855
                  Fax:    (203) 227-6992
24                E-Mail:  auxierj@halloran-sage.com

25                    -continued-
```



```
 1     APPEARANCES:
       (continued)

 2

 3         FOR THE DEFENDANTS:

 4                   DAY PITNEY, LLP
                 BY:  DANIEL L. SCHWARTZ, ESQUIRE
 5                   One Canterbury Green
                     Stamford, CT 06901
 6                   Phone:    (203) 977-7375
                     Fax:      (203) 977-7301
 7                   E-Mail:  dlschwartz@daypitney.com

 8                         -and-

 9                   THOMAS J. McANDREW, ATTORNEY AT LAW
                     One Turks Head Place, Suite 205
10                   Providence, RI 02903
                     Phone:    (401) 455-0350
11                   Fax:      (401) 455-0882
                     E-Mail:  tjmcandrewlaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3

4

5

6

7          Deposition of **PHILIP KINSLEY**, a Witness from

8   Dooney & Bourke, Inc., taken on behalf of the Plaintiff

9   herein, for the purpose of discovery and for use as

10  evidence in this cause, pending in the United States

11  District Court for the District of Connecticut, pursuant

12  to Notice, and Federal Rules of Civil Procedure, before

13  Lynne Stein, Licensed Shorthand Reporter, No. 00110, a

14  Notary Public within and for the State of Connecticut, at

15  the law office of Halloran & Sage, LLP, at 315 Post Road

16  West, Westport, Connecticut, on the 14th of May, 2014, at

17  10:20 a.m., at which time counsel appeared as

18  hereinbefore set forth. . .

19

20

21

22

23

24

25

1  conversation, but it's possible I would have asked him if

2  he approved that.

3      Q      It's conversely possible you didn't talk to

4  him, correct?

5      A      No, I said I don't know if I talked to him.

6      Q      But if you're going to speculate, it goes both

7  ways.

8             I just ask you not to guess, sir.  If you

9  know, you know; if you don't, you don't.

10            Did you ever send e-mails to Bob Goodwyn about

11  these RTVs?

12     A      I don't know.

13     Q      Okay.  Did you send any e-mails to Jeff

14  Mazzaro about these RTVs?

15     A      I don't know.

16     Q      Why would Bob Goodwyn have to approve RTVs for

17  Nordstrom in this time frame?

18     A      Somewhere in the time frame of the late 2010

19  to 2011, beginning of 2011, either Peter asked Bob to get

20  involved in the Nordstrom account or Bob volunteered to

21  assist in the Nordstrom account, in attempting to reverse

22  a trend of declining sales at Nordstrom.  And Bob was

23  instructed by Peter to attempt to make a meeting with the

24  people at Nordstrom and to go out and visit them in

25  Seattle in their buying office.

```
 1        Q      Very good.

 2               Was that deposition connected to your

 3    profession or was it a personal matter?

 4        A      It was a business matter.

 5        Q      For the record, that's a business matter with

 6    Dooney & Bourke, correct?

 7        A      Yes.

 8        Q      Was that in connection with a lawsuit?

 9        A      Yes.

10        Q      What is the, generally speaking, the subject

11    matter of that lawsuit?

12        A      It was a suit brought by Ron Moholt against

13    the company.

14        Q      Again, the subject matter of that suit,

15    though.  Do you know the nature of the allegations Ron

16    was making against the company?

17        A      I'm generally familiar with them.

18        Q      What are they?

19        A      He's claiming that he should have been treated

20    as an employee.

21        Q      Rather than what?

22        A      An independent contractor.

23        Q      Where is that suit pending?

24        A      I don't know.  I believe it's Washington.

25        Q      Washington State?
```

1      A      Vice president of finance.

2      Q      Were you involved in the termination of Lynn

3    Andrus from Dooney & Bourke?

4      A      Yes.

5      Q      Tell me, how did that come about?

6      A      The decision was made to terminate her, and I

7    was involved in that discussion with her to terminate

8    her.

9      Q      Who made that decision?

10     A      Peter Dooney and I.

11     Q      Who was involved in the discussion to

12   terminate her?

13     A      Peter Dooney and I.

14     Q      Were Bob Goodwyn or Jeff --

15            MR. AUXIER:  Strike that.

16     Q      Was Bob Goodwyn involved in the discussion?

17     A      No.

18     Q      Were they involved in the decision?

19     A      No.

20     Q      Did you discuss with Bob Goodwyn, prior to her

21   termination, that you were going to terminate Lynn?

22     A      No.

23     Q      Did you ever inform Bob Goodwyn of Lynn

24   Andrus's termination?

25            MR. SCHWARTZ:  Are you talking about any

1     A    I don't recall where I was.

2     Q    In the two months prior to her termination,

3 did Bob Goodwyn inform you of any returns on the

4 Nordstrom account that Lynn had approved?

5     A    We had a discussion about it.

6     Q    When was that?

7     A    I don't know.

8     Q    What was the substance of that discussion?

9     A    The substance of that discussion was I was

10 following up on a request by Peter Dooney to look into

11 some possible returns that had been made by Nordstrom,

12 and in doing so I went to obtain any documents that

13 existed related to returns from Nordstrom.  And I had a

14 conversation with Bob Goodwyn regarding those returns

15 after I saw the RTVs.

16     Q    How did this issue come to your attention,

17 sir?

18     A    Peter Dooney called me upstairs and asked me

19 if I was aware of any returns that had been made by

20 Nordstrom.

21     Q    When was this?

22     A    I don't recall what day it was or when it was.

23     Q    Okay.  Was it less than a week or more than a

24 week before her termination?

25     A    I don't recall exactly when.

1      Q     You can't -- do you have a general time frame?

2  Can you say it was less than a month?

3      A     No, I don't have a general time frame.

4      Q     When did you discuss those returns with Bob

5  Goodwyn?

6      A     At some point during my investigation of

7  looking into those returns, I made a phone call to Bob to

8  ask him about them.

9      Q     Did you maintain a file on that investigation?

10     A     No, I did not.

11     Q     What documentation did you retrieve regarding

12  those returns?

13     A     Three RTVs that Voula had received from Lynn.

14     Q     For the record, who's Voula?

15     A     Voula Panagoulias.

16     Q     Why would she have those returns?

17     A     Because she is the one who people would send

18  requests for RTVs to.

