# EXHIBIT G

1

```
 1              UNITED STATES DISTRICT COURT

 2                 DISTRICT OF CONNECTICUT

 3

 4    * * * * * * * * * * * * *          COPY

 5    LYNN ANDRUS,                  *

 6              Plaintiff,          *

 7         vs.                      *    Civil Action
                                         No. 3:13CV146(RNC)
 8    DOONEY & BOURKE, INC., and    *
      PETER DOONEY,
 9                                  *
              Defendants.
10    * * * * * * * * * * * * *
                                         Westport, CT
11
                                         May 23, 2014
12
                                         10:06 a.m.
13

14

15            DEPOSITION OF ROBERT J. ANDRUS

16

17

18
      APPEARANCES:
19
           FOR THE PLAINTIFF:
20
                   HALLORAN & SAGE, LLP
21                 BY:  JOSHUA M. AUXIER, ESQUIRE
                   315 Post Road West
22                 Westport, CT 06880
                   Phone:   (203) 227-2855
23                 Fax:     (203) 227-6992
                   E-Mail:  auxierj@halloran-sage.com
24
                       -continued-
25
```

```
 1   APPEARANCES:
     (continued)
 2

 3       FOR THE DEFENDANTS:

 4               DAY PITNEY, LLP
                 BY:  DANIEL L. SCHWARTZ, ESQUIRE
 5                    One Canterbury Green
                      Stamford, CT 06901
 6                    Phone:   (203) 977-7375
                      Fax:     (203) 977-7301
 7                    E-Mail:  dlschwartz@daypitney.com

 8                            -and-

 9               THOMAS J. McANDREW, ATTORNEY AT LAW
                 One Turks Head Place, Suite 205
10               Providence, RI 02903
                 Phone:   (401) 455-0350
11               Fax:     (401) 455-0882
                 E-Mail:  tjmcandrewlaw.com
12

13       FOR THE WITNESS:

14               LAW OFFICES OF NEAL ROGAN, LLC
                 BY:  NEAL P. ROGAN, ESQUIRE
15                    315 Post Road West
                      Westport, CT 06880
16                    Phone:   (203) 341-8783
                      Fax:     (203) 341-8560
17                    E-Mail:  neal@nealrogan.com

18

19   Also Present:  PHILIP KINSLEY

20

21

22

23

24

25
```

3

1

2

3

4

5

6

7            Deposition of **ROBERT J. ANDRUS**, a Witness from

8   Dooney & Bourke, Inc., taken on behalf of the Plaintiff

9   herein, for the purpose of discovery and for use as

10  evidence in this cause, pending in the United States

11  District Court for the District of Connecticut, pursuant

12  to Notice, and Federal Rules of Civil Procedure, before

13  Lynne Stein, Licensed Shorthand Reporter, No. 00110, a

14  Notary Public within and for the State of Connecticut, at

15  the law office of Halloran & Sage, LLP, at 315 Post Road

16  West, Westport, Connecticut, on the 23rd of May, 2014, at

17  10:06 a.m., at which time counsel appeared as

18  hereinbefore set forth. . .

19

20

21

22

23

24

25

10

1    he asks you the question.

2                    MR. SCHWARTZ:  Objection to --

3                    MR. McGUIRE:  You can't assert

4    privilege.

5                    MR. SCHWARTZ:  The question calls

6    for communications between him and his attorney.

7                    MR. McGUIRE:  It's his privilege to

8    either waive or assert, and that has nothing to do

9    with you or your clients.

10                    MR. SCHWARTZ:  Certainly before

11   anybody waives attorney-client privilege in a

12   deposition, I am going to alert them to the fact

13   that that privilege exists.  So I do think it's an

14   improper question.

15                    MR. O'ROURKE:  Is there a question

16   pending?

