# EXHIBIT I

1

1    UNITED STATES DISTRICT COURT
2         DISTRICT OF CONNECTICUT
3
4  * * * * * * * * * * * *
                          *
5  LYNN ANDRUS,           *
   an individual,         *    COPY
6                         *
          Plaintiff,      *
7                         *
       VS.                *    Civil Action No.
8                         *    3:13CV146(RNC)
   DOONEY & BOURKE, INC.  *
9  and PETER DOONEY,      *
                          *
10         Defendant.     *
                          *
11 * * * * * * * * * * * *
12                             Stamford, CT
13                             June 11, 2014
14                             10:10 a.m.
15                - - -

       DEPOSITION OF JEFFREY J. MAZZARO
16                - - -
17 APPEARANCES:
18
       FOR THE PLAINTIFF:
19
20         HALLORAN & SAGE, LLP
           BY:  TIMOTHY J. McGUIRE, ESQUIRE
21             315 Post Road West
               Westport, CT  06880
22             Phone:  (203) 227-2855
               Fax:  (203) 227-6992
23             Mcguire@halloran-sage.com
24
25             - Cont'd -

2

```
1    FOR THE DEPONENT:
2         BY:  O'ROURKE & ASSOCIATES, LLC
               BRENDAN J. O'ROURKE, ESQUIRE
3              27 Pine Street
               New Canaan, CT 06840
4              Phone:  (203) 966-6664
               Brendan@orourkeandassoc.com
5
6    FOR THE DEFENDANT:
7         BY:  THOMAS J. McANDREW, ESQUIRE
               One Turks Head Place, Suite 205
8              Providence, RI  02903
               Phone:  (401) 455-0350
9              Fax:  (401) 455-0882
               Tmcandrew@tjmcandrewlaw.com
10
11                 - and -
12        DAY PITNEY, LLP
          BY:  DANIEL L. SCHWARTZ, ESQUIRE
13             One Canterbury Green
               Stamford, CT 06901
14             Phone:  (203) 977-7536
               Fax:  (203) 399-5899
15             Dlschwartz@daypitney.com
16
     ALSO PRESENT:  PHIL KINSLEY
17                  DOONEY & BOURKE, INC.
18                  LYNN ANDRUS
19
20
21
22
23
24
25
```

3

1

2

3

4

5

6

7          Deposition of JEFFREY J. MAZZARO, the

8    witness herein, taken on behalf of the plaintiff

9    herein, for the purpose of discovery and for use

10   as evidence in this cause, pending in the United

11   States District Court for the District of

12   Connecticut, pursuant to Notice, before Matina

13   Papas, RPR, Licensed Shorthand Reporter, No.

14   00489, and a Notary Public within and for the

15   State of Connecticut, at the offices of Day

16   Pitney, LLP, One Canterbury Green, Stamford,

17   Connecticut, on the 11th day of June, 2014 at

18   10:10 a.m., at which time counsel appeared as

19   hereinbefore set forth . . .

20

21

22

23

24

25

16

1      A.      Right.  No, not specific names.  I don't

2  believe there was a name mentioned in the e-mail.

3  It was more about the overall structure of how

4  commissions would be paid going forward.

5                  MR. McGUIRE:  I guess if we are

6  going to get this document at lunch, it's silly to

7  ask the questions now.

8                  MR. O'ROURKE:  Yeah.

9      Q.      (By Mr. McGuire)  So is it your

10  testimony that in your possession or something that

11  you have ready access to there is only one e-mail

12  that regards Lynn Andrus, return policies for Dooney

13  & Bourke products, your individual commissions from

14  Dooney & Bourke, your position as director of

15  wholesale accounts and any materials related to this

16  above-captioned lawsuit?  You only have one document

17  that's responsive to all of those items?

18      A.      What I did was search my e-mail for

19  "commissions."  Whatever I came up with, I came up

20  with.  E-mails are e-mails.  If they exist, they

21  don't exist with me.