19     Q     For the record, so it's clear, RTVs are

20  returns, correct?

21     A     Returns to vendor.

22     Q     Did you call Bob Goodwyn before or after you

23  received those documents from Voula?

24     A     I called him after I received those documents

25  from Voula.

```
 1        Q       Did you ask any questions about those

 2   documents?

 3        A       I asked him whether -- I asked him to tell me

 4   what he knew about the returns.

 5        Q       How did he respond?

 6        A       I don't know the exact specifics of the

 7   conversation.  But generally he indicated that there were

 8   discussions about returning merchandise from Nordstrom

 9   and that Lynn had discussed it with him and Jeff; and

10   that the conversation was that they were going to attempt

11   to obtain orders in some equivalent amount of money of

12   goods that they wanted to return; and that until those

13   orders were received, that we were not going to accept

14   the return back.  And he indicated he was surprised to

15   find out that the RTVs had been issued.

16        Q       Okay.  Please, for the record, describe for us

17   the RTV process at Dooney & Bourke at this time frame.

18   For example, if a store said they wanted to return a

19   certain amount of items, what would happen after they

20   informed --

21                MR. AUXIER:  Strike that.

22        Q       Who would they inform, first, of that desire?

23                Let me clean up my question.  It was a little

24   jumpy.

25                If a store wants to make a return, who does
```

1     that store contact at Dooney & Bourke to make a return?

2       A     They would initially discuss it with their

3     sales rep that they wanted to make a return. The sales

4     rep would evaluate the benefits of doing that or the

5     detriments of doing that. The sales rep should be the

6     first line of defense to attempt to understand why that

7     makes sense for their business or doesn't make sense for

8     that business, or try to keep the customer to maintain

9     them. And at some point if they agree that that was

10    something that should be returned, they would make a

11    request for that authorization to be issued.

12             At different times, depending on who was in

13    charge of the salespeople, that request would go through

14    either Tom Bendheim or Gary Dembart or myself or Jim

15    Leamy or Rico Trevino, depending on the time frame.

16       Q     During this time frame, who would they go

17    through?

18       A     During what time frame?

19       Q     The time frame of Lynn's termination.

20       A     That should have gone through myself, been

21    brought to my attention.

22       Q     How did Peter Dooney become aware of these

23    returns?

24       A     I don't know.

25       Q     He never told you that?

1    A    No.

2    Q    Did you ever ask him?

3    A    No.

4    Q    So in this time frame --

5              MR. AUXIER:  Strike that.

6    Q    For the returns that are at issue in Lynn's

7    termination, which store was, or stores, were involved?

8    A    Could you ask the question again, please?

9    Q    Sure.  I'll rephrase it.

10              For the three returns that you found in

11   investigating, do you know which stores were making the

12   returns on those at that time?

13   A    Those three were associated with Nordstrom.

14   Q    Is there any documentation that has to be

15   drafted by Dooney & Bourke to approve a return?

16   A    There is a form that the sales rep would fill

17   out, and depending on who was involved in that account at

18   the time, there may be different sign-offs for approval

19   that were on there.  And at some point it would go to

20   Voula.  And at some point, if it was a substantial

21   return, it would be brought to my attention.

22   Q    Okay.  But I thought you said that all returns

23   were supposed to go through you at that time frame.

24   A    At some point in time it would be brought to

25   my attention if it was significant.

1    Q    So it's not all returns, just significant
2    returns?
3    A    Not necessarily all returns, but those returns
4    are maintained on a file that -- the RTVs are maintained
5    on a file that Voula periodically sends to me.
6    Q    What are the significant returns in that time
7    frame?
8    A    It depends on the account.
9    Q    For Nordstrom.
10   A    Nordstrom often returns goods.  $200,000 was a
11   sizable return for them.
12   Q    But is there a threshold where a return goes
13   from being insignificant to significant?
14   A    Not necessarily one that I could define or
15   that's written or that's formalized.
16   Q    So it just depended?
17   A    Yes.  It depends on the account.
18   Q    Who made that judgment?
19   A    I review the list of RTVs that's generated
20   every month.
21   Q    Okay.  But if you review them after they're
22   done every month, how do you determine if they're
23   significant?  If they're supposed to go to you when
24   they're significant, how does anybody know to come to
25   you?

```
1          A      If there is a significant return, Voula would

2    make me aware of it through the month.

3          Q      How would she know it was significant?

4          A      Based on history, based on ones that I

5    expressed interest in in the past.

6          Q      When it comes to Nordstrom, had you ever

7    expressed interest in returns prior to February or March

8    of 2012?

9          A      Yes.

10         Q      When did you express that concern?

11         A      It often happens with Nordstrom where they go

12   through a cycle where we ship them merchandise and they

13   sell it for a period of time, and then when it becomes

14   available in the regular marketplace there's also a push

15   back from Nordstrom to return those.  And often we

16   attempt to push back on Nordstrom to keep them,

17   especially if they've been good sellers for them.

18         Q      On these particular returns that you found

19   before you terminated Lynn in 2012, were those products

20   that were selling?

21                MR. SCHWARTZ:  Object to the form.

22                .  If you understand the question, you can

23          answer it.

24         A      No, I don't.

25         Q      Well, you said that --
```

```
 1          Q       When you spoke to Bob Goodwyn, did you take
 2    any notes?
 3          A       No, I did not.
 4          Q       Did you in any way memorialize that
 5    conversation into a memo or any kind of written form?
 6          A       No, I did not.
 7          Q       Other than Bob saying that he had -- was
 8    surprised to find out about those returns, did you do
 9    anything to verify that information with Jeff Mazzaro?
10          A       It's possible -- well, I think what I was
11    asking Bob was about whether or not that had been
12    authorized by him or he was in agreement with that
13    decision.  And he had not signed off on those RAs.  And
14    he told me that he was not in agreement with that
15    decision, but that Lynn had had a conversation with him
16    where Lynn had said that they had promised to accept this
17    return, and that Bob clarified that to say, Well, we
18    didn't promise to take the return, we agreed to take the
19    return if they issued us purchase orders for equivalent
20    merchandise.  And those orders were not issued prior to
21    Lynn accepting those returns.  It was probably also a
22    conversation with Jeff, I don't recall a specific one,
23    where I would have asked him if he approved that.
24          Q       But you have no specific recollection --
25          A       I have no specific recollection of a specific
```

1    investigation?