17                    MR. McGUIRE:  I don't believe there

18   is.  I think you -- I asked whether there were any

19   documents that you produced to your attorney that

20   you are not included in Exhibit 2, and I think you

21   said there is one document; is that correct?

22                    MR. O'ROURKE:  Well, I think that

23   Dan has prompted me again to assert the privilege,

24   and I think I will do that with this particular

25   question, but I think that you can ask the question

```
 1          Q      Does he receive those reports --
 2                 MR. AUXIER:   Strike that.
 3          Q      Does he receive all the shipment reports as
 4     well?
 5          A      Yes.
 6          Q      How often are those shipment reports generated
 7     and distributed by yourself?
 8          A      Depending on the timing of the month, it could
 9     be once a week, could be once every day as we approach
10     the end of the month.
11          Q      And to be clear, Jeff Mazzaro gets those every
12     time they're generated?
13          A      Every time.
14          Q      Do you know why?
15                 MR. AUXIER:   Strike that.
16          Q      Do you know who tasked him with getting these
17     reports?
18          A      I'm not exactly sure who it was, no.
19          Q      Do you recall the first time you had to start
20     sending him credit and shipment reports?
21          A      I don't recall the first, exact first time,
22     no.
23          Q      Do you recall how you were informed that you
24     would be sending these reports to him?
25          A      No.
```

1     Q     I believe you stated that Bob Goodwyn

2   sometimes gets the credit reports.  Is that correct?

3     A     Yes.

4     Q     Under what circumstances does he receive the

5   credit reports?

6     A     If I get a request specifically from them for

7   it, or somebody tells me specifically to send it to

8   either him or somebody who works for him.

9     Q     Can Bob Goodwyn, at his request, receive

10  credit reports for any sales rep that is employed by

11  Dooney & Bourke?

12             MR. SCHWARTZ:  Object to the form.

13     Q     You can answer unless one of your lawyers

14  tells you not to answer.

15             MR. ROGAN:  They're just preserving some

16         legal right they may have at the time of the trial.

17         So unless you get a specific instruction either

18         from corporate counsel or me, just try and answer

19         the question.

20     A     Can you ask it one more time?

21             MR. AUXIER:  Can you read it back, Madam

22         Reporter.

23             (Whereupon, the requested question was read.)

24     A     Meaning if he asked me to send them, would I

25  send them to him?

1   Q       Yes.

2   A       Yes.

3   Q       Do you know when that practice began at

4   Dooney & Bourke?

5   A       Approximately 2005.

6   Q       Did you seek authority from someone in

7   Dooney & Bourke prior to giving Bob Goodwyn the credit

8   reports?

9   A       Yes.

10   Q       Who was that from?

11   A       That would have been Phil.  I wouldn't send

12   any of those shipping or credit reports without checking

13   with him first.

14   Q       Can you describe for me, please, how that came

15   about?

16   A       How my request to Phil to ask?

17   Q       Exactly.  How did the situation come up?

18   A       I don't recall specifically.  But I would

19   imagine Bob Goodwyn requested them and I went to Phil to

20   ask if it was okay for me to send them.

21   Q       Do you remember if that was done by e-mail or

22   phone?

23   A       I don't --

24          MR. AUXIER:  Strike that.

25   Q       My question is unclear.

1        A       Right.

2        Q       What is her role at Dooney & Bourke, to the

3   best of your knowledge?

4        A       Planning and production.

5        Q       So Ms. Goodman has the ability to tell you to,

6   at Dooney & Bourke, to give these reports out to whomever

7   she thinks, in her discretion?

8        A       No.  If she told me specifically to send them,

9   I wouldn't just send them without clarifying that.

10       Q       Who would you clarify that with?

11       A       I'd ask her to clarify it with Bob Goodwyn and

12   with Phil.  And Rico Trevino.

13       Q       And that's currently.  Rico Trevino started

14   there at what time, sir?