22      Q.      You don't have any e-mails that mention

23  Lynn Andrus, other than this one commission e-mail?

24      A.      Oh, I've got -- Lynn and I were

25  connected at the hip for years, so I couldn't even

17

1   put a number on the number that there would be.

2       Q.      Is there a reason that you didn't

3   produce those e-mails today?

4       A.      Just, I would say, time.

5       Q.      Lack of time?

6       A.      I would say lack of time, yeah.  I did

7   the best that I could as far as searching certain,

8   what I consider with the limited knowledge that I

9   have to be able to go back and search things, I

10  searched things for any number of topics, and if I

11  found something that said "commission" in it, then I

12  provided it.

13      Q.      You don't have any e-mails that deal

14  with the return policies for Dooney & Bourke

15  product?

16      A.      I don't know that we have a specific

17  return policy, per se.

18      Q.      When you say "we," you mean Dooney &

19  Bourke?

20      A.      I am saying me, personally, I don't have

21  possession of anything that would be -- you know,

22  that it was directed at me, specifically, saying

23  that this is the return policy.

24      Q.      You don't have any e-mails that deal

25  with your commissions from Dooney & Bourke?

26

1   president of Jeffrey J. Mazzaro and Associates.  Are

2   those two interrelated positions?

3       A.      Yes.

4       Q.      As president of Jeffrey J. Mazzaro and

5   Associates, do you perform any duties that aren't in

6   furtherance of your position as an independent sales

7   rep?

8       A.      I'm not sure I understand the question.

9       Q.      As the president of Jeffrey J. Mazzaro

10  and Associates, do you do anything other than act as

11  an independent sales rep for Dooney & Bourke?

12      A.      No.

13      Q.      Does Jeffrey J. Mazzaro and Associates

14  have any other -- strike that.

15          Does Jeffrey J. Mazzaro and Associates act as an

16  independent sales rep for any companies other than Dooney

17  & Bourke?

18      A.      No.

19      Q.      Has the company ever acted as an

20  independent sales rep for any company other than

21  Dooney & Bourke?

22      A.      Yes.

23      Q.      When was the last time it did that?

24      A.      I wouldn't have a specific year.

25      Q.      In the past five?

29

1      A.      Well, again, I would say I live

2  day-to-day with Dooney & Bourke, so, yes, I would

3  say that I consider it.   You have to keep your

4  options open as you move through life.   But there

5  are no plans to sell anything else, but, you know,

6  there are -- certainly in this world you get

7  approached and asked, and so, yeah, there's always

8  considerations.

9      Q.      You said that you live day-to-day with

10  Dooney & Bourke.   You said that when I asked you a

11  question about whether there was a contract between

12  Dooney & Bourke and Jeffrey J. Mazzaro and

13  Associates.

14            Are there any agreements as to what will

15  govern the terms of your relationship, whether they

16  are spoken verbal or otherwise?

17      A.      I would say verbal.

18      Q.      So what is that agreement that Dooney &

19  Bourke and Jeffrey J. Mazzaro and Associates have?

20  What's the relationship?

21      A.      The relationship is virtually by

22  account.   There are commission rates assigned that

23  roll to a total, that if I'm happy with the total,

24  we proceed.   At any time that I feel like it's not

25  fair or not right for me as an independent

30

1   contractor, I have the ability to renegotiate where

2   I stand.  At any given time that I am not satisfied

3   with that, I am free to walk out that door and not

4   look back.

5          The flip side of that agreement, in my

6   mind, because it's strictly verbal or an

7   understanding or a handshake or whatever you would

8   like to call, is that he could also show me the door

9   at any day.  And I would say, Thank you very much

10  for the opportunity; you made my life better.  Then

11  I would move on with my life.

12     Q.     Do you actually negotiate the commission

13  rates that Jeffrey J. Mazzaro and Associates

14  receives on the different Dooney & Bourke accounts

15  or are they dictated to you?