2        A    No, I don't.

3        Q    There's a signature line on that form that

4    says Approved By Bob Goodwyn, and there's a second

5    signature line that says Approved By Jeff Mazzaro.

6            Does that mean for this particular return one

7    or both of them had to sign this form before the return

8    would be accepted?

9        A    That would be the procedure.

10       Q    Do you know if you could only accept one

11   signature or it had to be both gentlemen who signed?

12       A    I don't know if it would be both or not, but I

13   called Bob to ask him if he approved it.

14       Q    Have you ever seen a copy of that document

15   that he has signed?

16       A    I've seen copies of documents that have been

17   signed.

18       Q    Let me rephrase the question.  I was not

19   clear.

20            Have you seen a copy of the exact Exhibit 1

21   except that it has Bob Goodwyn's signature on it?

22       A    No, I have not.

23       Q    It says the accommodation returns have to be

24   signed.  When there is no signature, what is the protocol

25   at Dooney & Bourke at that point?

1        Q       So you have no idea why these returns were

2   submitted?

3        A       No.  You asked me if I knew what Dooney MDS

4   NORD Returns means, and I said, no, I don't know what

5   MDS --

6        Q       Okay.  Again, on Exhibit 2, do you know why

7   those returns were made, those 848 units?

8        A       No, I don't.

9        Q       The same question for Exhibit 3.  Do you have

10   any -- do you know why those 900 units were returned?

11       A       No, I don't.  But I know that I called Bob

12   Goodwyn and discussed with him whether he was in approval

13   of that return, and he was not in approval of that return

14   because he was awaiting replacement orders.  That's all I

15   did find out, that whether he had agreed to that or not.

16       Q       What did you do after he told you that?

17       A       After he told me that he had not agreed to

18   that return, he indicated to me that the arrangement was

19   that they were to obtain replacement orders, and those

20   replacement orders had not been received.  And what did I

21   do after that?  I went upstairs and told Peter Dooney

22   what I had found out.

23       Q       Okay.  So let me make sure that I'm being

24   clear.

25               The sum and substance of your investigation in

expenses that we were absorbing for, on Lynn's behalf,

and to push those costs and expenses out to the reps, who

would be Bob, Bill, and Jeff, and have them manage and

handle and absorb those expenses.

    Q    How is the Nordstrom account performing today?

    A    There had been an increase in the sales at

Nordstrom after Bob got involved in it, and there have

been some gains and there have also been some losses.

It's retreated a little bit in the last year, but we have

had constant contact with them and we continue to try to

develop that business.

    Q    You attended Peter Dooney's deposition, did

you not?

    A    I did.

    Q    Am I correct in saying that at the time he was

being deposed he said sales had gone down to 3 million

for Norstroms?

    A    I don't know, recall, what he said.

    Q    Okay, fair enough.

    Is that the number today, 3 million, or do you

have a different number?

    A    All I can tell you is that I know around 2006

the number was around $9 million, I know that around 2010

it was around $3.8 million.  I know it went up from that.

I couldn't tell you exactly the number it went up to.  I

```
 1          e-mail seems to refer to sales for a one-week

 2      period and for a one-month period.

 3                  MR. AUXIER:  Yes, it does.  I apologize.

 4                  MR. SCHWARTZ:  Okay.

 5      Q       But again, you don't have any knowledge to

 6  contradict that as you sit here today; is that correct?

 7      A       I have no knowledge to support or deny that.

 8      Q       Okay.  Now, when Lynn's employment was

 9  terminated, who informed her of that?

10      A       When Lynn's what?

11      Q       When her employment was terminated, who

12  informed Lynn Andrus?

13      A       I did.

14      Q       How did you inform her?

15      A       I called her.

16      Q       Describe for me, please, what you said in

17  that --

18                  MR. AUXIER:  Strike that.

19      Q       Please tell us what you said in that phone

20  conversation, to the best of your recollection.

21      A       To my recollection is, I said good morning,

22  how are you.  I indicated to her that the company has

23  over the past several years taken a look at various cost

24  centers throughout the company and has made many changes

25  to try to reduce costs and improve efficiencies.  And
```

Campano & Associates
Court Reporting Services

1    that it goes back and that over time there has been

2    significant consolidation in the wholesale channel.  And

3    if we step back several years, we had -- when Macy's

4    combined into one buying office, we had changed our

5    approach to servicing that account.  And we had gone to a

6    team approach, where we had Jeff and Lynn service that

7    account, and shortly thereafter we added Bob to that

8    account.  And we changed our ways in servicing those

9    accounts because there were fewer buyers, there were

10   fewer officers, and it was a way in which we could peg

11   people to different management levels.  And that since

12   that time we found that we thought that that was

13   successful.  And we expanded that approach to Dillard's,

14   where that approach was commonly being used at Dillard's.

15          We also explained that over the past few years

16   we had been looking at Nordstrom in the same lights and

17   that we had made a decision to implement that same team

18   approach on Nordstrom, and that we made a decision to put

19   a team together that would service them.  I don't know if

20   I listed the team or not.

21          And I indicated that at this point in time we

22   made a decision that we were no longer going to have her

23   part of that team, and that we were no longer going to --

24   and that we were terminating her employment with the

25   company.  I indicated to her that she was not the only

1  person that was going to be affected by this decision.

2          I may have paused and asked her if she -- may

3  have paused for a minute to see if she had any reaction.

4  I indicated she had been a long-term employee, she had

5  been -- worked for the company for many years, she had

6  contributed in a great deal.  We're sorry that we had to

7  make this decision, but it was a business decision

8  reacting to a changing environment, and that -- I believe

9  I also told her that we would continue to pay her base

10  pay for a period of -- through June 30th.  I believe I

11  told her that we would continue to pay her medical

12  expenses through that time, and afterwards she could pick

13  up those medical costs or continue that coverage under

14  COBRA if she wanted to, but she would have to contribute

15  to it.  I believe I told her we would pay her commissions

16  on shipments on her account through June 30th.