15       A       Approximately, it was a year, I think, in

16   March.

17       Q       So March of 2013?

18       A       '13.

19       Q       Correct?

20       A       On or about.

21       Q       Sure.  I want to be sure we're clear.  Can Bob

22   Goodwyn also get all shipment reports, if he asks for

23   them?

24       A       Yes.

25       Q       Are the circumstances the same as with credit

1      Q     Do you know if Jeff Mazzaro has a title with

2  Dooney & Bourke?

3      A     Yeah.  It changed.  I'm not sure exactly what

4  the title is, but I know that it changed a few years ago.

5      Q     Okay.  Would it have been director of

6  wholesale accounts?

7      A     Something like that, yes.

8      Q     You say it changed a few years ago.  You

9  mean -- what was it a few years ago when it changed?

10     A     I think he was just a regular account

11 executive, rep.

12     Q     Can you tell me about how many years ago he

13 started as director of wholesale accounts?

14     A     Approximately maybe 2009 or '10.

15     Q     How did you come to learn that he was the

16 director of wholesale accounts for Dooney & Bourke?

17     A     I had a conversation with him.

18     Q     Was that face to face or on the phone?

19     A     On the phone.

20     Q     Describe for me how that conversation came

21 about.  Did he call you about something else and mention

22 it or did he call you specifically and tell you this?

23     A     No.  I would talk to him, you know, 20 times a

24 day.  So I think it was just his job morphed into taking

25 on a larger responsibility.

```
 1        Q      To the best of your recollection, tell me
 2   specifically what he told you about being the director of
 3   wholesale accounts.
 4        A      That he would be tasked with really monitoring
 5   the chargebacks and credits that were going to each
 6   account, and that I would be -- he'd need my help in
 7   supplying him with the information, the data, so that he
 8   can do that.
 9        Q      Did he tell you who at Dooney & Bourke made
10   him the director of wholesale accounts, if anybody?
11        A      He didn't specifically say.
12        Q      Did you, shortly after that conversation,
13   attempt to verify that he was the director of wholesale
14   accounts with someone at Dooney & Bourke?
15        A      Phil.
16        Q      Did you do that through telephone or by
17   e-mail?
18        A      I don't recall.
19        Q      To the best of your recollection, did he
20   verify that information?
21        A      I don't know if I had a specific conversation
22   with Phil pertaining to what title that -- it was more
23   regarding information that I would be sending to Jeff now
24   that was, up until then, confidential.
25        Q      Okay.  So you more spoke about the function
```

1    rather than the title?

2        A    Yes.

3        Q    And did Mr. Kinsley contradict anything at

4    that time that Mr. Mazzaro told you --

5        A    No.

6        Q    -- about his new function?

7        A    No.

8        Q    Are you generally familiar with the job

9    functions of a sales representative for Dooney & Bourke?

10       A    Yes.

11       Q    Can you please describe them for me.

12       A    Their job would be to work with the buying

13    office for that particular account, maintaining a sales

14    budget and receipt plan given to them by that account,

15    and maximizing sales and profits for the company.

16       Q    Is that true for all Dooney & Bourke sales

17    reps?

18       A    Sure, yes.

19       Q    To focus in specifically, are you familiar

20    with the job functions that were performed by Lynn Andrus

21    when she was employed by Dooney & Bourke?