16     A.     No, they are negotiated.

17     Q.     Who does the company negotiate with?

18     A.     Generally, Phil Kinsley.

19     Q.     How many accounts does Jeffrey J.

20  Mazzaro and Associates currently work on with Dooney

21  & Bourke?

22     A.     That I am earning commission on?

23     Q.     Yes.

24     A.     I can name them.  I can't tell you the

25  number.  I have to add them up as we go.  I have --

1   right now I earn commission at some level with

2   Macy's, Dillards, Belk, Bon-Ton, Boscov's, Lord &

3   Taylor, Von Maur, and then various specialty stores

4   and golf shops.

5                       MR. O'ROURKE:   What about Nord --

6       Q.      Do you not work on the Nordstrom --

7       A.      And Nordstrom.  And there may be

8   somebody else in there.  How many is that?

9       Q.      That's eight stores and then the various

10  specialty stores?

11      A.      Mm-hmm.

12      Q.      When you say specialty stores, my

13  understanding is that the specialty stores are the

14  smaller stores, the smaller chains; is that what you

15  meant by that?

16      A.      Yes.

17      Q.      And then the ones that you named -- the

18  stores that you gave the names of those, are the

19  bigger --

20      A.      Major or mid-level department stores.

21      Q.      How many of these stores was the company

22  working with as of first quarter 2012, if any?

23                      MR. SCHWARTZ:   Object to the form

24  of the question.  Just a clarification, are you

25  asking him if he worked on or that his company

32

 1    worked on?  I didn't understand what you meant by

 2    the company, I'm sorry.

 3         Q.      (By Mr. McGuire)  That you worked on.

 4         A.      Jeffrey Mazzaro and Associates, which

 5    drills down to me.

 6         Q.      Yes.

 7         A.      That I was earning commission on in

 8    2012?  Macy's, Bon-Ton, Von Maur and specialty and

 9    golf shops.

10         Q.      When did you start working on -- I'm

11    sorry, strike that.

12              When did you start earning commission on Dillards?

13         A.      April of 2014.

14         Q.      How about Belk?

15         A.      April of 2014.

16         Q.      How about Boscov's?

17         A.      April 2014.

18         Q.      How about Lord & Taylor?

19         A.      April 2014.

20         Q.      Nordstrom?

21         A.      April 2014.

22         Q.      Did your earning any commissions on

23    these accounts have anything to do with Dooney &

24    Bourke hiring Rico Trevino?  Did it coincide with

25    the hiring of Rico Trevino?

46

1    Associates to expand the product line and move into

2    other brands?

3        A.      Over the years, yes.

4        Q.      Have there been any in the past five

5    years?

6        A.      No.

7        Q.      Do you have a title at Dooney & Bourke?

8        A.      No.

9        Q.      Director of wholesale accounts, does

10   that ring a bell?

11       A.      That certainly rings a bell, yes.

12       Q.      Why does that ring a bell?  How do you

13   not have a title but then a title rings a bell?

14       A.      I think, first of all, you have to

15   understand the hierarchy of Dooney & Bourke in that

16   there are no titles and things just evolve.

17              As we became more of a corporate,

18   meaning Bob and myself, a corporate structure and

19   going into, say, a major Macy's meeting where there

20   was upper-level management and you sit across the

21   table, much like this, and the first thing is

22   somebody says, What's your title? or What do you do?

23   Well, I am President of the Jeffrey J. Mazzaro and

24   Associates, Inc. and Mr. Goodwyn is president of

25   Goodwyn & Goodwyn, Inc.  What does that have to do

47

1   with the handbag world that we are talking about

2   here today?

3           So through a series of time, which I

4   can't recall what the time was, I specifically

5   remember having a conversation with Peter Dooney

6   that said along the lines of, Look, we are going to

7   these major meetings, we are trying to represent

8   different levels of participation here between

9   Goodwyn and Mazzaro and the first questions we are

10  being asked are, What are your titles?

11          And in a tongue in cheek way, he said, I

12  don't care what you call yourself; make up whatever

13  you want.  As long as it doesn't cost me anymore

14  money, you can call yourself whatever you want.