17      Q     Okay.  At the time of her termination, was

18  Lynn still on the Macy's team?

19      A     At the time of the termination, yes.

20      Q     How is the team constituted now?

21             MR. SCHWARTZ:  I'm sorry.  Just the last

22        question, I assume you mean just prior to her

23        termination?

24             MR. AUXIER:  Obviously, when he was on

25        the phone with her.

Campano & Associates
Court Reporting Services

```
 1                    MR. SCHWARTZ:  After the termination she
 2        wasn't part of the team.
 3                    MR. AUXIER:  Absolutely.
 4        Q     Today, who's on the Macy's team?
 5        A     Today the Macy's team involves Bob Goodwyn,
 6   Jeff Mazzaro, all of the people who work for Bob and Jeff
 7   either as employees or independent contractors, their
 8   merchandisers.  Kristen Charmoz in involved in that
 9   account.  That's who I believe is currently involved in
10   the account.
11        Q     And what is Kristen Charmoz's role on that
12   team?
13        A     Excuse me.  Rico Trevino is also involved in
14   that account.
15                    To answer your question about Kristen, I don't
16   know her exact involvement in the team.
17        Q     Is she a sales representative?
18        A     She's an employee of Dooney & Bourke.
19        Q     But is she a sales rep?
20        A     I don't know that I consider her a sales rep.
21        Q     She doesn't earn commissions?
22        A     She does earn a small commission.
23        Q     What is her commission?
24        A     I don't know her rate.
25        Q     Is it less than 1 percent?
```

```
 1          A      It is less than 1 percent.
 2          Q      What is Bob Goodwyn's commission on the Macy's
 3   account today?
 4          A      I don't know.
 5          Q      Do you know what it was in March of 2012?
 6          A      I do not.
 7          Q      And Jeff Mazzaro's, what is his commission
 8   rate on the Macy's accounts today?
 9          A      I don't know.
10          Q      Do you know what they were in 2012?
11          A      No, I don't.
12          Q      Who would know that information, besides the
13   reps themselves?
14          A      I would know that information generally if I
15   could go look it up.
16          Q      Where would you have to look to go look it up?
17          A      In the commission reports.
18          Q      Okay.  How often are commission reports
19   generated?
20          A      Commissions are paid monthly.
21          Q      So the report is, I guess, I'm assuming, but I
22   may be wrong, the report would be generated monthly as
23   well, correct?
24          A      Correct.
25          Q      Does Rico earn a commission on the Macy's
```

```
1        2012.
2                    MR. SCHWARTZ:  Maybe you did say --
3        Q     I meant March of 2012.
4                    MR. SCHWARTZ:  Your answer for both
5            concerned March of 2012, Mr. Kinsley?
6                    THE WITNESS:  Yes.
7        Q     And you said the team approach to Macy's had
8    worked out for Dooney & Bourke; is that correct?
9        A     I -- yes.
10       Q     Why was Lynn not allowed to remain on the
11   Macy's team in March of 2012?
12       A     We made a decision that we felt that that
13   wasn't necessary, for her to participate in either
14   Nordstrom or Macy's going forward.
15       Q     Was there a basis for that decision with
16   respect to Macy's?  We discussed Nordstrom.
17       A     It allowed us to push all the costs and
18   expenses associated with the Macy's account to the reps
19   who were handling -- the independent sales reps who were
20   handling it, and to no longer be absorbing those costs in
21   Dooney & Bourke, Inc.
22       Q     In March of 2012, what were those costs?
23       A     Those costs would have been certain
24   merchandisers that worked in Lynn's territory.  Those
25   costs would have been perhaps some people who worked, I
```

1    don't know what the proper term is, but some people who

2    may have worked in key doors.  I don't know whether they

3    would be called brand.  For example, we had somebody who

4    assisted in the Macy's Herald Square store.  Or we had a

5    brand specialist or brand merchandiser who worked in one

6    or two other stores, who we paid salary support to Macy's

7    on.  Lynn's travel and entertainment, if any.  Lynn's

8    payroll expense.  Lynn's support services.  The costs

9    associated with an employee, whether those benefits be

10   medical or otherwise.  And all of those costs would get

11   pushed to the sales reps, or most of those costs would

12   get pushed to the sales reps.

13        Q     What about, was there any kind of retirement

14   pension or 401(k) that Dooney & Bourke contributed to on

15   Lynn's behalf?

16        A     There is no contribution on Dooney's part to

17   either 401(k) or to a retirement plan.

18        Q     Okay.  Do you know how much travel and expense

19   Dooney & Bourke paid for Lynn Andrus in 2011?

20        A     No, I don't.

21        Q     Were any merchandisers terminated from their

22   employment along with Lynn's employment?

23        A     Well, merchandisers were not employees, they

24   were independent reps.

25        Q     Okay.  So let me maybe back up.

1          Who were the merchandisers that Lynn was using
2    in her role at Dooney & Bourke in 2012?
3          A     I believe there was a company called
4    Merchandising Services that provided services for some of
5    her accounts in her territory.
6          Q     And Dooney & Bourke paid Merchandising
7    Services for their -- for what they did for Lynn?
8          A     They did.
9          Q     Do you know annually how much that cost in
10   2012?  Or 2011, excuse me.
11         A     No, I don't.
12         Q     Who would know that information?
13         A     It would be in the payables records.
14         Q     Who at Dooney & Bourke, though?  I need a
15   name.  Who there now could I ask who would know that
16   information?
17         A     Anybody in the accounting department could go
18   look that up.
19         Q     When you decided to go to your team approach,
20   did you look up those costs in 2011?
21         A     I may have.  I don't recall specifically.
22         Q     The brand people, I don't know if we got a
23   better term for them, who is that?
24         A     I believe there were one or two people that we
25   paid Macy's salaries for having them work certain stores.

```
 1    volume of business that had been passed to them over the
 2    12 months.  And when Lynn's commission changed to be
 3    1 percent of all of Nordstrom, it appears that she
 4    continued to only get deducted for her allocated portion
 5    of the credits and not for any of Bob's -- I'm sorry,
 6    Bill's or Ron's.
 7         Q     In 2012 what was Bill's commission percentage?
 8         A     Bill was receiving 5 percent on southern
 9    California and whatever territories around there he had.
10         Q     Ron and Bill got 5 percent.  Is that what you
11    testified?  In 2012, that's who you -- those --
12         A     And Ron got 5 percent of Washington or
13    whatever his territory was.
14         Q     Okay.
15               MR. AUXIER:  This is 5.
16               (Whereupon, the document with handwriting,
17    Outline of Phone Conversation With Lynn Andrus, 3/14/12,
18    was marked as Plaintiff's Exhibit 5 for identification.)
19         Q     I show you what's been marked as Exhibit 5.
20    Mr. Kinsley, have you seen that document prior to today?
21         A     Yes.
22         Q     For the record, what is that document?
23         A     This is a typed script or outline that I
24    prepared in order to have the phone conversation where I
25    terminated Lynn Andrus and Ron Moholt.
```