22       A    Yes.

23       Q    And she had the same functions that you just

24    described for us today when she was employed as a sales

25    rep at Dooney & Bourke, correct?

```
 1        A        Correct.

 2        Q        Are you, sir, generally familiar with the

 3   commission rates of each sales rep at Dooney & Bourke

 4   during your time there?

 5        A        Yes.

 6                 MR. AUXIER:  Again, except for one

 7           document, Dan, I apologize, since I never know what

 8           I'm going to use right now, I don't have extra

 9           copies, but I'll give you time to review it as we

10           go.

11                 Why don't we mark this as 1, please.

12                 (Whereupon, the document with Bates no. Dooney

13   18599 was marked as Plaintiff's Exhibit 1 for

14   identification.)

15        Q        I show you, sir, what's been marked as

16   Plaintiff's Exhibit 1.  Do you know as you sit here what

17   that document is purporting to show?

18        A        Yes.

19        Q        What is that?

20        A        Various rep numbers, rep names, and

21   corresponding commission rates for those specific rep

22   numbers.

23        Q        First of all, what's a rep number, for the

24   record?

25        A        It's just a numerical equivalent of the rep's
```

```
 1        A      Yes.

 2        Q      Do you know what accounts Mr. Ray handles

 3   currently?

 4        A      Yes.

 5        Q      Which accounts are those?

 6        A      MMSC; Disney; Klear West, spelled with a K;

 7   and various other smaller accounts.

 8        Q      Fair enough.

 9               Referring to Exhibit 2, Mr. Ray is also on

10   that list as well, correct?

11        A      Yes.

12        Q      Okay.  And his rate on that list is -- excuse

13   me.  What's his default rate?

14        A      3.5 percent.

15        Q      Are there any exceptions to that?

16        A      Not on this list.

17        Q      Do you know of any exceptions that would apply

18   today?

19        A      As of today, I don't know.

20        Q      Do you know of any exceptions where he earned

21   a lower or higher commission in his time at Dooney &

22   Bourke?

23        A      Lower than the default rate?

24        Q      Yes.

25        A      No.
```

1        Q       I want to talk about Bob Goodwyn, who's also

2    on Plaintiff's Exhibit 2, which you can refer to if you

3    need to.

4                What is his default rate?

5        A       3.5 percent.

6        Q       There is an exception noted there.  Can you

7    tell us, for the record, what that exception is?

8        A       Dillards 2.5 percent.

9        Q       Please tell us what that means, Dillards 2.5

10   percent.

11       A       That -- this would mean that on any account

12   that rep number 14 was on that did not have rep 14 on the

13   exception report, he would earn 3.5 percent.  If there

14   was an account listed on the AS-400 in the exception

15   table with rep 14, the 2.5 percent would override 3.5

16   percent.

17       Q       Let me try and state it another way.  If I'm

18   wrong, tell me.

19                If he made a sale to a Dillards' buyer, that

20   he would earn 2.5 percent commission on that, correct?

21   That would be Bob Goodwyn, who's salesperson 14.

22       A       Correct.

23       Q       On all other commissions he would earn 3.5

24   percent, correct?

25       A       Correct.

```
1        Q        Okay.   Jeff Mazzaro, who we've spoken about

2    today, is also reflected on Exhibit 2, correct?

3        A        Correct.

4        Q        For the record, can you please tell us what

5    his rep number is.

6        A        18.

7        Q        What is his default rate?

8        A        3.5 percent.

9        Q        There are no exceptions listed on that form;

10   is that correct?

11       A        That's correct.

12       Q        Do you know of any exceptions that would apply

13   to his current accounts?

14       A        No.

15       Q        And I have the same question for Ron Moholt.

16   Ron Moholt is on this --

17       A        Can I go back to the last answer?

18       Q        Yes.

19       A        You said on his current accounts.

20       Q        Yes.

21       A        This is not reflecting the current situation

22   with Macy's.  He does not earn 3.5 percent on that

23   account.

24       Q        Okay.   What is the current situation with

25   Macy's with respect to his earned commissions?
```

Campano & Associates
Court Reporting Services

1    A    I just want to go back.  When you said

2    current, it's like -- I don't know really what's current.

3    I can tell you what was as of --

4    Q    Fair enough.

5    A    -- December 2013.

6    Q    Let's say as of December 2013, what was his --

7    A    He earned 1.65 percent commission on Macy's.

8    Q    As of the last information you have, was there

9    any other exceptions for Mr. Mazzaro?

10   A    Not to my knowledge.

11   Q    Okay.  In March 2012, were there any

12   exceptions to his default rate?