15      Q.      And is --

16      A.      In turn, whatever I made up, you tell

17  me, at the time, seemed appropriate based on the

18  duties that I was providing or services I was

19  providing of what my role became.  I'm certainly not

20  paid for that position.  It was more of being able

21  to introduce myself as something.

22      Q.      You are paid by Dooney & Bourke, though?

23      A.      Well, Jeffrey J. Mazzaro and Associates

24  is paid by Dooney & Bourke.  I am paid by Jeffrey J.

25  Mazzaro and Associates, Inc.

48

1    Q.      You mentioned the evolution of the

2    corporate structure having something to do with the

3    creation of that title.   How did the corporate

4    structure evolve?   Was that the corporate structure

5    of Dooney & Bourke?   With your company?   Bob's

6    company?

7    A.      Within mine and Bob's company.   And the

8    evolution, I would say, of Dooney & Bourke or as

9    people were hired or left the company for whatever

10   reason, the company being Dooney & Bourke, you know,

11   names come to mind of Tom Bendheim to Gary Denbart,

12   to most recently Jim Leamy.   It was really post Jim

13   Leamy.   As Jim Leamy left, there left a void of that

14   separation that we had.

15          In a conversation with Phil Kinsley

16   after that time, it really centered around different

17   aspects that I felt like I did well and that I could

18   offer my services to him and, ultimately, said I

19   would look out for certain financial or look over

20   from reps or whatever certain financial things and

21   basically give my recommendation to Phil or whoever

22   needed to be informed, give my recommendations,

23   whether I thought it was good deal for them or not.

24   Q.      So you --

25   A.      And that just kind of evolved into.

51

1    look at, recommend, as an example.  Some of those

2    things go on to this day with no compensation.

3       Q.    What sort of things would people ask you

4    to review?

5       A.    Markdown assistance, dollars, returns,

6    sales plans.

7       Q.    And they would ask for you to review

8    them and what's the next step?

9       A.    I would give my advice.

10       Q.    And in what way?

11       A.    Usually through a conversation.

12       Q.    Can you give me a specific example of

13    sometime that somebody from Dooney & Bourke went to

14    you and asked you to review something and you gave

15    your advice?

16       A.    Well, I would be given a list of

17    financial plans, say, to a Dillards and review the

18    financial plan of Dillards, see what the markdowns

19    wrote up to as a percent of sales, look at the

20    receipts, gross receipts, markdown rates, return

21    rates, advertising rates, and, ultimately, concluded

22    what I felt -- personally, what I felt was a fair

23    representation or a percent of these things should

24    total up to be broken into certain buckets,

25    advertising, markdowns, returns.

52

1          And as a quick acid test, if somebody

2    said, Hey, Dillards wants $30,000 for an ad, I might

3    say, How much have you given them already?  I've

4    given them 90,000.  So now we are at $120,000

5    divided into their receipts of X equal 4 percent.

6    That's too high.  We have goaled ourselves as

7    independent sales reps to about 2 percent.  So

8    things along that nature.

9          Same with markdowns.  If I want

10   markdowns to be with my accounts 6 percent or

11   7 percent of markdown assistance given and somebody

12   asked me for something that was significantly higher

13   than that, then I would make a comment that that

14   seems high to me.

15   Q.      And would that comment be binding?

16   Would the person do what you said?  Or would it be,

17   like you said before, a conversation that you would

18   have?

19   A.      I wouldn't consider it binding.

20   Q.      Who would you have these types of

21   conversations with?

22   A.      I would have them with the sales reps.

23   I would have them with Phil Kinsley.  I would have

24   them with Peter, Bob.

25   Q.      When you say you would have them with

57

1   account?

2       A.      According.to this, yes.

3       Q.      Did somebody else create this account or

4   did you create this account?

5       A.      I would assume that I did.

6       Q.      And this document appeared -- I can

7   represent to you that it is a printout from

8   LinkedIn.com of an account for Jeff Mazzaro.

9           Is your title -- is your current title

10  president at Jeffrey J. Mazzaro and Associates?