1      Q      I just want to be clear.  Who typed that
2  document?
3      A      I did.
4      Q      Did you type it prior to those phone
5  conversations?
6      A      I did.
7      Q      Somebody wrote at the top of that, it appears.
8  It says "Outline of Phone Conversation With Lynn Andrus,"
9  and it's dated 3/14/12, and there's a mark there.  Do you
10  know who wrote that above the typed portion?
11      A      Yes.
12      Q      Who did that?
13      A      I did.
14      Q      Okay.  And did you -- is that your, I guess,
15  initial next to it?
16      A      Yes.
17      Q      It's dated 3/14/12.  Is that the day you typed
18  this document?
19      A      No.
20      Q      Why did you date it 3/14/12?
21      A      Because that's the date I had the phone
22  conversation with Lynn.
23      Q      Okay.  And you used a copy of the same
24  document for the phone conversation with Ron?
25      A      After I spoke with Lynn, I called Ron and I

1    prepare these scripts prior to having these talks or

2    making these phone calls?

3         A    Generally, yes.

4         Q    I believe at the beginning of this deposition

5    you said you were the vice president of finance for

6    Dooney & Bourke currently; is that correct?

7         A    That is my title.

8         Q    How long have you had that title with Dooney &

9    Bourke?

10        A    Since 1985 or 1986.

11        Q    Have you held any other positions with

12   Dooney & Bourke prior to 1985?

13        A    Positions?

14        Q    Yes.

15        A    As an employee?

16        Q    Either as an employee or any other titles

17   while you were there.

18        A    I was not an employee of Dooney & Bourke prior

19   to that.

20        Q    When you started you were executive vice

21   president; is that correct?

22        A    No.  I was vice president of finance.

23        Q    Vice president of finance, sorry.

24             Have you served continuously in that role

25   since 1985?

1       A       I have.  Either '85 or '86.  I'm not sure

2   exactly of the start date.

3       Q       Sure.  Do you report to work generally in the

4   Norwalk facility?

5       A       Yes.

6       Q       During your time as vice president of finance,

7   did you have a supervisory role over the sales

8   representatives?

9       A       At times I had supervisory roles over the

10  independent sales representatives and the employees.

11      Q       When were those times?

12      A       Those times were at most times other than

13  from, say, 1997 to 2001, when Tom Bendheim was here.  I

14  believe he started in May of 1997.  I believe he left in

15  December of 2001.  And during that time I still had

16  involvement, but he was more responsible for the sales

17  end of the business.  He would discuss with me his

18  decisions and things that he was doing.  But I did not

19  have direct supervisory responsibility for those people.

20  And when he left that came back to me.

21              At some point around 2003 to 2005, Gary

22  Dembart came on board, and he was responsible for the

23  sales reps.  And at that time I was less involved in

24  their activities, but was very much up to speed on what

25  was going on and what decisions Mr. Dembart was making

1    on the other accounts as it was for Nordstrom and Macy's?

2         A     I don't know off the top of my head.

3         Q     State for us, what was Lynn's job functions as

4    a sales representative at Dooney & Bourke?

5         A     Lynn's responsibilities as an employee of

6    Dooney & Bourke were to --

7         Q     I hate to cut in.  She was employed in other

8    capacities.  I'm asking only as a sales representative,

9    which I think we've narrowed down maybe was in '97, late

10   '90s.  What were her job duties as a sales representative

11   at Dooney & Bourke?

12                    MR. SCHWARTZ:  I'm going to object to the

13        form.

14        Q     I'll stipulate she was an employee.  I know

15   that.  She served in other capacities when she first

16   began.  When she became a sales representative what were

17   her job functions?

18        A     Specifically, I'm not sure that I can list

19   them because I believe that was during the Tom Bendheim

20   era.  I believe that she had multiple accounts that she

21   dealt with.  I believe that she had responsibilities for

22   attending market, for reviewing the product that was

23   being shown, for promoting those products to her buyers,

24   for soliciting orders from them, for being the first line

25   of defense with them when they wanted to push back on

```
 1      returning merchandise, to be the first line of defense

 2      for knocking on their door to solicit more orders when

 3      things were selling, to be in the stores merchandising

 4      them, to be responsible for the way that those stores

 5      looked, the way that those stores appeared, the frequency

 6      with which those stores were visited.

 7              She had responsibilities for understanding the

 8      line and how it affected her business, and what other

 9      customers or competitors that she was not a rep on, what

10      things they might have been doing to capitalize on the

11      business that she may not be capitalizing on, and vice

12      versa, to push back when returns were requested, to push

13      back when credits were requested for merchandising

14      assistants.  To be a first line of defense in

15      representing the company.  To be in their face as much as

16      possible, to make sure that she's generating and

17      improving the business as much as possible, analytical

18      review of those accounts, performance review of those

19      accounts, analysis of inventory turn on those accounts.

20              Those are the things that come to mind.

21      Q       Okay.  Are all Dooney & Bourke sales reps, no

22      matter how classified, independent contractor or

23      employee, they're expected to attend market week?

24      A       They are.

25      Q       Is there a mandated frequency with which
```

```
1    Dooney & Bourke expects a sales rep to go to a buyer and

2    have a face-to-face meeting?

3         A    There is no specific mandated number.

4         Q    Okay.  Is there an expectation of how many

5    times that will occur over a year?

6         A    I think there's an expectation that that

7    should occur as frequently as necessary to develop the

8    business and to build it.

9         Q    Do you have an opinion about how often that's

10   necessary for a successful sales rep with Dooney &

11   Bourke?

12        A    I do not.

13        Q    Does Peter Dooney have that opinion, do you

14   know?

15        A    You would have to ask Peter.

16        Q    He's never told you, I guess I should ask.

17        A    You would have to ask Peter.

18        Q    Okay.  Again, he's never told you, though?

19        A    I don't know what his thoughts are or his

20   expectations are.  His expectations are that they should

21   be frequently visited.  His expectations are that they

22   should be visited when the need arises.  I think each

23   case is a case-by-case basis, so I'm not sure, I'm not

24   sure there's a magic number.

25        Q    Okay.  Are all sales reps expected to have
```

1   knowledge of the line that Dooney & Bourke is offering to

2   the buyers?