13   A    Just the Macy's.

14   Q    That was in effect in March of 2012?

15   A    Yes.

16        MR. SCHWARTZ:  I'm sorry.  Can you read

17   back the last question and answer.

18        (Whereupon, the requested testimony was read.)

19        MR. SCHWARTZ:  Thank you.

20   Q    Now I want to go back to Ron Moholt.  His rep

21   number is 32, correct?

22   A    Yes.

23   Q    What was his default rate?

24   A    3.5 percent.

25   Q    Can you tell us the exceptions that are noted

1             MR. SCHWARTZ:  Object to the form.  I

2      think you reversed what he said happened.

3             I thought you said it went from .25 to

4      .30.

5      A      In March of 2012 her rate was .30, not .25.

6      Q      Do you know why it went from .25 to .3?

7      A      So that she would earn more commission

8  dollars.

9      Q      Do you know why Dooney & Bourke decided to

10  allow her to earn more commission dollars?

11     A      I don't know why.

12     Q      Who generally decides what commission each rep

13  is going to earn, if you know?

14     A      I don't know specifically.

15     Q      Are you ever involved in negotiation or

16  setting of rates for sales reps?

17     A      Negotiations, no.

18     Q      What about the setting of them?  Are you

19  involved in that?

20     A      Setting of them, meaning do I help implement

21  after?

22     Q      No.  I'm being unclear.  I mean deciding which

23  rep earns what commission.

24     A      No.

25     Q      I just want to talk about another rep.  This

1    would be Bill Tripodi.  According to Exhibit 2 is sales

2    rep number 33; is that correct?

3        A    Correct.

4        Q    What is his default rate?

5        A    3.5.

6        Q    There are exceptions there.  Can you please

7    tell us for the record what those are.

8        A    Nordstroms 5 percent, Macy's 2 percent, Zappos

9    2.5 percent.

10       Q    In March of 2012, were those same exceptions

11   in effect?

12       A    No.

13       Q    What were the exceptions in March of 2012 for

14   Bill Tripodi?

15       A    He was not on at Macy's at 2 percent.

16       Q    Was he on Macy's at any percent?

17       A    No.

18       Q    When was Bill Tripodi first put on Macy's, if

19   you know?

20       A    It was one of his first accounts, I think,

21   back when he was first hired.

22       Q    When was he removed from Macy's?

23       A    When all the consolidation happened in 2008,

24   thereabouts.

25                    MR. AUXIER:  Mark this as 3 and the other

1   for Ron Moholt.

2       A      Nordstroms 5 percent, Macy's 2 percent.

3       Q      Was that true in March of 2012?

4       A      No.

5       Q      What were his exceptions in March of 2012, if

6   you can recall?

7       A      He was not on at Macy's at 2 percent in March

8   of 2012.

9       Q      Do you know what rate he was on Macy's, if

10  any?

11      A      He wasn't on any.

12      Q      Any other differences between that report and

13  the March of 2012?

14      A      Kristen Charmoz's rate was not .25 in March of

15  2012.

16      Q      What was it?

17      A      .3.

18      Q      I'm sorry?

19      A      .25.  It's essentially one quarter of 1

20  percent listed on here.

21      Q      Do you know why that change went into effect

22  after March of 2012?

23      A      Do I know why it went into effect after March?

24      Q      Let me rephrase it.  Do you know why her rate

25  was changed from .3 to .25?

1      one as 4.

2                    (Whereupon, the document with Bates no. Dooney

3      18657 was marked as Plaintiff's Exhibit 3 for

4      identification.)

5                    (Whereupon, the document with Bates no. Dooney

6      18658 was marked as Plaintiff's Exhibit 4 for

7      identification.)

8          Q      Before we move on, the information that's

9      contained in Plaintiff's Exhibit 1, to the best of your

10     recollection, that information is true and accurate for

11     the time frame that we discussed?