11      A.      Yes.

12      Q.      Have you been the director of wholesale

13  accounts for Dooney & Bourke from January of 2009

14  through the present?

15      A.      I would assume that this date and year

16  on here would put into perspective the question you

17  asked earlier, which was when did this take place.

18  So I am going to say, yes.

19      Q.      So --

20      A.      The time that I appointed myself to that

21  position, I am going to assume was January of 2009.

22      Q.      Do you hold yourself out to others as

23  the director of wholesale accounts at Dooney &

24  Bourke?

25      A.      To people within the industry, for

58

1    reasons that we already stated, I would say, yes,

2    that's what I held myself out as.

3        Q.    To the best of your knowledge, does Bob

4    Goodwyn hold himself out as an executive at Dooney &

5    Bourke?

6        A.    I believe during the same time frame, he

7    probably calls himself something.  I'm not sure what

8    it is.

9        Q.    Have you overheard the term "executive

10   vice president of sales"?

11       A.    Yes.

12       Q.    Is that the position that Bob Goodwyn

13   holds himself out to others?

14       A.    I don't know.  You have to ask him.

15       Q.    Have you ever heard himself hold himself

16   out as a Dooney & Bourke executive to anybody in the

17   retail industry?

18       A.    I would say in the context of what I've

19   already described, yes.

20       Q.    Meetings with executives at Dooney &

21   Bourke, customer meetings?

22       A.    Yes.

23       Q.    Do you have any business cards?

24       A.    Yes.

25       Q.    Do you have your business cards here

59

1    with you today?

2        A.      No.

3        Q.      What do your business cards say?

4        A.      Pretty much what's on here.  I've got

5    two sets: Jeffrey J. Mazzaro and Associates, Inc.

6    with my name and everything on here; and then if I

7    need for the purpose that we talked about earlier

8    here I also have another one that I would use in the

9    context of a meeting when everybody sits down and

10   starts asking what you do or do you have a card.

11       Q.      That second set, is that a Dooney &

12   Bourke set?

13       A.      That's a set that I made from Jeffrey J.

14   Mazzaro and Associates, Inc.  Dooney & Bourke didn't

15   give me a business card.

16       Q.      But does the card say "Dooney & Bourke"?

17       A.      Yes.

18       Q.      Does the card say that Jeffrey J.

19   Mazzaro is the director of wholesale accounts at

20   Dooney & Bourke?

21       A.      Yes.

22       Q.      Does it have a Dooney & Bourke.com

23   e-mail address on it?

24       A.      JMazzaro@Dooney.com, yes.

25       Q.      Does it have a phone number on it?

82

1    quarter 2012?  Or both?

2        A.    I would say in the early part of 2012,

3    it was starting to get to that.  I don't recall

4    exactly what the time frame was.

5        Q.    So as of first quarter 2012, who were

6    the people that were more involved?  You said --

7        A.    The day-to-day operation was Lynn, Bill

8    Tripody and Ron Moholt.

9        Q.    Do you recall any -- strike that.

10           What do you understand of an RTV or return to

11   vendor to be?

12       A.    Generally, it's slow moving product or

13   something that I would deem I need to get out of the

14   store to open up dollars to bring fresh product in

15   that would sell better faster at a more lucrative

16   margin.

17       Q.    Is it fair to say that it's when a

18   retail store returns a bag to Dooney & Bourke that

19   they had previously purchased and Dooney & Bourke

20   refunds the money that the store had paid for that

21   bag?

22       A.    Yes.

23       Q.    Are RTVs or returns to vendor used as a

24   tool for Dooney & Bourke to -- strike that.

25           Are RTVs used as a tool for a store to achieve

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES

96

1      3U298?

2          A.      I can't say I remember exactly what it

3      is, but I am going to guess it's a cross-body.  Like

4      a triple zip is a 298 number.  3U I think might have

5      been Dylan.  I am not 100 percent.