3          A     Yes.

4          Q     Is each sales rep expected to perform

5   analytics on each account that they service for Dooney &

6   Bourke?

7          A     They should.

8          Q     Does Dooney & Bourke expect sales reps to, I

9   think your words were push back, when a buyer wants to

10  get a credit or make a return?

11         A     Say that again?

12         Q     Does Dooney & Bourke expect its sales reps to,

13  I believe you called it push back, when a buyer wants to

14  ask for a credit or return on items?

15         A     Yes.

16         Q     Does Dooney & Bourke expect the sales reps to

17  be the first line of defense on returns, as you put it?

18         A     Yes.

19         Q     Since 1997, has Dooney & Bourke entered into

20  written contracts with its sales representatives?

21         A     Not that I'm aware of.

22         Q     Okay.  And I have to ask the specific

23  questions.

24               You know of no contract between Dooney &

25  Bourke and Bob Goodwyn or his associated company?

```
1         A       Can you ask me that?  I'm sorry.  I can't hear
2    you.
3         Q       I'm sorry.  I'm a bit of a mumbler.
4         A       I have bad hearing, so we're a good pair.
5         Q       We're a perfect match.  I'll try and speak up.
6    I apologize.
7                 To be more specific, though you've given me a
8    fair answer, does Dooney & Bourke have a contract with
9    either Bob Goodwyn or his associated company?  I believe
10   it's called Goodwyn & Goodwyn, Incorporated.
11        A       Not to my knowledge.
12        Q       The same question for Jeff Mazzaro and his
13   company.  Is there a written contract between Dooney &
14   Bourke and Mazzaro and Mazzaro's company?
15        A       Not to my knowledge.
16        Q       And for Bill Tripodi -- let me back up.
17                Does Bill Tripodi have a company that he uses
18   in his sales rep business?
19        A       I believe he does.
20        Q       Does Dooney & Bourke have a contract with
21   either Mr. Tripodi or his company?
22        A       No, not that I'm aware of.
23        Q       In your role, have you ever negotiated the
24   commission amount with a sales representative for
25   Dooney & Bourke?
```

1      A       She might be able to take stock from one order

2   and allocate it to a different order.

3      Q       Again, how does that affect how she's

4   compensated?  Why should she be compensated less or more

5   based on that?

6      A       Perhaps that's not a reason for compensation

7   differences.

8      Q       Okay.  In February 2013, for a similarly

9   situated employee as Ms. Andrus, what would the health,

10  her health benefits cost Dooney & Bourke?

11     A       Can you ask that again?  I'm sorry.  I wasn't

12  focused on it.

13     Q       No problem.

14             In, say, March of 2013, for a similarly

15  situated employee, or for Ms. Andrus herself, what would

16  her health benefits cost Dooney & Bourke?

17                   MR. SCHWARTZ:  I'm going to object to the

18        form.

19                   Did you mean March of 2012 when she was

20        still an employee?

21                   MR. AUXIER:  I did.

22     Q       March of 2012.

23     A       It's hard to say what her exact cost of her

24  medical plan was because we are self-insured.  And we pay

25  the first 50 or -- March of 2012, we would have paid the

1    first hundred thousand dollars of anybody's claims, and

2    we insured for the balance above that.  So the cost of

3    the plan to each individual employee differs, depending

4    on their usage under the plan.

5         Q    So are you able to give me a figure for that

6    time frame, February 2012, for her health benefits?

7         A    I can tell you that around that time frame the

8    company paid over $2 million in health benefits to their

9    employees. But specifically what her cost was based on

10   her claims, I can't tell you.

11        Q    Okay.  And how many employees were enrolled in

12   that plan at that time?

13        A    March of 2012?  Maybe 140, maybe 130.

14        Q    Is that a plan that was formed pursuant to

15   ERISA?

16        A    I don't know how to answer that.

17        Q    Okay.  How much were the merchandisers --

18             MR. AUXIER:  Strike that.  Sorry.  I

19        asked that question already.  I'll move on.

20        Q    Do you know how much federal income tax --

21   excuse me.  Do you know how much FICA tax you had to pay

22   for Ms. Andrus in around February of 2012 --

23        A    No.

24        Q    -- for the year?

25        A    No.

1        Q      Do you know the prior year, how much FICA

2   would have to be paid to the government?

3        A      No.

4        Q      I meant by Dooney & Bourke.  Excuse me.  I

5   don't know if that clarifies it.

6        A      No.

7        Q      Okay.  I want to talk a little bit about the

8   sales force in general.

9               In March of 2012, besides Ms. Andrus, were

10  there any other employees that were performing as sales

11  reps?  For Dooney & Bourke, obviously.

12       A      Employees who were performing what?

13       Q      As sales representatives for Dooney & Bourke.

14       A      There were probably some individuals who had

15  some sales rep responsibilities in their job function,

16  along with other responsibilities.

17       Q      Do you know anyone who was working exclusively

18  as a sales representative in that time frame besides

19  Ms. Andrus?

20       A      Kristen Charmoz was there at that time.  I

21  don't know if she would be considered exclusively

22  participating as a rep.  She participated in the Macy's

23  account, maybe some others.

24              Ann Marie Jones had certain sales rep

25  responsibilities for certain accounts.

1          He came in 1997, excuse me, and he implemented

2     his plan that we had discussed over several months,

3     sometime during 1998.

4          Q     So in 1998, did he assign, or in some cases he

5     left alone, but when he did make changes, at points he

6     did reassign certain accounts to different sales reps; is

7     that correct?

8          A     He did.  Or different doors to different reps.

9          Q     So the record is clear, door means, in this

10    context, means different stores; am I correct?