12                    MR. SCHWARTZ:  I'm just going to object

13          to the form.  I'm not sure a time frame was

14          discussed.

15         A      Right.  I'm not sure what time frame.

16         Q      Okay.  For Exhibit 1, it was before the 2007?

17         A      Yes.

18         Q      So it's accurate, to the best of your

19     knowledge?

20         A      Yes.

21         Q      Same question for Exhibit 2 --

22                    MR. SCHWARTZ:  I just have to object to

23          the form of the question, time frame.  If you're

24          saying that that was accurate as of sometime before

25          2007, but we don't know when before 2007 it was

1          accurate, that's fine.  But my understanding,

2          that's all the testimony is, it was sometime before

3          2007, he doesn't know when.

4                    MR. AUXIER:  Okay.  That's fine.

5      Q      Again, for Exhibit 2, the information that's

6  on that document is accurate, other than the exceptions

7  we noted and the changes we noted?

8                    MR. SCHWARTZ:  It was accurate at some

9          point in time, but he can't tell you when exactly

10          that point in time was that it was accurate.

11      Q      When you input the information, was it

12  accurate when you put it in?

13      A      Yes.  At the time I input this information it

14  was the current plan that was in place.

15      Q      In March of 2012, were the default rates

16  different?  With the exception of Lynn Andrus.  Strike

17  that, no.

18                In February 2012 were those default rates

19  accurate?

20      A      Rep number 94, Mairead Ainley, was not on at 1

21  percent anymore.

22      Q      What was her rate in February of 2012?

23      A      She was not earning any commissions on any

24  accounts at that point.

25      Q      When did she begin to earn commissions on

1    accounts?

2         A    I don't recall it specifically.  It would have

3    been on or about 2004/'5.

4         Q    When did she stop earning commissions on

5    accounts?

6         A    2008.

7         Q    Do you know why she stopped earning

8    commissions?

9         A    I do not.

10        Q    I'll show you what's been marked as Exhibits 3

11   and 4.  You can read them over.  But the question I'm

12   going to ask you is:  Does that help your recollection as

13   to when the consolidations occurred at Macy's and

14   Nordstroms?

15        A    Yes.

16        Q    When, approximately, when did those

17   consolidations occur?  Let say at Macy's.

18        A    According to this e-mail, March of 2008.

19        Q    The e-mail was from you.  Do you recall typing

20   the e-mail, sir, the parts that you typed, in 3 and 4?

21        A    Yes.

22        Q    Also, is this the time frame in which

23   Nordstroms consolidated?

24        A    Yes.

25        Q    Prior to the consolidation, who were -- which

1          A       Not that I know of.

2          Q       Did Bob Goodwyn ever earn commission for sales

3     of product to Nordstrom from Dooney & Bourke?

4          A       Not that I'm aware of.

5          Q       Do you know of any compensation they may have

6     earned in their role in overseeing the Nordstrom account?

7          A       No.

8                  (Whereupon, the document with Bates nos.

9     Dooney 20202 through 20289 was marked as Plaintiff's

10    Exhibit 5 for identification.)

11         Q       It's a very long document, Mr. Andrus.

12                 Can you tell me generally, it says at the top,

13    Dooney & Bourke Commissions Paid; is that correct?

14         A       Yes.

15         Q       Do you know generally what these documents

16    are?

17         A       Yes.

18         Q       What are they, sir?

19         A       These were the computer-generated printouts of

20    commissions paid by month for the particular rep.

21         Q       Did you generate these reports?

22         A       No.

23         Q       Who generates these reports, if you know?

24         A       These were the ones that were automatically

25    generated by the AS-400 system.

1    would you characterize --

2         A    Same.

3         Q    Top two?

4         A    Probably.

5         Q    Who would be the other part of that two, top

6    two?