6          Q.      Is a cross-body then a small purse?

7          A.      Yeah, it's a small bag.

8          Q.      So the reason codes that you pointed to

9      before, you said this was an accommodation return.

10     What is an accommodation return?

11         A.      An accommodation return would be that

12     there is not something particularly defective or

13     wrong with the bag.  In this case, someone noted on

14     here that it was slow-selling style.  So in order to

15     accommodate getting good product in to sell, you

16     might accommodate them by taking bad product out or

17     perceived bad product.

18         Q.      Which in turn helps the store maintain

19     their stock levels?

20         A.      Yes, I don't think any of us, whether

21     it's the rep, Dooney & Bourke or the department

22     store wants product sitting on the floor that's not

23     selling.  It's just taking up space and dollars.

24         Q.      So next to where it says, "accommodation

25     returns", it says "approved signature required".

103

1    travel for you to get here?

2         A.    I did.

3         Q.    And you flew from Cincinnati?

4         A.    I did.

5         Q.    To where?

6         A.    LaGuardia.

7         Q.    When did you do that?

8         A.    Yesterday.

9         Q.    You weren't -- were you out here last

10   week?

11        A.    I was here last week, yes.

12        Q.    And was that in connection with market

13   week meeting?

14        A.    We had a Macy's meeting and then an

15   event to attend here on the East Coast on Friday, so

16   the meetings were Thursday, Friday with preparations

17   on Wednesday.

18        Q.    And then you went back to Cincinnati and

19   came back today?

20        A.    Yes.

21        Q.    Do you have any expectation that Dooney

22   & Bourke is going to reimburse you for your travel

23   out here today?

24        A.    No.

25        Q.    Has Dooney & Bourke ever paid for any of

104

1   your travel costs?

2        A.      They have.

3        Q.      On how many occasions?

4        A.      I couldn't give you a specific number.

5   But if there are things that I do that would be

6   outside of the realm where I might earn income,

7   again, that would be something I would negotiate

8   with Phil generally ahead of time as I would do

9   certain things, but I am not going to go backwards

10  by doing it.

11       Q.      Is it a regular occurrence for Dooney &

12  Bourke to either pay for or reimburse you for travel

13  expenses?

14       A.      I would say, no, it's not a regular

15  occurrence.

16       Q.      How many times a year does Dooney &

17  Bourke pay for or reimburse your travel expense?

18       A.      Sometimes zero, sometimes more than

19  once.  It just depends on whatever a particular year

20  might bring.

21       Q.      Has it ever been over ten times?

22               MR. SCHWARTZ:  In a given year?

23       Q.      In a given year.

24       A.      No, I wouldn't think so.  Ten seems like

25  a lot.

110

1  working with Macy's together.

2          As the West Coast merged into one Macy's

3  division in New York, Kristen had been working with

4  the West Coast group out of Norwalk and had a lot of

5  knowledge, and, ultimately, she helped put a lot of

6  the forms and things together that we used on a

7  regular basis.

8          And then after Lynn left, it was just

9  something that evolved into her becoming more

10  involved with it and picking up a lot of that load.

11      Q.      Were you working with Lynn Andrus on a

12  daily basis in 2012 before she was terminated?

13      A.      Yes.

14      Q.      How about in 2011?

15      A.      Yes.

16      Q.      2010?

17      A.      Yes.

18      Q.      2009?

19      A.      I believe 2009, yes.

20      Q.      2008?

21      A.      I don't recall exactly when the Macy's

22  merger took place when my stores came East.  It was

23  right around that time at some point.  We certainly

24  worked together and communicated almost daily before

25  that.  But then once the Macy's team or the Macy's

111

1    stores merged, then it became ultimately we were

2    connected at the hip daily.

3         Q.    You are answering a lot of my questions

4    before I ask them.  My next question was going to be

5    when were these consolidations you talked about

6    earlier?

7         A.    I don't really remember exactly.  I am

8    going to guess mid 2008 --

9         Q.    And --

10        A.    -- 2009, sometime in that time frame.

11        Q.    At that's the Macy's consolidation?

12        A.    Yes.

13        Q.    And that's a consolidation from how many

14   offices to how many offices?