11         A     Correct.

12         Q     What was he trying to accomplish by assigning

13    different doors and different accounts to different reps

14    in this reevaluation?  What was his goal?

15         A     I think that his goal was to correct how

16    Dooney serviced their customers based on how the

17    environment in the United States had changed, in that

18    there had been a significant amount of consolidations

19    within the accounts.  Many had Pacman gobbled up by

20    Federated or other department store chains were absorbed.

21    Changes in buying offices happened.  What used to be more

22    of an assignment of an account to a particular place,

23    there had been buying offices moving all over.  There had

24    been reps who had merchandisers that were traveling all

25    over the country.

1   convey.

2        Q    But when you're doing that reevaluation, was

3   there any look to see, well, whether less merchandisers

4   or more merchandisers would have to be used, or whether

5   the costs associated now went up or down for the

6   particular sales rep? Was there any kind of analysis of

7   how a consolidation would affect his overhead or his need

8   to have a certain number of employees, or anything of

9   that nature?

10        A    Yes.  I believe there was some weight given to

11   that.  For example, in the situation where Macy's

12   consolidated, Jeff Mazzaro had a team of merchandisers

13   that he would have to now spread out across the country,

14   or pay other people's merchandisers in other territories

15   to perform those services, and he may have had

16   incremental costs associated with that.  And that may or

17   may not have gone into the decision of what that

18   percentage was reduced to.

19        Q    Did you ever ask to see what his actual costs

20   were or what he was expending prior to the consolidation?

21        A    No, I did not see his actual numbers.

22        Q    Did anybody at Dooney & Bourke ask for that

23   information?

24        A    I don't know if at that particular time I

25   asked for that information.  There was a period of time

1    that I did sit down with each of the reps and tried to

2    identify what type of support they had on -- in their own

3    entities, or what type of support Dooney & Bourke

4    provided for its employees associated with that.

5          Q     When was that period of time?

6          A     I don't recall exactly when that was.

7          Q     Was that before the Bendheim reforms, for lack

8    of a better word?

9          A     No, it would have been much longer after that.

10         Q     Okay.  But was it before Lynn's employment

11   termination?

12         A     It was before Lynn's termination.

13         Q     Now, in February of 2012, do you know what the

14   cost to Dooney & Bourke was for Lynn's IT support?

15         A     I wouldn't know to value that.

16         Q     Okay.

17         A     But I certainly could say that she could turn

18   around to her husband and ask him to get access to any

19   computer data or any information that was there, or

20   assistance with her computers.  Or she could contact

21   Martin Ronk or Felix Lugo for assistance in any IT

22   support she would need.  So she had access to employees,

23   one of whom probably sat behind her in the same room.

24         Q     The cost would be minimal, it sounds?

25         A     Well, I pay Bob a lot.

1    how we would have handled it.

2         Q    Okay.  So we're clear, to the best of your

3    knowledge, no independent Dooney & Bourke sales rep has

4    sold handbags from another, for lack of a better term,

5    supplier or designer or manufacturer?

6         A    Not to my knowledge.

7         Q    And you have no opinion, if you were to find

8    out, hypothetically, that Bob Goodwyn was selling

9    handbags from another manufacturer to Nordstrom, would

10   you have an opinion as to whether -- would you allow that

11   or would you have an issue with that?

12        A    Generally, I don't think we would allow that.

13        Q    Okay.  And that would be true for any item

14   that would compete directly with your item; is that

15   correct?

16        A    Certainly, if it was in competition, or any

17   serious competition.

18        Q    I'm not being a wise guy, I'm kind of curious.

19   Would, say, watches, would that, jewelry or watches,

20   would that be in competition with your goods, or no, in

21   your opinion?

22        A    In my opinion it would depend on the brand, it

23   would depend on the size of it.  I wouldn't think we

24   would be objectionable to that.

25        Q    Do you know if any of the sales reps do sell

1    Q    Is there any kind of financial incentive for a

2  sales rep to find new accounts?

3    A    They would earn commission on those accounts,

4  so, yes, there's an incentive.

5    Q    I guess I meant above and beyond, like a

6  bonus.  A signing bonus, I guess would be a colloquial

7  way to put it.

8    A    No.

9    Q    Okay.  Does Dooney & Bourke provide training

10  to its independent sales reps?

11    A    At times.  We provide suggestions on how they

12  can merchandise new collections within the stores.  At

13  times we, mostly back in the Tom Bendheim era, talked

14  about displays and generalities of how the products

15  should be presented.

16        As to specific training, as to specific

17  guidelines that this is the way it has to be and this is

18  the way it has to go, no.  They're just suggestions on

19  how the goods should be presented, or how we feel, we

20  place importance on certain collections versus others.

21        But each rep is able to make their own

22  decisions in their territories.  But we certainly have

23  the ability to walk in that store and make our

24  suggestions on that.  But is there a training program, is

25  there a hoo-hah where we all get together and say this is

1    president.

2        Q    Okay.  Nevertheless, did he ever have an

3    occasion to tell you where he's had to admonish a sales

4    rep for failure to merchandise in the way that's

5    appropriate?

6        A    I don't know if "admonish" is the right word.

7    But I've known that since he's been there that he's made

8    an extensive review of many of the stores.  I know that

9    he's worked with the sales reps in visiting those stores.

10   I know that he's worked with the sales reps in having

11   comments on the presentation, on how the store appears,

12   on what's selling, on where merchandise is, whether it's

13   on the floor or not.  I know that they've toured the

14   stores with buyers.  I know that they've -- Rico's had

15   conversations with merchandisers about different things

16   that he liked or didn't like.  He's been active in

17   evaluating that aspect of the business.

18       Q    Getting back to new accounts, can you think of

19   the last time that you turned down a new account that a

20   sales rep has presented to you?  To Dooney & Bourke; I

21   should be precise.

22       A    We have turned down accounts.

23       Q    Do you remember the last time that happened?

24       A    I can't remember specifically the last time,

25   but there are some specialty stores that we've turned

1    down.  We've turned down Zappos -- wait a minute, I'll

2    take that back.  We've turned down Amazon.

3         Q    Safe to say the ultimate decision on whether

4    the sales rep can sell to that account is with Dooney &

5    Bourke, correct, when it comes to Dooney & Bourke

6    products?