7         A    Bob Goodwyn or possibly Sue Clifton, with QVC.

8         Q    Did Sue Clifton have responsibility for any

9    other accounts other than QVC in 2011, that you know of?

10        A    I don't think she did.

11        Q    Now, would your opinion change if you factored

12   in credits in 2011?

13        A    You had asked on net shipments, so credits

14   were already factored into that.

15        Q    Sorry.  You're right.

16             MR. AUXIER:  Off the record for a second.

17             (Discussion held off the record.)

18             MR. AUXIER:  Back on the record.

19        Q    What about 2010, for net shipments, how would

20   you characterize, if you can, Lynn Andrus's performance?

21        A    Same.  Always.  The sheer volume of her

22   accounts was always, always in the top tier.

23        Q    And did Bob Goodwyn have the same measure of

24   success in 2010?

25        A    I don't -- I can't recall why it would be any

93

1    might have been working there during this time

2    frame.  I'm not sure who it was at this point.

3        Q.    You said you didn't recognize any of

4    these specific documents but you recognize the form.

5    How do you know Lynn had anything to do with any of

6    these?

7        A.    I don't know that I do, other than the

8    fact that her name is on here.

9        Q.    Her typewritten name?

10       A.    Yes.

11       Q.    Is there anything that indicates to you

12   that Lynn was actually involved with any of these

13   returns?

14       A.    Not that's on this form, other than the

15   fact her name is on it.

16       Q.    And you do or don't have any specific

17   recollection of any of these returns based on the

18   date and further review of these documents?

19       A.    I don't recall these or this time frame

20   specifically, no.

21       Q.    All three of these documents appear to

22   be from Nordstrom, correct?

23       A.    Yes.

24       Q.    Returns that Nordstrom requests of

25   Dooney & Bourke?

1      A.      Yes.

2      Q.      Do you recognize any of the reasons for

3   return, what they mean, the entries in that section?

4      A.      Yes.

5      Q.      Do you recognize what the reason for

6   return entry means on Exhibit No. 4?

7      A.      No. 4 is 50, accommodation return.

8      Q.      I wanted to point you to a little higher

9   up and further to the right where it says "reason

10  for return."

11     A.      Slow-selling styles, do not mark styles

12  down.

13     Q.      What does that mean?

14     A.      I would assume that this is something

15  that we talked about earlier, that if this was a

16  style that wasn't moving and that somewhere along

17  the line a decision was made not to authorize or

18  support, if you will, a markdown that Dooney &

19  Bourke would probably be better off taking this item

20  back.

21     Q.      So was Exhibit No. 4 done in connection

22  with a markdown cancel?

23     A.      Not necessarily.  I don't know that this

24  item was currently on markdown.  It only says here

25  that it's a slow-selling style.  So in this case,

```
 1         Q       I'm sorry.  In between Sobotka and Moholt was
 2    Fenton.  Who's Fenton?
 3         A       That was a team between Larry and Janice
 4    Fenton, a husband and wife team.
 5         Q       They were also paid 5 percent?
 6         A       According to this, yes.
 7         Q       That 5 percent commission rate was paid
 8    regardless whether it was Janice Fenton who was
 9    responsible for the sale or Larry Fenton who was
10    responsible for the sale?
11         A       Yeah.  There would be no way of knowing who
12    was responsible for the sale, but, yes.
13         Q       Could you then look at Plaintiff's Exhibit 2.
14    Am I correct in understanding that this is a chart of
15    commission rates that was in place sometime -- occurred
16    sometime in or around 2008?
17         A       Yeah, but I -- this would have had to have
18    been before the mergers because there's no exceptions for
19    any of the Macy's accounts on here.  So this was
20    definitely earlier than 2008.
21         Q       This was earlier than 2008?
22         A       Yes.
23         Q       Okay.  Well, this lists a default rate for
24    Mr. Goodwyn and Mr. Mazzaro of 3 and a half percent,
25    correct?
```