15        A.    Well, as we lead up to that, there was a

16   lot of things going on in the marketplace, but the

17   major one at that time was that it became only

18   Macy's West, Macy's East and Macy's in Atlanta,

19   which was -- I can't even remember what they called

20   it, Central.  There were those three buying offices,

21   and they did away in my case with Macy's North and

22   Macy's Midwest.  They came East and merged into that

23   one office.

24              So at that time, we still had west.  And

25   the Atlanta came North.  So we had West, then East,

112

1    and then eventually, it became just one Macy's.

2    Time frame, I'm not exactly sure.

3         Q.       Time frame as in how long of a period

4    this took to take place?

5         A.       Overall, in this world, we had all this

6    consolidation going on.  So we went from, whether it

7    was Dillards, whether it was Macy's, whether it was

8    Bon-Ton, whether it was Belk, Mercantile, all of

9    these had individual buying offices that all of us

10   as independent reps serviced in one way, shape or

11   form.

12            As consolidation started to happen,

13   sometimes you won, sometimes you lost.  But each

14   step along the way, you could see that there were

15   becoming fewer and fewer players in this game.

16            Dillards bought a lot of Mercantile

17   stores.  Federated took over a lot of Mercantile

18   stores.  And a company that I poured my heart and

19   soul and cut my teeth in this business was now gone.

20   It didn't even exist.  It was in my hometown.  Gone.

21        Q.       So when you said sometime you win,

22   sometimes you lose, you lost Macy's West and Macy's

23   Northwest?

24        A.       I had Macy's North and I had Macy's

25   Midwest.  Those two divisions were consolidated into

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES

113

1   Macy's East --

2        Q.     And --

3        A.     -- which was based in New York City.

4        Q.     So you had worked on the Macy's account

5   up until that time that it happened, and then you no

6   longer had any buying offices in Macy's.  What

7   happened then?

8        A.     I had Macy's in Minneapolis.  I had

9   Macy's in St. Louis and I worked with Macy's in

10  Atlanta.  So I was involved in three divisions.  I

11  don't recall the total number of stores that that

12  encompassed, but a pretty good chunk of the Macy's

13  operation was under my watch.

14       Q.     So what happened when you lost Macy's

15  North and Macy's Midwest?

16       A.     Well, I didn't lose them.  They went

17  East.  And the conversation, ultimately, took place

18  between Peter and I, and he said, I think what I

19  would like to do is I would like to have you in

20  charge of Macy's and Bob Goodwyn in charge of

21  Dillards.  And for this, the negotiation started

22  really of what it was going to cost to do that.

23       Q.     So when this consolidation happened, you

24  don't recall when, it's your position that you took

25  over Macy's?

114

1    A.    Yes.

2    Q.    Do you recall when you took over Macy's?

3    A.    I don't remember the specific date, no.

4    Q.    Do you remember the year that you took

5    over Macy's?

6    A.    Not specifically.

7    Q.    Were there other people working on the

8    Macy's account?

9    A.    Yes.

10   Q.    At that time?

11   A.    Yes.

12   Q.    Who were they?

13   A.    Well, Lynn was in charge at that point

14   of Macy's East in New York City.

15   Q.    So when it was consolidated, Lynn was no

16   longer in charge of any Macy's account?

17   A.    Well, like I said, what Peter asked me

18   to do was to -- he made an offer to me that said,

19   You take all of Macy's; this is what I want to do.

20   Q.    So at that point, you became in charge

21   of Macy's, and Lynn was no longer in charge of

22   Macy's?

23   A.    I would say that's -- if that's the

24   phrase you want to use, yes.

25   Q.    I don't mean to be --

117

1    Q.       So Dooney & Bourke no longer pays

2    merchandisers on the Macy's account?

3    A.       They do in certain situations, but as a

4    rule, no.