7         A    Yes, it is.

8         Q    Are there some outlet stores that sell

9    Dooney & Bourke products?

10        A    Dooney & Bourke operates outlet stores, yes.

11        Q    Has its own, correct?

12        A    Yes.

13        Q    Does it currently sell product in, I believe

14   it's Nordstrom Rack?  Have I got that name correct?  Is

15   that the Nordstrom outlet?

16        A    Do we currently sell them as of today?

17        Q    Yes.

18        A    Yes, we do.

19        Q    Was there a time you did not sell them?

20        A    There was a time where I resisted selling

21   them.

22        Q    What was the basis for that resistance?

23        A    I was not supportive of shipping on a regular

24   basis to the Nordstrom Rack.  And I did not believe that

25   that was positive to our business and competed with our

1    Bourke products to my A, B, and C stores.

2        A    I'm not aware of any.

3        Q    Okay.

4        A    I'm not saying that somebody couldn't approach

5    us and we wouldn't evaluate that option, but I'm not

6    aware of any.

7        Q    Do the independent sales reps have access to

8    sales data and the analytics you spoke of earlier,

9    whether they're on the account or not?

10       A    One more time?

11       Q    Sure.  Do the independent sales reps have

12   access to sort of your data that you use for sales or for

13   your business?  Can they -- even if it's not on their

14   account -- can someone who works only on the Macy's

15   account see the sales data on Nordstrom with respect to

16   product that's moving and what products are not moving,

17   and is that data freely shared amongst the independent

18   sales reps?

19       A    Generally we restrict the data that each rep

20   is able to go in and view and monitor, mostly related to

21   purchase orders and history of shipping, to their

22   accounts.  So if they signed on to the system they would

23   be limited, if they were an independent rep, to the

24   accounts that are tied to their rep number.

25            However, we do have certain information that

1    we gather on a corporate basis that we share with the

2    reps that allow them to understand what competitors in

3    the same mall might be selling that their account might

4    not, to help them figure out, well, gee, store A at the

5    end of the mall is flying this particular style out like

6    crazy, and this store B at the other end of the mall

7    isn't buying it, therefore that's a missed opportunity.

8    We share that type of information with them.

9              We also generally share information on SKU

10   selling in total.  So we would indicate, for example, for

11   the last week, for the last four weeks, for the season to

12   date, and the year to date, what are the sales in the

13   wholesale channel.  You could play with that any way you

14   want and dissent it.  We might share with you what we

15   sell in our retail stories, We might share with you what

16   we sell in our web.  We might share with you what we sell

17   in another channel.  So you can go in and you can see

18   across different channels what might be selling better or

19   worse.  However, you might not be able to go down into

20   the level and say this is rep A and this is rep B.  But

21   we share information to help them use that to improve

22   their sales.

23        Q    Do the independent sales representatives have

24   input on the design of the line?  I know you have

25   different lines per season.  Do they get to have input by

1       A     Yes.

2       Q     And this restructuring of the rate, did that

3  have anything to do with any consolidation within Macy's

4  at that time?

5       A     May I see that again, please?

6       Q     Sure can.

7       A     (Perusing document.)

8             Can I hear your question once again.

9               MR. AUXIER:  Can you read back my last

10    question.

11           (Whereupon, the requested question was read.)

12       A    I do not believe so.  It simply reallocated

13  the amount between Bob and Jeff.  And the total between

14  Bob and Jeff before this percentage and after this

15  percentage, I believe, were the same.

16       Q    Why did they have these merchandisers in

17  overlapping territories?  How did that come about, if it

18  was not consolidation?

19       A    I'm going to take that back.  I do remember

20  this conversation.  It either had to do with a

21  reallocation of the commission between Bob and Jeff, or

22  it had to do with, this is the time frame, February 2010,

23  when Bob was added to that account team, which was

24  previously handled by Jeff and Lynn and Kristen, when

25  they consolidated to one office in 2009.  And at some

1   point later on after that consolidation or after that

2   structure had been Jeff, Lynn, and perhaps Kristen.  I

3   don't know if Kristen was there in the beginning or not.

4   At some point of time we added Bob Goodwyn to that

5   account as part of the team, and we allocated,

6   reallocated a percentage of the commission to himself.

7   And we may have had some conversation between Bob and

8   myself with how he wanted, and Jeff wanted, the total of

9   their portions to be split to try to accommodate for how

10  merchandisers and costs may be split between Mazzaro's

11  business and Goodwyn's business.  So I don't believe

12  this -- I believe this is when we added Bob Goodwyn to

13  the team.

14       Q     Okay.  Do you remember what the difference in

15  the percentages that you discussed over the phone were

16  from the e-mail?  The e-mail says there were some

17  differences from what was discussed on the phone.  Do you

18  remember those differences?

19       A     I think that the conversation was between Bob

20  and myself.  I don't know if Jeff was involved in that or

21  not.  I believe Bob was talking to Jeff on the side.  And

22  we were coming to terms as to what involvement Bob would

23  have in the account and what percentage commission we

24  were going to pay him.  And then there was some

25  conversation that Bob and Jeff wanted to be able to have

1   another level of management that was below that.  I don't

2   know whether they're with a buyer or GMM or DMM or

3   M-O-U-S-E.  But they each tried to peg themselves with

4   different levels of management such that Macy's was

5   feeling that we were servicing their account at every

6   level of interest that we can to try to develop.

7       At some points in time Bob's relationship with

8   someone topside was able to convince them to reverse a

9   decision that some buyer may have made that may have been

10  an inappropriate decision.  Buyer may have wanted to

11  return stock and we thought it was a bad move, and Bob's

12  relationship might be able to influence that.  If Lynn's

13  relationship with whoever her buyer was or Jeff's

14  relationship with whoever he had were for that other

15  item -- it was an ability to have multiple people to

16  argue the case and not have it closed and shut when one

17  buyer said return them.

18      Q    Who decided how to arrange the pegs on the

19  Macy's team?

20      A    I believe that that was between Peter and

21  myself, and that we felt that Bob was the most senior

22  person.  He had the most senior structure in the

23  Dillard's structure.  This is 2010.  2010 -- give me a

24  second.

25      So I believe that in 2010 -- 2005, 2007,