5    Q.       What are these certain situations?

6    A.       Just like I described.  In this case, I

7    negotiated the deal that Dooney & Bourke would

8    continue to pay Herald Square Macy's merchandisers

9    just because it was part of the negotiations.

10   Q.       Is that the only store that Dooney &

11   Bourke pays for merchandisers to go into Macy's?

12   A.       No.

13   Q.       What other Macy's stores are there?

14   A.       Currently, Dooney & Bourke is paying

15   what we have determined to be brand managers in

16   these locations.  There are 20 of them.

17   Q.       How many locations are there?

18   A.       Twenty.

19   Q.       So each person has one location?

20   A.       Generally, each person has two

21   locations.  I would say there are 10 brand managers,

22   20 locations, and, quite honestly, it's something we

23   are in the middle of now negotiating who is going to

24   handle that going forward.

25   Q.       Does Jeffrey J. Mazzaro and Associates

119

1     Q.    Meaning, you were working on the

2  account, but you didn't receive a commission on the

3  account?

4     A.    I offered advice and listened and --

5     Q.    Did you travel to the Seattle buying

6  office in 2012?

7     A.    I don't recall specifically in 2012.  I

8  know there was a trip prior to that that I was

9  scheduled to go on that I didn't.  And I believe

10  probably in 2012 after Lynn left, I probably went

11  out there twice in 2012.

12     Q.    Did you ever go out before she left?

13     A.    No.  Actually, yes, I did.  I remember

14  Lynn and I sitting at a table together at Nordstrom

15  in Seattle.

16     Q.    And you weren't earning commissions on

17  this Nordstrom account at that time?

18     A.    That is correct.

19     Q.    Does Dooney & Bourke pay for any other

20  services that Jeffrey J. Mazzaro and Associates

21  benefits from?

22     A.    Not that I can think of.

23     Q.    Does Dooney & Bourke provide any IT

24  support for Jeffrey J. Mazzaro and Associates?

25     A.    Yes.

120

1    Q.      And in what form?

2    A.      I have a Dooney e-mail, which I would

3    argue that goes back to the same thing as the title

4    we discussed earlier.   It's a means of convenience

5    or credibility.   JMazzaro@Dooney.com is the e-mail

6    address.

7            And, of course, laptops that I've

8    purchased over the years, generally, I will have

9    somebody from Dooney & Bourke -- because of the

10   volume that they do, they can get a better deal -- I

11   will give them my credit card number.

12           But when you mention IT support, yeah, I

13   will use the little guy they've got working there

14   that helps me from time to time.

15   Q.      And the example in which you purchased a

16   laptop, does Dooney & Bourke load any of its

17   software onto that laptop for you?

18   A.      Yes.

19   Q.      Do they charge you for the use of that

20   software?

21   A.      Not that I am aware of.

22   Q.      Does Dooney & Bourke charge you for the

23   labor of actually installing the software?

24   A.      No, not that I am aware of.

25   Q.      Does Dooney & Bourke charge you for your

140

1   of Dillards and Belk and Nordstrom, as we took a

2   team approach, then as part of that negotiation, I

3   gave up a little more on Macy's.  The longer I sit

4   here and talk about it, the more I question doing

5   that, but.

6       Q.     Do you recall -- when you were earning

7   the approximately 2.85 percent on Macy's, do you

8   recall what percentage Lynn was earning, if you knew

9   or ever knew?

10      A.     It was roughly .30 or .35, but I

11  wouldn't swear to it.

12      Q.     What were Lynn's responsibilities on

13  that account at that time?

14      A.     I would term Lynn as day-to-day

15  operations.

16      Q.     What were your responsibilities?

17      A.     Same, maybe at a different level.  But

18  certainly, like I said earlier, we were connected at

19  the hip.

20      Q.     Why was Bob Goodwyn at a different level

21  than you, if you know?

22      A.     Well, I know specifically why.  I don't

23  think -- I know where I stand with Bob Goodwyn and I

24  don't consider him at a different level.  I know the

25  perception that we portray to our customers is that